**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*LAWRENCE MAYNARD* )
DC DC *#307469   DC JAIL* )
*1901 D STREET SE.* )
*WASHINGTON DC 2000*3 )
(Enter your full name, prison number
and address)

v.                                        (
                                          (

*STEPHANIE E SMITH, SPECIAL AGEN*
*FEDERAL BUREAU OF INVESTI-*
*GATION WASHINGTON FIELD*
*OFFICE, WASHINGTON DC* )
(Enter the full name and address(es),
if known, of defendant(s) in this
action).

Case: 1:07-cv-01193
Assigned To : Leon, Richard J.
Assign. Date : 6/29/2007
Description: Pro Se Gen. Civil

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### Instructions for filing a Complaint by a Prisoner
### Under the Civil Rights Act 42 U.S.C. §1983

This packet contains one copy of a complaint form and one copy of an application to proceed *in forma pauperis.* To start an action, you must file an original and one copy of this complaint form.

Your complaint must be clearly handwritten or typewritten and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use another blank page.

Your complaint can be brought in this Court only if one or more of the named defendants is located within the District of Columbia. Further, you must file a separate complaint for each claim that you have unless they are related to the same incident or problem. The law requires that you state only facts in your complaint.

You must supply a certified copy of your prison trust account, pursuant to the provisions of 28 U.S.C. §1915, effective April 26, 1996. The filing fee is $150.00.. If insufficient funds exist in your prison account at the time of filing your complaint, the court **must** assess, and when funds exist, collect an initial filing fee equal to 20 percent of the greater of:

**RECEIVED**
(1) the average monthly deposits to your prison account, or
(2) the average monthly balance of your prison account for the prior six-month period.

MAY 2 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*1*

Thereafter, you are required to make monthly payments of 20% of the preceding month's income. The agency having custody over you must forward payments from your account to the clerk of the court each time the amount in the account exceeds $10.00 until the filing fees are paid.

Therefore, before an assessment can be made regarding your ability to pay, you **must** submit a certified copy of your prison account for the prior six-month period.

When this form is completed, mail it and the copies to the Clerk of United States District Court for the District of Columbia, 333 Constitution Ave., NW, Washington, D.C. 20001.

## I.   SUCCESSIVE CLAIMS

Pursuant to the Prison Litigation Reform Act of 1995, unless a prisoner claims to be in "imminent danger of serious physical injury," he or she may not file a civil action or pursue a civil appeal *in forma pauperis* "if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or they failed to state a claim upon which relief could be granted."

## II.   PREVIOUS LAWSUITS

A.   Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?     Yes ( )     No (X)

B.   Have you begun other lawsuits in state or federal court relating to your imprisonment? Yes ( )     No (X)

C.   If your answer to A or B is Yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

   1.   Parties to this previous lawsuit.

   Plaintiffs:_____ N/A _____

   Defendants:_____

   2.   Court (if federal court, name the district; if state court, name the county)
   _____ N/A _____

   3.   Docket number_____ N/A _____

   4.   Name of judge to whom case was assigned:____ N/A _____

5.   Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?)_____ N/A _____

6.   Approximate date of filing lawsuit:_____ N/A _____

7.   Approximate date of disposition:_____ N/A _____

## III.   PLACE OF CONFINEMENT

_____

A.   Is there a prisoner grievance procedure in this institution?    Yes ( )    No (X)
If your answer is Yes, go to Question III B. If your answer is No, skip Question III B, C and D and go to Question III E.    N/A

B.   Did you present the facts relating to your complaint in the prisoner grievance procedure?
Yes ( )    No ( )    N/A

C.   If your answer is Yes to Question III B;

1.   To whom and when did you complain?_____ N/A _____

2.   Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)    Yes ( )    No ( )    N/A

3.   What, if any, response did you receive? (Furnish copy of response, if in writing.) _____ N/A _____

4.   What happened as a result of your complaint?    _____ N/A _____

D.   If your answer is No to Question III B, explain why not.    _____ N/A _____

E.   If there is no prison grievance procedure in the institution, did you complain to prison authorities?    Yes ( )    No ( )    N/A

F.   If your answer is Yes to Question III E;

1.  To whom and when did you complain? _____ *N/A* _____

2.  Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)

3.  What, if any, response did you receive? (Furnish copy of response if in writing) _____ *N/A* _____

4.  What happened as a result of your complaint? _____ *N/A* _____
    _____
    _____

## IV.  PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A.  Name of Plaintiff: *LAWRENCE MAYNARD DCDC # 307469*
    Address: *1901 D STREET SE. WASHINGTON, D.C. 20003*

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B.  Defendant: *STEPHANIE E. YANTA* is employed as
    *SPECIAL AGENT* at *FEDERAL BUREAU OF INVESTIGATION*
    Address: *WASHINGTON FIELD OFFICE*
    *WASHINGTON DC*

Defendant: _____ is employed as
_____ at _____
Address: _____
_____

Defendant: _____ is employed as
_____ at _____
Address: _____
_____

Defendant: _____ is employed
as _____ at _____
Address: _____
_____

APRIL 24, 2007

STEPHANIE E. YANTA, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION
WASH. FIELD OFFICE, WASHINGTON, D.C.

1. VIOLATING FOURTH AMENDMENT RIGHTS WITH PERJURY AND
OMISSIONS OF FACTS TO OBTAIN SEARCH WARRANTS. IE.
TEXT MESSAGES

2. MISLEADING JUDGE WITH FALSE STATEMENTS IN AFFIDAVITS,
APPLICATIONS OF ORDER AND SEARCH WARRANTS. IE. TEXT
MESSAGES

3. FAILURE TO GIVE NOTICE OF SEARCH, AFTER 90 DAY DELAY
NOTICE EXPIRED. IE. TEXT MESSAGES

I AM SEEKING DAMAGES FROM DEFENDANT YANTA OF THE
F.B.I. ON A CLAIM THAT SHE DEPRIVED ME OF LIBERTY WITH-
OUT DUE PROCESS OF LAW BY USING PERJURED TESTIMONY
AGAINST ME, CONCEALING AND FABRICATING
CRITICAL EVIDENCE.

## V.   STATEMENT OF CLAIM

State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include the names of other persons involved, dates and places. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra sheets if necessary.

*SEE ATTACHMENT*

## VI.   RELIEF

State briefly exactly what you want the Court to do for you.

*SEE ATTACHMENT*

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED
BEFORE ME THIS _____ DAY OF
_____ (YEAR)
NOTARY PUBLIC FOR THE DISTRICT OF COLUMBIA
MY COMMISSION EXPIRES JULY 31ST 2008

Signed this _24_ day of _APRIL_, _2007_.

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_4/24/07_
(Date)

_____
(Signature of Plaintiff)

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3   --------------------------X
 4   THE UNITED STATES OF AMERICA  x
                                   x   Docket No. CR-05386
     vs.                           x
 5                                 x   Washington, D.C.
     ANTOINE JONES,                x   Wednesday, November 15, 2006
 6   ADRIAN JACKSON,               x   1.42 p.m.
     MICHAEL HUGGINS,              x
 7   KEVIN HOLLAND,                x   (Day 12)
                                   x
 8   Defendants.                   x   (AFTERNOON SESSION)
 9   --------------------------X
10
11              TRANSCRIPT OF TRIAL
12        BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
          UNITED STATES DISTRICT JUDGE, AND A JURY
13
14   APPEARANCES:
15   For the Government:        JACK GEISE, ESQUIRE
16                              RACHEL LIEBER, ESQUIRE
                                Office of the U.S. Attorney
17                              555 Fourth Street, N.W.
                                Washington, D.C. 20560
18                              (202) 616-9156
19   For the Defendant Jones:   EDUARDO BALAREZO, ESQUIRE
20                              400 Fifth Street, N.W.
                                Suite 300
21                              Washington, D.C. 20001
                                lawoffice@balarezo.net
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:    (Con't.)
 2   For Defendant Jackson:     JON NORRIS, ESQUIRE
 3                              641 Indiana Avenue, N.W.
                                2nd Floor
 4                              Washington, D.C. 20001
                                (202) 842-2695
 5
 6   For Defendant Jackson:     RUDOLPH ACREE, ESQUIRE
 7                              1211 Connecticut Avenue, N.W.
                                Suite 303
 8                              Washington, D.C. 20036
                                (202) 331-0739
 9
10   For Defendant Holland:     BRIAN McDANIEL, ESQUIRE
11                              1211 Connecticut Avenue, N.W.
                                Suite 506
12                              Washington, D.C. 20036
                                (202) 331-0739
13   Court Reporter:            ANNIE R. SHAW, RPR
14                              United States District Court
                                District of Columbia
15                              333 Constitution Avenue, N.W.
                                Room 6820
16                              Washington, D.C. 20001
                                (202) 354-3242
17
18
19
20
21
22
23
24   Proceedings recorded by machine shorthand, transcript produced
25   by computer-aided transcription.
```

**Page 3**

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2        (Afternoon session 1:42 p.m.)
 3            (Jury not present.)
 4       THE COURT:  Okay.  Miss Griffith has retyped -- or
 5   listened to the transcript of the plea and has found that she
 6   has transcribed the figure incorrectly.  So it would not have
 7   been a helpful -- I can't allow the cross-examination given
 8   what she has listened to.  Anything else before she leaves for
 9   her lunch?  No?  All right.  Thank you.
10       Mr. Acree, have you now completed your cross?
11       MR. ACREE:  I just have a couple more questions, Your
12   Honor.
13       THE COURT:  I thought you had finished.
14       All right.  Something?
15       MR. BALAREZO:  One quick thing, Your Honor.
16       THE COURT:  Yeah, sure.
17       MR. BALAREZO:  Yesterday the government provided to us
18   a set of documents related to the ICE investigation that Agent
19   Gikas was testifying about.
20       THE COURT:  Yes.
21       MR. BALAREZO:  And going through it I noticed that
22   there were four reports which were sequentially numbered one,
23   two, three is not there, and then four and five.  And I have
24   asked the government to provide me a copy of number three, and
25   I have been told that it has nothing to do with this matter.
```

**Page 4**

```
 1   But I --
 2       THE COURT:  This is a report by Gikas?
 3       MR. BALAREZO:  By Gikas, right.
 4       THE COURT:  Gikas.  Well, I -- if it doesn't have --
 5   you mean it has nothing to do with her testimony so there's not
 6   Jencks for it, has nothing to do with this case?
 7       MISS LEIBER:  It has to do with the back end
 8   investigation, in other words, the Texas side of the
 9   investigation of this case.  I have a copy of it and I'm happy
10   to provide it to the Court.
11       THE COURT:  Sure.  We'll get it --
12       MR. BALAREZO:  I will ask the Court to look at it.
13       THE COURT:  Yeah.  But I can't do anything with it
14   until I hear what she testifies about.  I barely can remember
15   her testimony from before, I just remember the jurors thought
16   she looked like a movie star.  Anyway -- all right.  Then we
17   should bring in the -- what time did we tell the jury?
18       THE DEPUTY CLERK:  You told them 1:45.
19       THE COURT:  Just check on their numbers.  Is that it?
20       MISS LEIBER:  Yes.
21       THE COURT:  All right.  I am now being provided this
22   report.  But I guess I have -- this is a short two-page report.
23       MISS LEIBER:  Your Honor, I can't imagine that we
24   would get to cross of Special Agent Gikas or through it today,
25   so I don't have a question, I just wanted to give a head up.
```

FILED

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

07 1193

**5**

```
 1  on --
 2          THE COURT:  Right.  I won't -- I'm sorry, I won't be
 3  able to rule on it anyway until I hear direct, the question of
 4  what's relevant to her direct.
 5          Is she the next witness?
 6          MISS LEIBER:  We have two very short witnesses before
 7  her.
 8          THE COURT:  We couldn't work out any stipulation as to
 9  the one?
10          MISS LEIBER:  That we're actually going to move that
11  in terms of the search warrant of Mr. Adams' house, that's not
12  going to come until next week.
13          THE COURT:  I guess I'm a little lost, who cares what
14  you got at his house?
15          MR. GEISE:  Well, Your Honor, I think we've all talked
16  about it, and we think this could be one of the ones where the
17  stipulation would actually take longer than the witness,
18  because people just want to put things in context, where they
19  were physically located, and to stipulate to it probably --
20          THE COURT:  I'm lost, though.  I have to say I can't
21  understand why the government wants to put that in at all,
22  but --
23          MR. GEISE:  Well, we don't, but they do, so we'll
24  accommodate everybody.
25          THE COURT:  No, no.  Why would you even be approaching
```

**6**

```
 1  the subject?  Why is it in your interest to put in what was
 2  seized at his house?
 3          MR. GEISE:  That's a fair point, Your Honor.  Let me
 4  think about --
 5          THE COURT:  That's a question you are supposed to ask
 6  yourselves.
 7          MR. GEISE:  Well, now I am.  Now I am.
 8          THE COURT:  Well, okay.  I asked him what purpose doe
 9  it serve from the government's point of view.
10          MISS LEIBER:  It corroborates the wire, Your Honor,
11  that's why.  And he testified about it anyway, so --
12          THE COURT:  Okay.
13          MISS LEIBER:  -- we're not afraid of it.
14          THE COURT:  No, but it's cumulative.
15          Okay.  Then let's bring in the witness, please.
16  (Jury present 1:53 p.m.)
17          THE COURT:  Everybody have a good lunch?
18          THE JURORS:  Yes.
19          THE COURT:  Then let's go.  I hope you don't mind that
20  I got half a doughnut.
21          MR. ACREE:  I'm sorry, I waited until the jury came
22  in, but there was one question I wanted to ask if I could ask
23  before --
24          THE COURT:  Okay.  Sorry, ladies and gentlemen.
25          MR. ACREE:  Sorry about that.
```

**7**

```
 1          (Bench conference.)
 2          MR. ACREE:  I'm sorry.  Yes, Your Honor, I was going
 3  to ask whether it's appropriate to ask, because I guess the
 4  fact that Mr. Adams had a prior felony and he picked up a --
 5  essentially these charges with the firearm, whether I would be
 6  permitted to ask him is it fair to say that -- well, you know
 7  you had a prior felony and you had a firearm, and is it fair to
 8  say that you could have been charged as a felon in possession
 9  of a firearm?  You know what I mean or --
10          THE COURT:  Yeah, I understand what you mean.  He was
11  just charged in a one-count conspiracy initially because
12  everybody came in on --
13          MR. ACREE:  Yes, that's right.
14          THE COURT:  Well, is it old, is that why it hasn't
15  come out --
16          MR. GEISE:  Yes.
17          THE COURT:  -- about his prior record?
18          MR. ACREE:  That's why none of it --
19          THE COURT:  Is there any limit of a prior felony for
20  possession with a prior felon?
21          MR. GEISE:  Well, for a felon in possession, no, Your
22  Honor.
23          THE COURT:  Okay.  He's right about it.
24          MR. GEISE:  The openly point I would make is, of
25  course, he could not have been charged in this district with
```

**8**

```
 1  it.
 2          THE COURT:  He couldn't have been charged in what
 3  district with it?
 4          MR. GEISE:  Here, because it was in Maryland.
 5  That's --
 6          THE COURT:  I don't think that's right.  A prior
 7  felony is a prior felony.
 8          MR. GEISE:  Yeah, but you can only charge him with a
 9  felon in possession where he was the felon in possession when
10  the gun was found.
11          THE COURT:  Oh, yes, but he could have been charged in
12  Maryland with that.
13          MR. GEISE:  Yes.
14          THE COURT:  I think it's fair to ask him, at least as
15  to the government, he fairly admits this is -- got messed up
16  with the --
17          MR. GEISE:  Your Honor, I think if Mr. Acree would ask
18  if he had a prior conviction, the jury already knows he was in
19  jail and he had a prior conviction.
20          THE COURT:  Well, he would say, you have a prior
21  felony.
22          MR. ACREE:  Right.
23          THE COURT:  And you are not going into what it was?
24          MR. ACREE:  No, that's fine.
25          THE COURT:  But obviously he could be charged with --
```

9

1        MR. ACREE:   Not at all. Not at all.
2        MR. GEISE:   I don't have any problem with that.
3        THE COURT:   All right.
4        (open court.)
5  BY MR. ACREE:
6  Q.  Just a few more questions, Mr. Adams. One thing I wanted
7  to ask you now, it's fair to say that at the time that you had
8  that firearm at your house that was recovered on October 24th
9  of 2005, you had been convicted previously of a felony; isn't
10  that right?
11  A.  Yes, sir.
12  Q.  So as a result, it's fair to say that by virtue of your
13  admission of being in possession of that firearm that was
14  recovered from your home on October 24th of 2005, you could
15  also have been charged with a person who had a felony that was
16  in possession of a firearm, could have been charged with that
17  as well; right?
18  A.  Yes, sir.
19  Q.  But you know that no one from -- from law enforcement has
20  charged you with that offense; isn't that right?
21  A.  That's correct, sir.
22  Q.  Now, just a couple of things I wanted to ask you about your
23  meetings where the government was present, either or both of
24  the prosecutors, and Agent Yanta and/or Agent Horne. Isn't it
25  fair that you -- to say that you told them essentially that you

10

1  asked Mr. Jones what half a ticket was, and Jones basically
2  said that he didn't know what that meant, somebody messed up;
3  isn't that one of the things that you told the agents and the
4  prosecutors when you met with them in November of 2005?
5  A.  I could have, yes, sir. I could have.
6  Q.  Say it again?
7  A.  I could have, yes, sir.
8  Q.  Okay. Now, just to go back briefly to the photographs for
9  a moment, now, it's fair to say that you looked at a lot of
10  photographs; isn't that right?
11  A.  Yes, sir.
12  Q.  Fair to say like more than ten; isn't that fair to say?
13  A.  Yes, sir, it might be.
14  Q.  And you do recall seeing a photograph of Antoine Jones, as
15  you said; isn't that right?
16  A.  Yes, sir.
17  Q.  And, for example, you specifically said about that
18  photograph that that was an old photograph of Antoine. That's
19  fair to say; right?
20  A.  Yes, sir.
21  Q.  Because that was something that stuck out to you, the fact
22  that it was an older picture of him; right?
23  A.  Yes, and the way he looked.
24  Q.  And it's also fair to say that there were times when --
25  well, let me ask you this: One of the things that you claim is

11

1  that you went to Mr. Huggins' house; is that right?
2  A.  Yes, sir.
3  Q.  Did you ever have an occasion to see Mr. Huggins' wife or
4  what you believe may have been his wife when you went to his
5  home?
6  A.  No, sir.
7  Q.  Okay. Now, and just to be clear with regards to the
8  photograph, the photographs themselves, it's fair to say that
9  you never said when looking at any of the photographs that "I'm
10  not sure" -- anything along the lines of "I'm not sure whether
11  I can identify that person or not because that photograph is
12  not clear enough"? You never said anything like that or
13  anything similar to that back in November to one of these
14  individuals; isn't that fair to say, sir?
15  A.  I could have, I don't remember.
16  Q.  Okay. In other words, you can't remember specifically
17  saying that do you?
18  A.  No, sir.
19        MR. ACREE:   Okay. I think that's all I have, Your
20  Honor. Thank you.
21        MR. GEISE:   Your Honor, a few questions.
22        REDIRECT EXAMINATION
23  BY MR. GEISE:
24  Q.  Mr. Adams, first of all, good afternoon.
25  A.  Good afternoon, sir.

12

1        MR. GEISE:   Good afternoon.
2        THE JURORS:   Good afternoon.
3  BY MR. GEISE:
4  Q.  Now, the first question that the -- I'd like to talk to you
5  about some of the things that Mr. Acree went through with you
6  to begin with. Just before the break Mr. Acree asked you
7  whether your wife trusted you.
8  A.  Yes, sir.
9  Q.  Do you know, do any of our wives trust us?
10        THE COURT:   How does he know about yours?
11        MR. GEISE:   I'll withdraw the question, Your Honor.
12  BY MR. GEISE:
13  Q.  Do you recall Mr. Acree asked you about whether the name --
14  Mr. Jones ever used the name "Mike" in any of the
15  conversations. Do you recall that?
16  A.  Yes, sir.
17        MR. GEISE:   Ladies and gentlemen, I'm going to ask you
18  to look at call 4491. It's at page 104 of the transcripts.
19        THE COURT:   Of Volume I?
20        MR. GEISE:   Of Volume I, yes, ma'am. Page 104 of the
21  transcripts. Page 104, Volume I of the transcripts, it's call
22  4491. It's page 104 of the transcripts --
23        THE COURT:   Just wait for everybody. It's on
24  October 11th, '05?
25        MR. GEISE:   Yes, ma'am.

**13**

1    THE COURT: One minute, please. Everybody find it?
2  Who found it first? Okay. Very good. Let's go, you ready,
3  104?
4    MR. GEISE: Yes, ma'am.
5    (CD is played.)
6  BY MR. GEISE:
7  Q. Now, who is the "Mike" that Antoine Jones is referring to
8  in that conversation?
9  A. Mr. Huggins.
10    MR. ACREE: Objection, Your Honor. I think he ought
11  to say who does he believe he was referring to.
12    THE COURT: That's true.
13  BY MR. GEISE:
14  Q. Well, what did you do after the conversation?
15  A. I went around Mike's house.
16  Q. And whose house is Mike's house?
17  A. The gentleman sitting right there.
18  Q. What did you do when you went around his house?
19  A. I'm not sure that day whether I gave him my -- gave him
20  drugs or received drugs back from him, I'm not really sure, but
21  it was a drug transaction that was made that day.
22  Q. Mr. Acree asked you about a conversation you had with
23  Defendant Antoine Jones about half tickets and whatnot. Would
24  you tell the members of the jury when that conversation took
25  place and exactly what the discussion was?

**14**

1  A. I can't really remember the conversation right offhand.
2  Q. Do you remember when it took place?
3  A. No.
4  Q. You mentioned in talking with Mr. Acree about those photos
5  that you picked out certain people's photos?
6  A. Yes, sir.
7  Q. Prior to seeing those photos, how many times, best of your
8  knowledge, had you seen Antoine Jones face-to-face?
9  A. Numerous times.
10  Q. How often when you were working at the club would you see
11  him?
12  A. Every day that I was working. I seen him mostly every day.
13  Q. And how about Lawrence Maynard, how many times had you see
14  him face-to-face before you looked at those photos?
15  A. A lot.
16  Q. And how often would you see him when you were at the club?
17  A. Every day I was there.
18  Q. And how about Derrick Gordon, how often would you see him?
19  A. Every day that I was at the club almost.
20  Q. Was he also employed at the club?
21  A. Huh?
22  Q. Was he also employed at the club?
23  A. Yes, he was.
24  Q. Now, prior to seeing the photo -- any photos of Michael
25  Huggins, how many times had you seen Mike Huggins face-to-face

**15**

1  prior to that?
2  A. Two or three.
3  Q. Now, Mr. Acree asked you about some of these words that
4  were used, tickets, VIP tickets, words like that.
5  A. Yes, sir.
6  Q. And you mentioned that -- you told him that the people who
7  were in the conversations were the ones who would understand
8  it?
9  A. That's correct.
10    MR. GEISE: Let's look at call 4735, Your Honor. It's
11  in Volume I at page 0036. That's 4735, Volume I, 0036.
12    THE COURT: I'm sorry. Where would that be in this?
13    MR. GEISE: That would be in the first tab, Your
14  Honor, suppliers.
15    THE COURT: Oh, first tab. I'm sorry.
16    MR. GEISE: Yes.
17    THE COURT: Thirty-six. Are you under tab one in
18  Volume I?
19    MR. GEISE: Yes, ma'am.
20    THE COURT: Not you, I'm talking to the jury.
21    MR. GEISE: Oh, sorry.
22    THE COURT: Has everybody found it under the first
23  tab?
24    MR. GEISE: Page 36.
25    THE COURT: 0036, it's an October 13th, '05, call at

**16**

1  5:25. Find it?
2    MR. BALAREZO: Your Honor, can we approach?
3    THE COURT: Let's approach. Sorry.
4    (Bench conference.)
5    MR. ACREE: I'm just anticipating a little bit. I
6  don't know whether Mr. Geise is about to ask this witness what
7  the -- what were Mr. Jones and Mr. Bermea talking about --
8    THE COURT: No, he can't.
9    MR. ACREE: -- or what they meant.
10    MR. GEISE: Huh-uh.
11    MR. ACREE: Okay.
12    MR. GEISE: No, my question is actually going to be
13  after we play it who are the parties to the call and who would
14  have the best idea what it meant.
15    THE COURT: He can't tell who the parties of the call
16  are.
17    MR. GEISE: True enough.
18    THE COURT: Hasn't this been played before?
19    MR. GEISE: Once, Your Honor, yes.
20    THE COURT: And so what's your question? You can't --
21  you can only --
22    MR. GEISE: The question is the VIPs in the bottom.
23    MR. ACREE: Yeah, but he can't --
24    THE COURT: Well, what do you want to do?
25    MR. GEISE: I just want to reference to the use of the

**17**

1  VIP tickets, the very term that Mr. Acree was asking about.

2       THE COURT:    Well, what are you asking, has Jones ever

3  used the term VIP tickets?

4       MR. GEISE:    Has he ever used it in the context of

5  drugs.

6       THE COURT:    You want him — it's an odd way to do

7  this.  I mean, this is in evidence.  It's for you to argue it.

8  Why are you putting it in front of him?  He's just reading the

9  document?

10      MR. GEISE:    Well, I just want to reference it at this

11  point in reference to the cross-examination.

12      THE COURT:    But it's already in.

13      MR. GEISE:    Sometimes even though it's already in,

14  Your Honor, you do want to use it again.

15      THE COURT:    Yeah, but you are just doing it — you're

16  just — it hasn't —

17      MR. GEISE:    To make a point.

18      THE COURT:    Well, I know you are doing it to make a

19  point, but you are doing it with somebody who has no firsthand

20  knowledge of this particular conversation, so I have to sustain

21  that.

22      All right.  Thank you.

23      (Open court.)

24      THE COURT:    All right.  You can take the stand again.

25  BY MR. GEISE:

**18**

1  Q.  Mr. Adams, I'm going to ask you a couple of questions about

2  some of the things you discussed with Mr. McDaniel late

3  yesterday and earlier today.  Remember which one Mr. McDaniel

4  is, the gentleman here?

5  A.  Okay.  Yes, sir.

6       THE COURT:    You mean the one with the nice suit?

7       MR. GEISE:    Always with the nice suit, Your Honor.

8  BY MR. GEISE:

9  Q.  Do you remember your discussion with Mr. McDaniel about

10  that Million Man March?

11  A.  Yes.

12  Q.  That you talked to Mr. Jones about having Kevin, the

13  promoter's, involvement?

14  A.  Yes.

15      MR. GEISE:    Your Honor, at this time I would like to

16  play call 5177, which is — there is no transcript of it, Your

17  Honor, but I'm going to —

18      THE COURT:    What's the date of it?

19      MR. GEISE:    I believe it is October 16th, Your Honor.

20      (CD is played.)

21  BY MR. GEISE:

22  Q.  Let's play a little bit more and see if you recognize the

23  voices, Mr. Adams.

24      (CD is played.)

25      THE COURT:    Wait.  Is that finished?

**19**

1       MR. GEISE:    Yeah, that's it, Your Honor.

2       THE COURT:    I mean, can he identify the caller and the

3  speaker?

4       MR. GEISE:    Yes.

5  BY MR. GEISE:

6  Q.  Do you know who is speaking in that?

7  A.  Me and Mr. Jones.

8  Q.  And when Mr. Jones is talking to you about the Sunday paper

9  in the MCI building, what's he talking about?

10  A.  He is talking about the event, the Million Man Movement

11  event that was at the MCI Center.

12  Q.  And what happened about that event?

13  A.  It was a flop.

14  Q.  And who was the person who was running that event?  What

15  did Mr. Jones tell you about the person running the event?

16  A.  That Mr. Holland was one of the promoters, that's it.

17  Q.  Now, at the time, did you know the last name?

18  A.  No, sir.

19  Q.  And how did Mr. Jones reference him?

20  A.  Kevin from Lissen.

21  Q.  Mr. McDaniel asked you something about that proffer in

22  support of detection.  Remember that thick document that —

23      THE COURT:    Do we have a Jones 25?  Okay.

24      MR. GEISE:    Jones 25, a copy of it.

25      THE COURT:    That has only been marked for ID.  Okay.

**20**

1  BY MR. GEISE:

2  Q.  I'll show you what's been marked Jones 25 for

3  identification.  Do you recognize that, sir?

4  A.  Yes, sir.

5  Q.  And you mentioned to Mr. McDaniel that you discussed that

6  with some of your codefendants at the jail?

7  A.  Yes, sir.

8  Q.  What was the discussion you had with them?

9       MR. NORRIS:    Objection, Judge.  Can we approach?

10      THE COURT:    No, it was opened up.  Overruled.

11  BY MR. GEISE:

12  Q.  What was the discussion you had with them at the jail?

13  A.  It was me, Mr. Jones, Mr. Jackson, we were discussing this,

14  saying that —

15      MR. NORRIS:    Objection.  Can we approach, Your Honor

16      THE COURT:    Yes, you can approach.  Can I see the

17  exhibit, please.

18      (Bench conference.)

19      THE COURT:    Everybody was trying to insinuate he

20  learned a whole lot of stuff from this.

21      MR. NORRIS:    Judge, I can tell you I didn't open up

22  any discussions with my client.

23      THE COURT:    It was done at least by two, if not three,

24  of you.  You can't pick and choose at this point in time,

25  that's the problem.  If the notion was left with the jury that

21

1 he learned a whole bunch of things that he couldn't have known
2 otherwise except for looking, what's he going to say? Let's
3 hear what he has to say.
4 　　MR. GEISE:　I believe what he's going to say is -- it
5 also goes to the "half ticket" discussion. I think what he is
6 going to say is he and Antoine Jones -- that he and Antoine
7 Jones were discussing it and he said, "Look" --
8 　　THE COURT:　Discussing what?
9 　　MR. GEISE:　The proffer and what was in it.
10 　　THE COURT:　That 2S?
11 　　MR. GEISE:　The conversations that were in it, and he
12 said, you know, there is no way we can keep claiming
13 basically -- I'm probably putting it more elegantly, no way we
14 can keep claiming that it's just about legitimate stuff.
15 What's a "half ticket"?
16 　　THE COURT:　Who said this?
17 　　MR. GEISE:　Adams says this to Jones. And Jones says,
18 "Well, somebody made a mistake."
19 　　THE COURT:　Somebody made a mistake?
20 　　MR. GEISE:　In using the term "half ticket." So, I
21 mean, you know, they are all talking about whether they can --
22 what this proffer means, whether they can get away with the
23 cover story that it's all --
24 　　THE COURT:　I think you have to be specific about who
25 says what to whom, and so far I got that.

22

1 　　MR. GEISE:　Well, I'll ask him --
2 　　THE COURT:　It's going to come in.
3 　　MR. NORRIS:　Well, none of that goes to what he
4 learned from the actual proffer, the discussions are beyond the
5 scope of the proffer.
6 　　MR. GEISE:　Well, Your Honor, there was also the
7 question about half tickets. Mr. Acree I think asked him about
8 half tickets and his discussion, he actually asked him about
9 the 302 and what he told the agents about half tickets, so that
10 it's not only that they brought a --
11 　　THE COURT:　What he is saying in the 302 about --
12 　　MR. GEISE:　Well, he told them about what happened in
13 the jail, that he said to Antoine Jones, "Well, you know, how
14 can" -- basically, what's our story from what a half ticket is.
15 　　THE COURT:　But what's in the 302?
16 　　MR. GEISE:　I think that's a --
17 　　THE COURT:　You said you think he brought up somethin
18 about a 302.
19 　　MR. GEISE:　There is a bit about it in one of the
20 302s, and I believe it was Mr. Acree who raised it, asked a
21 question about it in the context of the 302 and what did Jones
22 say about half tickets.
23 　　MR. NORRIS:　None of that, though, is relevant to what
24 was discussed at jail. Judge, it's completely different
25 circumstances.

23

1 　　MR. GEISE:　Well, he had the proffer at the jail, the
2 discussion was what use he made of the proffer, whether he
3 acquired information from the proffer. But the specific
4 reference to "half ticket" --
5 　　THE COURT:　I'm sorry. How are you going to go about
6 the information -- what's responsive to the issue of what he
7 learned from the proffer or what he didn't learn from the
8 proffer?
9 　　MR. GEISE:　Well, first of all, what use they made of
10 it as a group. And second, the half ticket specifically.
11 　　THE COURT:　What use did they make of it? I mean, I
12 don't understand.
13 　　MR. GEISE:　I mean, I think they discussed it, whether
14 they could get away with the cover story that this was all
15 about tickets, real tickets, legitimate tickets. And then
16 there was also the specific discussion about the half tickets
17 that Mr. Acree asked him about, I can check my notes, but I
18 think it was near the end this morning, and there was a
19 discussion about 302, what he told him about half tickets.
20 　　THE COURT:　Well, did you ask about half tickets?
21 　　MR. ACREE:　I think basically what it was, he said he
22 asked Jones what a half ticket was, and Jones said, "I don't
23 know, somebody messed up."
24 　　THE COURT:　Did you bring that up?
25 　　MR. ACREE:　Yes. In other words, I asked him is that

24

1 what -- did he tell that to the -- to the folks he met with in
2 November, the law enforcement folks he met with in November.
3 　　MR. NORRIS:　But again, that doesn't open up
4 discussion at the jail.
5 　　MR. GEISE:　Well, that's where the conversation about
6 the half ticket took place.
7 　　THE COURT:　Yeah. You can go into what Jones said
8 about the tickets. I don't see any problem with that. But are
9 you going to be -- can I see this for a minute?
10 　　MR. GEISE:　That's not the proffer, Judge, that's what
11 you just gave him. The proffer's in front of the witness, I
12 think.
13 　　THE COURT:　Everybody's trying to say that he
14 didn't --
15 　　MR. GEISE:　That is right.
16 　　THE COURT:　-- he couldn't know what he knew other
17 than by reading these silly documents, which I doubt very much.
18 I feel as though the whole thing has been opened up. But this
19 conversation may be relevant to a couple of other things.
20 　　MR. GEISE:　Well, that's right, Your Honor. I mean, I
21 could even go into that conversation without talking about the
22 proffer.
23 　　THE COURT:　I think so too.
24 　　MR. GEISE:　I could rephrase the question that way.
25 　　THE COURT:　But it may be that you are right about

25

1  your particular client and this proffer, but it's not going to
2  be true for everybody else.
3       MR. NORRIS:  Well, here's the --
4       THE COURT:  And you're going more into the proffer.
5       MR. GEISE:  I can just rephrase my question to what
6  they discussed, I suppose.
7       MR. BALAREZO:  But, Your Honor, again, with what
8  Mr. Norris said, I attempted to go there and -- but I decided
9  to stop once I was getting objections, I said it's not really
10 worth it. So I didn't open up anything for my client except
11 that --
12      THE COURT:  So I'm going to allow him to repeat what
13 Jones said to him about tickets in there, and then move on.
14      MR. NORRIS:  Judge, here is my problem before moving
15 on, is Mr. Geise -- you know, I should have objected, because I
16 didn't know where he was going on this. I did object when it
17 came to jailhouse discussions. And now it's in front of the
18 jury that this witness had jailhouse discussions with my
19 client. He mentioned three people by name, he clearly said
20 Jackson. That was after I objected, and we couldn't approach
21 the bench at this point, and now it's out there, and --
22      THE COURT:  He's not attributed anything to Jackson;
23 right?
24      MR. GEISE:  I did not go into it on my direct, Your
25 Honor, because it just seemed messier than useful, but now that

26

1  it's open -- so I don't --
2       MR. NORRIS:  But he opened it.
3       MR. GEISE:  No, they opened it when they asked him
4  about half tickets and what Jones had told him. So, you know,
5  my best recollection is that is mostly a conversation between
6  him and Antoine Jones, although Mr. Jackson may have chimed in,
7  they were all talking together about --
8       THE COURT:  Well, just ask him to tell us what Jones
9  said.
10      MR. NORRIS:  And then I would like an instruction from
11 the Court striking the part about a discussion with my client.
12      THE COURT:  No. He didn't say anything about your
13 client yet. We'll find out what the discussion is and we'll
14 limit it to Jones. I don't know how in the world you can avoid
15 some of this just because you didn't make inquiry, I mean
16 somebody else opens the door to all this stuff. Some things
17 come in. But we can work it out so that he limits it to,
18 "During this discussion what did Mr. Jones say about tickets?"
19 That's where we'll --
20      MR. NORRIS:  Well, Judge, I think one of the things
21 I'm going to need to do is object and ask to approach when
22 Mr. Geise starts opening these other areas for proffers. I
23 mean, I hate interrupting cross -- or redirect like that, but
24 it was done that way on our crosses and you can see the
25 problems that come out now.

27

1       THE COURT:  I don't know where he's going. He is not
2  touching the proffer anymore after this.
3       MR. NORRIS:  There's other areas, you know, so --
4       THE COURT:  You don't know what they are yet.
5       MR. NORRIS:  I'm just giving you a heads-up. If I
6  don't know what they are, I'm going to be up here.
7       THE COURT:  Fine.
8                    (Open court.)
9  BY MR. GEISE:
10 Q.  And during this discussion what did Mr. Jones say to you?
11 What was your conversation with Antoine Jones?
12 A.  When we was in D.C. Jail?
13 Q.  Yes.
14 A.  Well, me and him and Mr. Jackson --
15      MR. NORRIS:  Objection, Your Honor.
16      THE COURT:  He just asked you about what did Jones
17 say.
18      THE WITNESS:  Oh, Mr. Jones? I'm sorry. He said --
19 we were discussing, and he said, "Man, they don't have nothing
20 on us. All they got is a bunch of like garble, they don't know
21 what we talking about."
22 BY MR. GEISE:
23 Q.  And then what did you say to him?
24 A.  I said, "Man, what you mean they don't know" -- "they don't
25 got nothing? We got people in here talking about half a

28

1  ticket, whole tickets, 26 in the hole." I mean, I asked him
2  "What's a half a ticket?" I even made a mistake one time and
3  said a whole ticket. A whole ticket to me is one kilo of
4  cocaine.
5  Q.  And what was defendant's response at that point?
6       THE COURT:  Jones?
7  BY MR. GEISE:
8  Q.  What was Defendant Jones' response at that time?
9  A.  He didn't say anything.
10      MR. BALAREZO:  Your Honor, I would move to strike th
11 series of questions.
12      THE COURT:  Overruled.
13 BY MR. GEISE:
14 Q.  Now, you mentioned in response to several of the counsels'
15 cross-examination that you met with the government several -- a
16 number of times.
17 A.  Yes.
18 Q.  Were you asked about everything you knew at the first
19 meeting?
20 A.  No, sir.
21 Q.  Did it -- were more and more questions asked as time went
22 on?
23 A.  Yes, sir.
24      THE COURT:  Was the first meeting November 1?
25      THE WITNESS:  It could have been, Your Honor. I don't

29

1  remember the exact date.
2  BY MR. GEISE:
3  Q.  Mr. Balarezo asked you some questions about -- about who
4  you identified to the government as customers.
5  A.  Can you repeat that, sir?
6  Q.  Mr. Balarezo asked you some questions about who you
7  identified to the government as your customers.  Do you
8  remember that?
9  A.  Yes, sir.
10  Q.  Did you give full names of your cousins?
11  A.  Yes, sir.
12  Q.  And you identified other people to the best you could?
13  A.  Yes, sir.
14  Q.  Now, do you know what further investigation the government
15  is doing?
16  A.  No, sir.
17  Q.  At one point in talking to Mr. Balarezo, you mentioned
18  something about Carlos, who had owned the club before?
19  A.  Yes, sir.
20  Q.  Just explain what that was about.
21  A.  Well, when I came to Levels, it was -- Levels was one side.
22  It was one side was the Boom Boom Room and the other side was
23  Club Levels.  These clubs -- the only thing really divided
24  these clubs was some doors.  So they were having problems with
25  Carlos, so eventually they wanted to buy Carlos out, Mr. Jones

30

1  and Fats.  So --
2      MR. BALAREZO:  I object.  I think there's some hearsay
3  regarding the specific references.
4      THE COURT:  I'm not sure it's being offered for the
5  truth.
6      MR. GEISE:  It's just being offered to explain his
7  discussion of Carlos in cross-examination, Your Honor.
8      THE COURT:  Go ahead.  Overruled.
9      THE WITNESS:  So eventually they did convince Carlos
10  to sell them the other part, the other half, which was the Boom
11  Boom Room.
12  BY MR. GEISE:
13  Q.  In response I think to Mr. Balarezo's cross-examination,
14  you mentioned some things that Lawrence Maynard had told you
15  about some events in North Carolina.
16  A.  Yes, sir.
17  Q.  What did Mr. Maynard tell you about those events?
18  A.  Me and him was sitting in the little part that we call --
19  it's a little room upstairs, and me and him got to talking.  So
20  he was telling me that him and Derrick was on the way to North
21  Carolina --
22  Q.  Now, which Derrick was that?
23  A.  This is Derrick Gordon, Antoine's nephew, Mr. Jones'
24  nephew.  That they had got stopped in North Carolina.  I said,
25  "What'd they stop you for?"  He said the police told him that

31

1  Derrick looked like he was a gang member.  So he said -- he
2  said -- as you know, they was questioning him and everything,
3  and the police brought a dog out on the scene.
4      MR. BALAREZO:  Objection, Your Honor.  Can we approach
5  on this part?
6      THE COURT:  Okay.
7      (Bench conference.)
8      MR. BALAREZO:  When the Officer Whitehead testified, I
9  objected to the part about the dog coming in and showing
10  positive for the drugs, because I don't think he was there, he
11  was told by somebody else.  I don't know if this is where he is
12  going with this.  I know it's Maynard supposed to be telling
13  him, but --
14      THE COURT:  What's it being offered for, period,
15  anyways?  Why are you offering this conversation?
16      MR. GEISE:  Well, it's coconspirators hearsay.  They
17  brought out his statements to the officers about Maynard and
18  the North Carolina stop.  I'm just having him tell us what he
19  learned about the North Carolina stop from Lawrence Maynard,
20  who I -- I think he's going to just describe what Maynard told
21  him, the dog alerted, they found the money, and told him that
22  they were heading south to buy some kilos.
23      MR. BALAREZO:  Well, Your Honor, all I asked was at
24  one time you said he heard it from Derrick, the other time you
25  said you heard it from Maynard.  I don't think the details --

32

1  for that very reason I don't think the details are necessary,
2  he can say Maynard told him at this time and he told me that
3  something happened and then --
4      THE COURT:  Yeah, but you made a point about he had it
5  flip-flopping around.  So he's --
6      MR. BALAREZO:  The only flip-flop was about who he
7  heard it from, not what he heard.  It's a big difference.  I
8  mean, it --
9      THE COURT:  Well, it may be, but overruled.
10      MR. BALAREZO:  So you're going to let in the dog and
11  all that?
12      THE COURT:  Yeah, because it shows that he remembers
13  what he learned from Maynard.  He wasn't so flip-floppy after
14  all.  If he can pinpoint what he learned from Maynard, then the
15  jury can be told about the dog.  This isn't whether or not the
16  dog alerted positive or not, that's not --
17      MR. BALAREZO:  Well, it is, Your Honor, because if
18  it's a drug case, all they found on that stop was money, and
19  now we're going to get some testimony about a dog alerting
20  positive for cocaine --
21      THE COURT:  But we'll tell them there was no cocaine;
22  right?  They didn't find any.
23      MR. GEISE:  The way they testified it was money.
24      THE COURT:  All right.  Overruled.
25      (Open court.)

33

BY MR. GEISE:

Q. You were saying, sir, Mr. Maynard told you what?

A. That they had brought a dog out, and they put the dog around the van, and the dog smelled something. Then they searched the van, and it was money in the van.

Q. Did he tell you how much money?

A. No, sir, I don't remember that, no.

Q. Did he tell you what the money was for?

A. Yes, sir.

Q. And what did he tell you the money was for?

A. Say they was going to Atlanta to pick up some ki's of cocaine.

Q. Did he tell you what happened after the police found the money?

A. Said they took the van and let them go.

Q. Prior to when you were arrested on October 24th, when Antoine Jones would talk to you about Unk or reference Unk, what did Unk mean?

A. That was our -- that was his cocaine supplier.

Q. Mr. Balarezo asked you about I think what's already been entered as Jones Exhibit 24, which is a flyer for a birthday party.

A. Yes, sir.

MR. GEISE:    Is it in evidence?

THE DEPUTY CLERK:    It's not in evidence.

34

THE COURT:    Do you want to put it into evidence?

MR. GEISE:    Actually I just wanted to show it to the witness.

MR. BALAREZO:    I have no objection.

THE COURT:    Put it in so everybody can see it. It's Jones what?

THE DEPUTY CLERK:    It's 24.

MR. GEISE:    It's Jones 24, Your Honor.

THE COURT:    All right. Well, it's admitted.

(Jones Exhibit Number 24 was received into evidence.)

BY MR. GEISE:

Q. Let me just show you that, and you may remember independently or -- let's see. And what day was that party?

A. Friday, July 16th.

Q. And what day is your actual birthday, sir?

A. July the 15th.

Q. You mentioned when you were talking to Mr. Balarezo about the things that you had had in your closet, the money.

A. Yes.

Q. And you said it was more accessible where it was.

A. Yes, sir.

Q. Now, why was it more accessible in the stuff it was in?

A. Because one of my closet doors is broke, so me and my wife had piled a lot of stuff up there so it wouldn't fall back and forth. So instead of me having to move everything and climb

35

all the way in the back, I just made it so I can just easy reach up and get my money when I needed it.

Q. When you were talking again to Mr. McDaniel about Kevin Holland --

A. Yes.

Q. -- if you wanted to, could you have pointed to Kevin Holland and said you delivered drugs to him?

A. No, sir.

Q. Why not?

A. Because I never delivered drugs to Mr. Holland.

Q. Thank you.

MR. McDANIEL:    I don't know if I agree with that, Your Honor. I would object.

THE COURT:    Overruled. I think the jury understands. But it is like similar-type questions are possible, but he said he couldn't do it. That's not possible.

BY MR. GEISE:

Q. I think Mr. Balarezo asked you about whether you could put dates on particular things.

A. Yes, sir.

Q. Let's look at page 78 of the transcripts, call 3119.

MR. GEISE:    That's in the first volume, Your Honor, page 78.

THE COURT:    First volume under tab two?

MR. GEISE:    Yes, ma'am, first volume under tab two.

36

THE COURT:    And the page number is?

MR. GEISE:    Page 78.

THE COURT:    I'm sorry.

BY MR. GEISE:

Q. You will notice, sir, that's dated September 30th?

A. Yes, sir.

MR. GEISE:    Let's play that call.

(CD is played.)

BY MR. GEISE:

Q. Now, what did you do after this conversation, sir?

A. I went to Mike's house.

Q. And what did you do at Mike's house?

A. Picked up a bag of money from him.

Q. And that's the bag of money you described before?

A. Yes, it is.

Q. And based on the call, what date was that?

A. September 30th, 2005.

Q. Now let's look at call 3178, which is on page 81.

THE COURT:    3178.

BY MR. GEISE:

Q. Call 3178 on page 81. And what day is that, sir?

A. October 1st, 2005.

MR. GEISE:    And I'm going to play the first portion of it. Actually, Miss Lieber has set it up for me to play it.

(CD is played.)

37

BY MR. GEISE:

Q. Sir, although you testified about that several days ago, what's going on in that conversation?

A. This is a conversation about one of my customers had bought some bad drugs, so he brought it back. So if I'm not mistaken, it was an eighth, and I kept it. And --

Q. An eighth of what, by the way?

A. Eighth of crack. And we was talking about -- he told me a number, and the only thing I can remember was 14, 14 is a half ounce. So that's when I said the large jersey I was talking about the half ounces, and the extra large jerseys would have been up to -- that amount was 62.

Q. And what were you supposed to do with the crack that you had gotten back from your customer?

A. I was supposed to give the 62 to Derrick, the 14 to Ty, and the 14 to Brian.

Q. And let's look at the next conversation, 3237, which is at page 90.

THE COURT: I'm sorry. Have we already heard these before?

MR. GEISE: Yes, Your Honor. This is the only one I plan to play a little bit of. 3237 at page 90.

THE COURT: If it's in and he has interpreted it once, isn't that what -- how can that be rebuttal again?

MR. GEISE: Well, let me ask, then, a couple --

38

THE COURT: Is there something that you haven't covered with him before?

MR. GEISE: The timing issue, Your Honor. I'll wrap it up with a couple of questions.

BY MR. GEISE:

Q. This call also is on October 1st, sir; is that right?

A. Yes.

Q. Based on these calls, do you know what day you gave those drugs to Brian and Ty and Derrick?

A. I never gave Ty and Brian the drugs, I only gave Derrick the drugs.

Q. And what day did you give Derrick the drugs?

A. I can't remember.

Q. Was it the day of this conversation?

A. It could have been. I'm not for sure, it could have been.

Q. Now, Mr. Balarezo and everyone else actually asked you a lot of questions about the plea agreement, if you'll recall?

A. Yes.

MR. GEISE: Just pull that out for a minute.

THE COURT: Before you do that I have a question for the jurors. I'm sorry. I don't have a question.

Tomorrow we're going to start a half hour late, ladies and gentlemen, so I was just inquiring about whether breakfast has already been ordered.

And apparently it has; right?

39

THE DEPUTY CLERK: Yes.

THE COURT: So tomorrow we'll start court -- we have to share a lawyer with another judge for about 20 minutes in the morning, so we will start at 10:00. But breakfast will be here before then.

MR. GEISE: Let me show the witness, it's paragraph 8 of the plea agreement, which is already in evidence.

BY MR. GEISE:

Q. Let's look at paragraph 8. It says, "Your client understands that the sentence to be imposed upon him is determined solely by the Court."

Who do you understand will ultimately sentence you?

A. The Judge.

Q. Based on several days in the courtroom, if the government were to say to the Judge we believed that you've given substantial corporation and the Judge thought you were lying, what do you think she would do?

MR. ACREE: Objection.

THE COURT: Sustained. Good heavens.

BY MR. GEISE:

Q. Let me ask you another question. Who do you understand will ultimately determine whether you have given honest testimony?

A. The Judge.

MR. GEISE: Court's indulgence for one moment.

40

THE COURT: Again, it's going to be in the province of the jury to decide whether or not for purposes of this trial. He is just asking about sentencing.

MR. GEISE: Yes, ma'am.

THE COURT: I'm not usurping the jury's role for purposes of the trial. They are the fact-finder. Okay.

MR. GEISE: No further questions, Your Honor.

THE COURT: Okay. I think that concludes the witness.

MR. BALAREZO: Your Honor?

THE COURT: You have other questions?

MR. BALAREZO: Yes, just --

THE COURT: Go ahead quickly.

FURTHER CROSS-EXAMINATION

BY MR. BALAREZO:

Q. Good afternoon, Mr. Adams.

A. Good afternoon, sir.

Q. I'll start with the last question from Mr. Geise about you said the Judge will determine whether you're telling the truth; right?

A. Yes.

Q. That's what you just said; correct?

A. Yes, sir.

Q. The Judge didn't make the plea agreement, did she?

THE COURT: This is recross, sir.

MR. BALAREZO: Your Honor, it's regarding the

41

1 government's questions on redirect.
2     THE COURT: We have gone over this ad nauseam. I have
3 no idea what you possibly would be asking that hasn't been
4 asked five times before.
5     MR. BALAREZO: Well, I haven't asked that one, Your
6 Honor.
7 BY MR. BALAREZO:
8 Q. Mr. Adams, did the Judge sign the plea agreement for you?
9 A. I signed it, and I think she did sign it.
10 Q. Did she make you the plea offer?
11 A. No, sir.
12 Q. Is she going to file a motion with the committee at the
13 U.S. Attorney's Office?
14 A. No, sir.
15 Q. So your answer is not correct, because they determine
16 whether you tell the truth; right?
17     MR. GEISE: Objection.
18     THE COURT: Sustained.
19 BY MR. BALAREZO:
20 Q. Now, Mr. Adams, the conversation that you claim to have had
21 with Mr. Jones at the jail, you don't remember when that was;
22 right?
23 A. A couple of days after we were arrested. I don't remember
24 the exact day, no, sir.
25 Q. You don't remember exactly where you were at the jail?

42

1 A. We was in D.C. Jail, sir, at the top tier.
2 Q. Top tier?
3 A. Yes, sir.
4 Q. And you were all just housed at the same place; right?
5 A. Yes, sir.
6 Q. All right. So the only thing the jury has to go by is your
7 word on what Mr. Jones said, then; correct?
8 A. That is correct.
9 Q. And regarding the North Carolina stop, you don't remember
10 when Lawrence Maynard told you about that; right?
11 A. Not the exact day, no.
12 Q. And you've heard a lot of questions about the proffer --
13     THE COURT: Twenty-five.
14     MR. BALAREZO: Twenty-five.
15     THE COURT: You have any exhibits --
16     MR. BALAREZO: You might have it, Your Honor, I'm
17 sorry.
18     THE COURT: It did come up here at one point.
19 BY MR. BALAREZO:
20 Q. Well, you had a chance to read the proffer; correct?
21     MR. GEISE: Objection, Your Honor. I think it's
22 beyond the scope of redirect.
23     THE COURT: I don't know, it was here, but who has got
24 it now? Where is it?
25     MR. BALAREZO: I hope I don't have it.

43

1     THE COURT: I don't have it. But I tell you the -- we
2 are going to open up more cans of worms here.
3     MR. BALAREZO: I think they're all out, Your Honor.
4     THE COURT: We are going to hear from Mr. Norris.
5 All right. Go ahead.
6 BY MR. BALAREZO:
7 Q. Now, you said you had a chance to read the proffer;
8 correct?
9     THE COURT: When? Back then, when they were -- huh?
10 Is that what you are asking him?
11     MR. BALAREZO: Your Honor, if I could just at least
12 get my question out. I'm sorry.
13     THE COURT: No. I want to know what we're talking
14 about so I can rule on the objection. You want to know whether
15 he read it back at the time of his arrest?
16 BY MR. BALAREZO:
17 Q. Mr. Adams, you testified earlier on my cross-examination
18 that before you met with the government you had an opportunity
19 to read the proffer. That's correct; right?
20 A. Yes, sir.
21 Q. And the first time you met with the government was on
22 November the 1st of 2005?
23     MR. GEISE: Objection, I think it's beyond the scope
24 of redirect.
25     THE COURT: I'll hear the question, but I think it's

44

1 going to be a problem.
2 BY MR. BALAREZO:
3 Q. Right?
4 A. Repeat that, sir.
5 Q. You read the proffer within a week after your arrest?
6 A. Yes.
7 Q. All right. And in the proffer there is a section called,
8 A, prior to the first interception, and it details the North
9 Carolina stop involving Lawrence Maynard; correct?
10     THE COURT: Okay. Let's approach. Let me see it.
11 (Bench conference.)
12     THE COURT: What page are we on?
13     MR. BALAREZO: It's right at the beginning, Your
14 Honor.
15     THE COURT: Okay. If you do open up this proffer, you
16 can't pick and choose paragraphs and then insinuate that he
17 learned about something from the proffer if you don't want to
18 put the proffer into evidence. You can't do it.
19     MR. BALAREZO: Your Honor, we're put in a position
20 where we have this guy testifying to whatever he wants to
21 testify about, and we have nothing to go against him -- can I
22 finish, Jack?
23     MR. GEISE: Yeah, I wasn't going to say anything.
24     MR. BALAREZO: We have nothing to go against him
25 because it's his word. And all we have is these other --

---

**45**

1  THE COURT:  Excuse me, that's just such a
2  misstatement.  We've got all these tapes, we've got all these
3  documents, we have these pictures.
4  MR. BALAREZO:  We don't have a tape of the jail
5  conversation, Your Honor.  We don't have a tape of the Maynard
6  conversation.
7  THE COURT:  So --
8  MR. BALAREZO:  All the information he just said is
9  right there.  That's all I'm trying to say.
10  THE COURT:  But it has to go into evidence.  That's
11  the problem with what you're trying to do.  You can't pick and
12  choose just so that what you say may be right.
13  MR. BALAREZO:  But, Your Honor --
14  THE COURT:  When you open doors, you open doors, you
15  don't just -- you're trying to insinuate that he learned about
16  it from this paragraph.
17  MR. BALAREZO:  Well, Your Honor, let me --
18  THE COURT:  You have no basis for doing that, frankly,
19  and if you are, you're going to have to put it into evidence.
20  And I'm not going to let you just put paragraph three into
21  evidence, Mr. Norris will go crazy.
22  MR. BALAREZO:  Your Honor, if I could just have -- all
23  I'm asking him, and all I asked him before was, he said he --
24  this is the only document that he claims to have read prior to
25  the meeting with the government.  He testified to that, and I

---

**46**

1  think he just acknowledged it.  He met with the government
2  within a week after the arrest.  He just testified that
3  Lawrence Maynard told him X, Y, and Z.  All I'm saying is there
4  is a paragraph in this document which explains X, Y, and Z.
5  And it's clear why I'm doing it.  I'm not asking about the
6  other 20 or 30 pages, I don't see why the whole document has to
7  be opened.  All I'm asking him a question about is this
8  particular paragraph.
9  THE COURT:  The paragraph of the --
10  MR. GEISE:  If I might try to -- there is also another
11  issue, which is I asked about in reference to the 302 and the
12  cross-examination about the 302.  In fact, when I tried to get
13  into the proffer at one point, this actual proffer, they all
14  said you can't get into the factual proffer, rephrase your
15  question, and I did.  That was the question concerning what he
16  had been told in the jail by Jones, so -- or I think.  But my
17  point is I was not allowed and I chose not to get into the
18  proffer on redirect as I recall, so I'm not sure how the
19  proffer is now opened on recross, frankly.  Not to mention, as
20  the Court pointed out, once you start putting in paragraph
21  after paragraph, it creates a huge mess, but I don't believe I
22  got into it on redirect.
23  MR. BALAREZO:  You put the proffer in front of him.
24  MR. GEISE:  That's when I --
25  THE COURT:  I know, but then it went away because

---

**47**

1  Mr. Norris started objecting.
2  MR. GEISE:  Objected, and so I wasn't allowed to get
3  into it.
4  THE COURT:  Yeah.  You know, I'm not actually sure
5  going line-by-line your inference is correct.  He said more
6  about -- he said facts that aren't part of this.  When he
7  talked about what Maynard told him, what did he -- oh, he said
8  he was going to Atlanta to pick up kilos.
9  MR. BALAREZO:  To pick up kilos.
10  THE COURT:  See, it seems -- I'm going to sustain it.
11  You're going to open up all kinds of things.  There are things
12  that he said in his testimony that aren't in this paragraph,
13  and otherwise the jury isn't going to be able to go
14  line-by-line and compare what he said that Maynard told him
15  versus what's in here.
16  MR. BALAREZO:  But again, Your Honor -- that's fine,
17  I'll abide by that, but the proffer is not the only universe of
18  what he knows, there's like five or six affidavits which have
19  more information and --
20  THE COURT:  He said he never saw those.  So what are
21  you going to do?  You can create this inference, but you have
22  to have a good basis for it, and that's not it, not the Maynard
23  situation.  Look at it, the facts are not precisely the same
24  line-by-line.  And otherwise, at some point, if you try to
25  create the inference from that document, the jury has got to

---

**48**

1  read it.  So thank you.
2  (Open court.)
3  BY MR. BALAREZO:
4  Q.  So, Mr. Adams, regarding the conversation with Mr. Maynard,
5  you don't recall when that conversation took place; right?
6  A.  I know it was before I got arrested.
7  Q.  Well, a lot of things happened before you were arrested.
8  A.  I don't remember the exact date, no.
9  Q.  Do you remember the month, the day?
10  A.  No, sir.
11  Q.  You said you were at some room in the club, you didn't even
12  say what room you were in; right?
13  A.  I said we was in a room upstairs, sir.
14  Q.  There are a lot of rooms upstairs; right?
15  A.  Yes, it is.
16  Q.  All right.  And once again, all the jury has to go by is
17  your word on that; right?
18  A.  Yes, sir.
19  Q.  Now, I'm just a little confused about this call 3178 that
20  you mentioned that was played again, or at least portions of
21  it, the one about the jerseys.
22  A.  Yes, sir.
23  Q.  All right.  There is a part where Mr. Jones supposedly
24  says, "I need -- I need two of these jerseys."  Is that drug
25  talk, according to you?

49

```
1    A.  Oh, yes, it is.
2    Q.  All right.  How much is each jersey?
3    A.  What do you mean, sir?
4    Q.  Well, how much drugs is each jersey?
5    A.  A half ounce can go for $400 or $500, depending on --
6         THE COURT:  No, he doesn't mean dollars, he means
7    what's the quantity of a jersey.
8         THE WITNESS:  Oh, 14 grams.
9    BY MR. BALAREZO:
10   Q.  So each jersey is 14 grams; is that what you're saying?
11   A.  The large ones, yes.
12   Q.  No, no.  If you want to look at page 81.  Do you want to
13   look at page 81?  Three lines down from the -- or three names
14   up from the bottom where it says, Jones, "I need -- I need two
15   of those jerseys;" right?
16   A.  Yes, sir.
17   Q.  All right.  Each of those jerseys is referring to what?
18   A.  A half ounce, 14 grams.
19         THE COURT:  Fourteen grams?
20   BY MR. BALAREZO:
21   Q.  So just so the jury knows, 14 grams equals what?
22   A.  A half ounce.
23   Q.  All right.  So that each jersey is a half ounce, so we're
24   talking about one ounce of cocaine?
25   A.  Yes, sir.
```

50

```
1    Q.  Okay.  Now, you indicated I believe that you were going to
2    give 14 ounces -- excuse me, 14 grams to Ty and 14 grams to
3    Brian; right?
4    A.  Yes, sir.
5    Q.  All right.  And then you said something about an extra
6    large jersey?
7    A.  Yes, sir.
8    Q.  Now, that's a 62?
9    A.  Yes, sir.
10   Q.  Which is how many ounces?
11   A.  May I have a pencil, please?
12   Q.  I have to ask the Marshal.
13         THE COURT:  Do we have a --
14         THE WITNESS:  I don't add all that good, sir, I mean,
15   so I can add it up for you.
16   BY MR. BALAREZO:
17   Q.  All right.  Fourteen grams is half an ounce; right?
18   A.  Yes, sir.
19   Q.  So 28 grams would be one ounce?
20   A.  Yes, sir.
21   Q.  So 28 times two is 56 grams, that would be two ounces; is
22   that correct?  Am I right?
23   A.  Yes, sir.
24         THE COURT:  So far so good.
25   BY MR. BALAREZO:
```

51

```
1    Q.  All right.  So 62 grams, is that a little over two ounces?
2    If 56 grams is two ounces, 62 grams is a little over two
3    ounces; does that make sense?
4    A.  Yes.
5    Q.  Okay.  So you're saying that out of those two jerseys, you
6    are going to give two half ounces -- excuse me, two half
7    ounces, one to Ty, one to Derrick -- or Brian, and then you're
8    going to have to give 62, which is the extra large jersey, to
9    somebody else?
10   A.  To Derrick, yes.
11   Q.  Where does that 62 come from?
12   A.  What do you mean where did it come from?
13   Q.  I'm just trying to understand the conversation that you're
14   talking about.
15   A.  It came from the coke that was given back to me.
16   Q.  Well, how much was given back to you?
17   A.  Maybe --
18   Q.  I think you talked about an eighth?
19   A.  Yeah, but it was a little -- it may have been a little
20   shorter than an eighth.
21   Q.  Well, you have said an eighth all along.
22   A.  It may have been a little shorter than an eighth.
23   Q.  Well, an eighth is how many grams?
24   A.  Between --
25   Q.  Well, no, an eighth is an eighth.
```

52

```
1    A.  Sir, excuse me.  Excuse me.
2         THE COURT:  Do you want him to answer the question "a
3    eighth is an eighth"?
4         THE WITNESS:  An eighth is 125 grams.
5    BY MR. BALAREZO:
6    Q.  Okay.
7    A.  Some people sell 120 grams, 122 grams, 123 grams, and they
8    still say it's an eighth.
9    Q.  But an eighth refers to an eighth of a?
10   A.  Eighth of a kilo.
11   Q.  Of a kilo?
12   A.  Yes, sir.
13   Q.  A kilo is 1,000 grams?
14   A.  Yes, sir.
15   Q.  125 grams is an eighth of a kilo; right?
16   A.  Yes, sir.
17   Q.  All right.  So you're giving 14 to Ty, a 14 to Brian, and
18   then you got a 62 to somebody else?
19   A.  To Derrick.
20   Q.  To Derrick.  So that's 28 and 62.  If my math is correct,
21   that's 90, 90 grams?
22   A.  Yes, sir.
23   Q.  What happened to the remainder?
24   A.  Sir, that's what I got back from the customer that gave it
25   to me.
```

**53**

1  Q.  All right.  So in this case an eighth is 90 grams, not 125?
2  A.  I'm not saying that, sir.  I'm telling you when they
3  brought it back to me, that's what it was.  It was two half
4  ounces and one 62.  It might have been maybe 63, 62, but that's
5  what it basically was.
6  Q.  So you can't account for the other 35 grams basically?
7  A.  No, sir.
8  Q.  All right.  And all we have regarding what actually
9  happened is your word on this; right?
10  A.  Yes.
11  Q.  And you are an experienced drug dealer and you don't know
12  what happened to the other 35 grams; right?
13  A.  I would have to ask the person that gave it back to me.
14  Q.  I'm asking you.  You are the experienced drug dealer since
15  1984, and you don't care about the other 35 grams?
16  A.  Sir, I would have to ask the person that gave it back to
17  me.
18  Q.  And you never did, did you?
19  A.  No, I didn't.
20      MR. BALAREZO:  I have nothing else for this witness.
21      THE COURT:  Anything else?
22      MR. NORRIS:  There is no redirect on behalf of --
23      FURTHER RECROSS-EXAMINATION
24  BY MR. McDANIEL:
25  Q.  Mr. Adams, your partner, Paul Taylor, that was his name?

**54**

1  A.  Yes.
2  Q.  Do you know if Paul Taylor has been arrested?
3  A.  I don't know, sir.
4  Q.  This was your partner, your 50/50  partner; right?
5  A.  Sir, I don't know if he has been arrested or not.
6      THE COURT:  I think we're way beyond the scope of
7  redirect.
8  BY MR. McDANIEL:
9  Q.  You don't know if your man has been arrested; is that
10  right?
11      THE COURT:  Thank you.
12      THE WITNESS:  I don't know if he has been arrested or
13  not.
14      THE COURT:  Thank you.
15  Anything else, only limited to this redirect?
16      MR. ACREE:  Yes, Your Honor.
17      RECROSS-EXAMINATION
18  BY MR. ACREE:
19  Q.  Mr. Adams, one of the things that you and I talked about
20  was the fact that you had -- you claimed to have said to
21  Mr. Jones "What does this half a ticket mean"; right?
22  A.  Yes. Yes.
23  Q.  And then you and Mr. Geise talked about the fact that you
24  and Mr. Jones had this whole conversation about, you know, they
25  got us because, you know, then somebody was talking about half

**55**

1  a ticket, and somebody messed up; right?
2  A.  Yes.
3  Q.  Now, on another occasion that you spoke to members of law
4  enforcement in November, you said that -- you told them that
5  anyone would know that a half a ticket is a half a kilo.  Do
6  you remember saying that to them?
7  A.  Yes, sir, I probably did.
8  Q.  So if you know, and not only you, but anybody, according to
9  you would know that half a ticket means half a kilo, why would
10  you and Mr. Jones have a conversation where you saying, well,
11  what's a half a ticket mean, and he says, I don't know,
12  somebody messed up?  How can you be involved in both of those
13  kind of conversations?
14  A.  Sir, I can't tell you what somebody else said.  I can only
15  tell you what I said, what I know.
16  Q.  No, but you asked him "What does half a ticket mean?"
17  Right?
18  A.  Sir --
19  Q.  Didn't you say that you asked Jones what half a ticket
20  means?
21  A.  I don't remember saying that.
22  Q.  Sir, you just testified before, we asked you, isn't that
23  what you and Mr. Geise and before that you and I were talking
24  about, that you said to Mr. Jones, what's this whole half a
25  ticket stuff, and he said, I don't know, somebody messed up?

**56**

1  A.  I think I told him that a half a ticket was a half a kilo a
2  minute ago.
3  Q.  But what I'm asking you now is, didn't you say that you
4  were saying to Mr. Jones, having a conversation with him about
5  the fact that there is this conversation about half a ticket;
6  right?  Right?
7  A.  Yes.
8  Q.  Isn't that what you were talking about, this half a ticket;
9  right?
10  A.  Yes, sir.
11  Q.  And you said to Mr. Jones, what does that mean?
12  A.  Oh, no, sir, excuse me --
13  Q.  And he said --
14  A.  I'm talking reference like, man, what is this, somebody
15  talking about a half a ticket, what is that?  That's in
16  reference, sir.
17      THE COURT:  I think that -- I'm sorry, Mr. Acree.  I
18  didn't understand him to be saying what you are saying, at
19  least not on the redirect, at all.
20  BY MR. ACREE:
21  Q.  So what you're saying is that nobody should have been
22  saying half a ticket; is that -- is that what you're saying?
23      THE COURT:  You want to approach?  I think we are
24  really getting everybody confused here.
25      MR. ACREE:  Well, I'm just trying -- I'm not trying to

57

1  get everybody confused. I'm only asking.
2      THE COURT:  Well, you want me to tell you what I
3  understood his redirect to be?
4      MR. ACREE:  No.
5      THE COURT:  I think you are misleading.
6      MR. ACREE:  Well, I'm not trying to, I'm only asking
7  the questions if we can get —
8      THE COURT:  I'm sorry.  You are setting it up as if
9  you are interpreting it one way.  We will excuse the jury for a
10  movement.
11      MR. ACREE:  Okay.
12      THE COURT:  All right.  Take a short recess, ladies
13  and gentlemen.
14      (Jury out at 3:01 p.m.)
15      THE COURT:  You can correct me if I'm wrong,
16  Mr. Acree, but I think we're barking up the wrong tree.  He
17  testified on redirect that —
18      MR. ACREE:  Your Honor, can we have this conversation
19  outside the presence of the witness?
20      THE COURT:  Sure.
21      You are limited now to redirect.  The scope is very
22  limited.  And I'll tell you the way I understood it, we can go
23  back and get the transcript, but on redirect he was explaining
24  about a conversation with Jones in the jail where Jones says,
25  well, they will never figure this out, nobody is going to know

58

1  what we are talking about.  His point in response was, how
2  could they not know, a half a ticket doesn't make any sense, or
3  a whole ticket doesn't make any sense, and then he said Jones
4  didn't say anything in response.  I can assure you the more you
5  go at this the worse it's going to get.  If I'm wrong about
6  what he said, I don't understand your questions, but it's going
7  to land up tramping on Mr. Norris' objections, and it's going
8  to open up more of this conversation.
9      MR. ACREE:  Aren't we still talking about — it just
10  seems to me — I guess my first point, as far as opening up the
11  door, it just seems to me that we are on just this one
12  conversation regarding this one comment.
13      THE COURT:  Yeah, but he never said that he didn't
14  understand what a whole ticket was or a half ticket.
15      MR. ACREE:  Right.
16      THE COURT:  He said that anybody listening to the
17  tapes would be able to figure out that they weren't talking
18  about real tickets because nobody talks about half tickets or
19  whole tickets.  That's what he was saying in response to
20  Mr. Geise.  And so your questions are misinterpreting his
21  testimony.  You can have her read it back to you, but, one,
22  that's what I heard him say, I wrote it down, that's what I
23  understood him —
24      Right, Mr. Norris?  You are the one concerned that we
25  don't get too far afield here.

59

1      But you keep on suggesting that he didn't understand
2  the words, and that's not what he was saying in the jail.
3      MR. NORRIS:  Judge, if I could just clarify my
4  objection.  I'm not trying to limit my cocounsel in their cross
5  or recross.
6      THE COURT:  I know you're not.
7      MR. NORRIS:  I just don't want it to get into any
8  discussions with Mr. Jackson.
9      THE COURT:  I understand.
10      MR. NORRIS:  And I don't think this opens that, nor do
11  I want the entire proffer to go in.
12      THE COURT:  I know you don't.
13      MR. NORRIS:  Portions are fine, but as long as they
14  don't deal with Mr. Jackson.
15      THE COURT:  I understand.  But I'm just telling you
16  that this conversation, the more we go at this conversation to
17  have him explain what he was saying with Mr. Jones, I — you
18  can go back and read what he said in response to Mr. Geise's
19  question, but the import was not that he didn't understand the
20  words as used in the tape, but rather the odd suggestion that
21  people would talk about half tickets or whole tickets is going
22  to mean that the people listening, i.e., the government, will
23  understand that they are not talking about real tickets.
24  That's what his point was.
25      MR. ACREE:  And I understand what the Court is saying.

60

1  So if he is saying that, I know that — basically, with the
2  point being my follow-up on him would be, well, for example,
3  there was a ticket that said half price, we know that there is
4  a ticket that says half price.  So what I'm saying is that if
5  that's where he wants to go, I'll go wherever he wants to go —
6      THE COURT:  No, no.  You're limited to the
7  conversation — his point to Jones, to the extent there was a
8  point, was anybody listening to these tapes would get clued in
9  that we weren't really talking about the real thing.  It's not
10  time now to pick a little — you know, to show there was a real
11  ticket somewhere.  Otherwise all you are doing, that's not
12  responsive to his conversation with Jones whatsoever.
13      MR. ACREE:  Well, the problem with that, Your Honor,
14  is that to say that — to say that if you say half a ticket
15  that it necessarily means half a kilo.  How do we get there?
16  Why can't half a ticket mean a half-price ticket of which we
17  know they exist.  I'm saying this is a conversation that Mr. —
18  I mean, I think I understand that the Court is saying, and I —
19  and I thought that what we were doing was going back to his
20  conversation and him saying that this is — this is what it
21  means.
22      THE COURT:  Not exactly at all.
23      MR. ACREE:  Okay.  Okay.
24      THE COURT:  We have already gone around what does it
25  mean 3 million times with everybody questioning him and coming

61

1  up with flyers and coming up with tickets. We have had tons of
2  that. This is just merely him saying to Jones, Jones' point is
3  they will never catch us, they won't understand these tapes.
4  This guy comes back and says, yeah, they will because there's
5  some very odd things on the tapes. And here we are with that
6  as the government's argument. That's it. That's all. It's
7  not whether there are half tickets, aren't half tickets,
8  whether or not anybody would figure out these tapes. Only that
9  he thinks that they have fooled the government and this guy
10 says, no, and here is why. That's it. There is no more to be
11 gotten out of this conversation going back to show there might
12 be a half ticket in existence. So we're way beyond the scope.
13        MR. ACREE:  Well, and let me just say this for the
14 record. I understand the Court's ruling. I think the
15 problem -- what the Court's saying it that, well, because he
16 said it that makes it so because there is nothing else.
17        THE COURT:  No.
18        MR. ACREE:  And that's the way that it was left on
19 redirect.
20        THE COURT:  No. But you can't go back and rehash the
21 stuff that's already been hashed before. Redirect and recross
22 is not the opportunity to rehash what you've already done. We
23 have rehashed and covered the ground about whether or not there
24 might be such a thing as a half ticket, whether there are real
25 tickets running around, it's all done. That's not what recross

62

1  is all about. Thank you.
2        We will be back a quarter past.
3        Have we got any more for this witness? Do we need him
4  anymore? Do you have any more, Mr. Acree? We are not going
5  back to whether he thinks there is such a thing as a half
6  ticket and whether there was one.
7        MR. ACREE:  I guess --
8        THE COURT:  The answer is, do you have anything else?
9  The question, I'm sorry. Do you have anything else?
10        MR. ACREE:  No, Your Honor.
11        THE COURT:  The witness is excused. Thank you.
12        Get your next witness.
13        (3:09 p.m.)
14        MS. LIEBER:  Gikas is coming.
15        MR. BALAREZO:  And this was raised when she last
16 testified, is that based on her reports that we've read, or
17 that I've read, it appears that a lot of her knowledge is not
18 direct knowledge, it's secondhand, it's from other agents. And
19 when she gets on the stand and she testifies, she testifies as
20 if she'd witnessed something, she saw it, she did it.
21        And I'm just a little concerned, because I was reading
22 through her transcript and I missed -- I objected about three
23 questions from when I should have in one instance because I
24 wasn't sure.
25        And I just want -- if the government could tell her to

63

1  testify or elicit questions about her direct knowledge and not
2  ask her questions where she'll answer something as if she did
3  it --
4        THE COURT:  Okay.
5        MR. BALAREZO:  -- or saw it herself.
6        THE COURT:  I think --
7        MR. BALAREZO:  Because really, it's misleading to
8  us -- well, to me --
9        THE COURT:  Right.
10        MR. BALAREZO:  -- in a way, because I can't object
11 because I don't know, you know, what she knows or what she did.
12        THE COURT:  Okay.
13        MR. BALAREZO:  And if it comes out later, it's too
14 late.
15        THE COURT:  And if the government would kind of lay a
16 foundation, we'll -- we can avoid the problem. Some of it can
17 go in as non-hearsay, but we've got to understand where we're
18 going.
19        MS. LIEBER:  And there -- I -- I'll try.
20        THE COURT:  Fine. Let's bring in the jury. I'll
21 instruct the witness, then, to limit herself to what she saw
22 and heard.
23        MR. BALAREZO:  Your Honor, just in the interest of
24 time, will the Court allow us to question agent Yanta about the
25 302s that we questioned Mr. Adams about?

64

1        THE COURT:  No. But if you want to take her off for a
2  few minutes -- they're not putting her on for that at all.
3        Sorry. Good try.
4        Have a seat. You're still under oath.
5        We put her on for two days so we could go over the
6  302s. If you want her in your case, she'll be available.
7  She's sitting right out there, subject to being asked.
8        (Jury present at 3:26 p.m.)
9        THE COURT:  Everybody okay?
10        All right. Detective, you're still under oath.
11        THE WITNESS:  Yes, ma'am.
12        (Witness, Stephanie Yanta, 3:26 p.m.)
13              DIRECT EXAMINATION
14 BY MS. LIEBER:
15 Q.  Good afternoon, Special Agent Yanta.
16 A.  Good afternoon.
17 Q.  On October 24, was John Adams' wife arrested?
18 A.  Yes, she was.
19 Q.  And did you participate -- well, why was she arrested?
20 A.  Based on the amount of cocaine and the firearms that were
21 recovered from the residence.
22 Q.  Was she present in the residence when those items were
23 recovered?
24 A.  Yes, she was. And she is of adult age.
25 Q.  Is that why she was arrested?

SCHAEFFER 11-15

65

1  A.  Yes.
2  Q.  Did you participate in the decision about whether or not to
3  actually formally charge her in connection with those items?
4  A.  Yes, I did.
5  Q.  And when was that decision made?
6  A.  It was actually made on the 24th, once the search warrants
7  had been competed.
8  Q.  And what was that decision?
9  A.  The decision was to not formally charge her.
10  Q.  Okay.  And when was she released from custody?
11  A.  I believe she was actually released the next day.
12  Q.  All right.  Why -- who was the focus of the investigation
13  that you were working on?
14  A.  The investigation was focused on Antoine Jones and the
15  conspiracies surrounding.
16      MR. BALAREZO:  Objection.  Calls for legal conclusion.
17  Move to strike.
18      THE COURT:  Well, sustained.  The focus was Antoine
19  Jones.  After that, I don't see that the rest of the answer is
20  particularly responsive.  So it will be stricken.
21      MS. LIEBER:  Thank, Your Honor.
22  BY MS. LIEBER:
23  Q.  And Special Agent Yanta, finally, was John Adams'
24  willingness to cooperate with the government, did that factor
25  in at all to your decision to cut Mrs. Adams loose?

66

1  A.  No, it did not.
2  Q.  How do you know that?
3  A.  Because at that point in time, no one had expressed a
4  willingness to cooperate with the government.
5  Q.  Thank you.
6      MS. LIEBER:  I don't have anything else.
7      THE COURT:  I can't believe we have any questions on
8  that particular point.
9      MR. BALAREZO:  Believe it, Your Honor.  I have a few.
10  Or don't believe it.
11                CROSS-EXAMINATION
12  BY MR. BALAREZO:
13  Q.  Good afternoon, Special Agent Yanta, how are you?
14  A.  Good afternoon, sir.
15  Q.  You were aware at the time you made this decision to
16  release Mrs. Adams, that a weapon had been found in the closet
17  of her shoes -- or in -- with a box of her shoes; right?
18  A.  Yes, sir.
19  Q.  And you were aware that a large amount of money, about
20  $9,700, was found in a closet and in a shoe box containing her
21  shoes; right?
22  A.  Yes.
23  Q.  All right.  And you were aware that her husband, Mr. Adams,
24  had also -- or you were aware that drugs were also found in her
25  house; correct?

67

1  A.  Absolutely.
2  Q.  Now, you've -- normally, possession of drugs and weapons
3  are offenses in certain -- certain cases; right?
4  A.  I believe it's an offense all the time.
5  Q.  All the time.  Very good.
6      Now, you indicated that she was not the focus of a -- of
7  the investigation; right?
8  A.  Yes.
9  Q.  That's what you just said?
10  A.  That's correct.
11  Q.  So are you telling us that because she was not a focus of
12  the investigation, you're willing to overlook a crime that may
13  have been committed by her?
14  A.  No, sir.
15  Q.  Okay.  Did -- you just decided not to pursue the charges;
16  right?
17  A.  That's correct.
18  Q.  Now, you didn't make that decision all on your own?
19  A.  No, sir, I did not.
20  Q.  You had conversations with the prosecutors; correct?
21  A.  Yes, sir.
22  Q.  And basically they directed you to release her and not
23  press charges against her; correct?
24  A.  It was a collaborative decision, sir.
25  Q.  But ultimately, it was their decision; right?

68

1  A.  I don't know who ultimately made the decision.
2  Q.  Well, you don't make a decision to prosecute or not, do
3  you?
4  A.  That's correct, I do not.
5  Q.  They make that decision?
6  A.  They are the prosecutors, yes, sir.
7  Q.  Right.
8      So they make the decision?
9  A.  They are the prosecutors.
10      MR. BALAREZO:  I have nothing else, Your Honor.
11      MR. NORRIS:  No questions, Your Honor.
12      MR. McDANIEL:  No questions.
13      MR. ACREE:  No questions.
14      THE COURT:  Nothing else?
15      MS. LIEBER:  Nothing.  Thank you.
16      THE COURT:  Okay.  Call your next witness.
17      MS. LIEBER:  Your Honor, the government calls Andrew
18  Schaeffer.
19      THE COURT:  Right up here, sir, please.
20      (Witness sworn by the clerk at 3:31 p.m.)
21                DIRECT EXAMINATION
22  BY MS. LIEBER:
23  Q.  Good afternoon, sir.
24  A.  Good day.
25  Q.  In a nice, clear voice, can you please introduce yourself

STAND A    SC hoeffen

69

1  to the jury and spell your first and last names for the court
2  reporter?
3  A.  My name is Andrew Schaeffer, S-C-H-A-E-F-F-E-R.
4  Q.  Sir, how are you employed?
5  A.  I'm the president of Metropolitan Investment Company.
6  Q.  And what is Metropolitan Investment Company?
7  A.  It a property management company for commercial buildings.
8         THE COURT:  Sorry.  You'll have to speak up a little
9  bit.  It moves your -- if you want to move it closer.
10 BY MS. LIEBER:
11 Q.  Mr. Schaeffer, is one of the properties that your company
12 manages the Hampton Park Storage Facility located at 400
13 Hampton Park Boulevard in Capitol Heights, Maryland?
14 A.  It is.
15 Q.  Okay.  And sir, I'm going to show you what I've marked as
16 Government's Exhibits ICE-15, -16, -17, -18 and -19.
17        MS. LIEBER:  First, I'm going to show this to the
18 defense, Your Honor, which they've seen before.  And actually,
19 I'll add in ICE 21, while we're at it.
20        MR. BALAREZO:  Before we show this, can we lay a
21 proper foundation about --
22        THE COURT:  No.  The way you lay it is to show it to
23 him and ask him if he recognizes them.  They're not in evidence
24 yet.  That's what she's doing.
25        MR. BALAREZO:  I understand, Your Honor.

70

1         THE COURT:  All right.  Go ahead.  You can -- has
2  everybody seen them?  I'm sure you've seen them before.
3         What page of the list, Gwen, do you know?
4         THE DEPUTY CLERK:  It's page 18.
5         THE COURT:  18, thank you.
6         MS. LIEBER:  Your Honor, if I may approach the
7  witness.
8         THE COURT:  Yes.
9  BY MS. LIEBER:
10 Q.  Mr. Schaeffer I'm showing you Government Exhibits ICE-15,
11 -16, -17, -18, -19 and -21.
12        I'm just going to ask you to take a look at those documents
13 and see if you recognize those documents.
14 A.  I do.
15 Q.  Have you seen those documents today, as a matter of fact?
16 A.  Yes.
17 Q.  Okay.  What are those documents?
18 A.  The first one is the front page and the last page of a
19 lease for 400 Hampton Park Boulevard.  Exhibit 16 is a credit
20 application, business application, and 17 is a termination
21 letter.  18 is a brochure of the building.  And 19 is a plan of
22 the building.
23 Q.  Okay.  And I'm going to stop you there for a minute.
24        Just that first -- not the picture, but that first set of
25 documents, are those -- those documents, those lease documents

71

1  that you have before you, are those records that you -- well,
2  first of all, do those pertain to a particular lease at the 400
3  Hampton Park Boulevard storage facility?
4         MR. BALAREZO:  Objection, Your Honor.
5         THE COURT:  Why?
6         MR. BALAREZO:  I think it's getting a little bit ahead
7  of itself before the proper foundation is laid, if it gets into
8  specifics of --
9         THE COURT:  You recognize these?
10        THE WITNESS:  I do, Your Honor.
11        THE COURT:  Did a copy of these come from your files,
12 from your company's files?
13        THE WITNESS:  They did.
14        THE COURT:  And are these documents kept in the
15 regular course of business.
16        THE WITNESS:  They are.
17        THE COURT:  And is it in the regular course of
18 business for your company to maintain tease type of documents?
19        THE WITNESS:  It is.
20        THE COURT:  What's your objection?
21        MR. BALAREZO:  Well, none in that -- with that direct.
22        THE COURT:  Anything else?
23        MS. LIEBER:  For the record, those were my next four
24 questions.
25        THE COURT:  You said it was going to be a short

72

1  witness.  I'm determined to have it be a short witness.
2         Anything else for anybody?
3         MR. BALAREZO:  You want to do my cross?
4         MS. LIEBER:  Your Honor, at this time, I seek
5  admission of ICE-15 through -19.
6         THE COURT:  And what about 21, I'm sorry -- okay.
7         Any objection to my laying that foundation?
8         MR. BALAREZO:  No, Your Honor.
9         THE COURT:  Mr. Norris?
10        MR. NORRIS:  No.
11        THE COURT:  18 – 15, 16, 17, 18, 19 are admitted.
12 Thank you.
13
14        (Government's Exhibits ICE-15, ICE-16, ICE-17, ICE-18,
15        and ICE-19 were received into evidence.)
16 BY MS. LIEBER:
17 Q.  Mr. Schaeffer, I'm also now going to put on this Elmo, just
18 for your purposes at this point, it's in the in evidence,
19 ICE-21 --
20        THE COURT:  Do you want the jury to see the ones that
21 just went in?  I didn't do that.
22        I think you just at least could have him identify the
23 ones that just went into evidence, please, for the purpose of
24 the jury.
25 BY MS. LIEBER:

**73**

1  Q. Mr. Schaeffer, before we go on to ICE-21, let me ask you,
2  who is the person who leased -- and I'll put this on the Elmo
3  for you, if you look at that little screen.
4      Who is the person who leased this Hampton Park warehouse
5  storage facility?
6  A. Mr. Jones and Mrs. Jones.
7  Q. Okay. And is it Antoine and Denise Jones?
8  A. Yes.
9  Q. And did you, yourself, actually make copies of these
10 documents and give them to anybody a while back?
11 A. Yes.
12 Q. Okay. And who did you give them to, if you remember?
13 A. I received a subpoena, and I gave them -- I only remember
14 the first person, Katerina, I believe her name was.
15 Q. Okay. And in reviewing them again today are these the same
16 documents?
17 A. They are.
18 Q. Okay. Now, let me ask you, finally, Mr. Schaeffer about
19 ICE-21.
20     Do you recognize that picture?
21 A. I do.
22 Q. What is that -- that's actually not in evidence.
23 A. That is the front of 400 Hampton Park Boulevard.
24 Q. Okay. And does that picture fairly and accurately
25 represent the front of a particular storage unit at Hampton

**74**

1  Park?
2  A. It does.
3  Q. Okay. Which unit was that?
4  A. 400.
5  Q. Okay. And is 400 the unit that we've been talking about?
6  A. It is.
7  Q. Okay. And does that picture fairly and accurately
8  represent how the front of Unit 400 look at the time that it
9  was being leased by Mr. Jones?
10 A. It does.
11     MS. LIEBER:  Your Honor, at this time I would move
12 Government's ICE-21 into evidence.
13     MR. BALAREZO:  At what time?
14     THE COURT:  What's the date of the lease, please?
15 BY MS. LIEBER:
16 Q. Well, let me ask this, actually, Mr. Schaeffer, at the time
17 that Mr. Jones entered into the lease agreement with your
18 company for 400 Hampton Park Storage, did the front door to
19 that unit look like this?
20 A. No.
21 Q. What did the front door of that unit look like when you
22 first rented that space to Antoine Jones?
23     MR. BALAREZO:  Objection, Your Honor.
24 Can we approach one second?
25     THE COURT:  No. Does he know?

**75**

1      MR. BALAREZO:  It's not about -- it's about something
2  else, Your Honor, please.
3      THE COURT:  All right.
4      (Bench conference.)
5      MR. BALAREZO:  Your Honor, this may be a minor point
6  in the universe, but, number one, there's been no
7  identification of my client yet.
8      Number two, I don't know if this witness can identify
9  my client.
10     Number three, I object to Miss Lieber saying something
11 about Mr. Jones and then pointing to my client.
12     MS. LIEBER:  I'm sorry. I -- I didn't think about it,
13 and you're right.
14     THE COURT:  I don't know. That's all well-taken. I
15 don't know if he can or he can't.
16     He can identify dates. Can he identify him?
17     MS. LIEBER:  He can. He has a picture in his file, a
18 driver's license picture.
19     THE COURT:  Oh, all right. Well then, you'd better
20 establish that.
21     MS. LIEBER:  Okay. And I'm sorry. I didn't think
22 about it.
23     THE COURT:  I don't know how we're using this
24 custodian of records -- very good.
25     MR. BALAREZO:  Well, I didn't object, but he's the

**76**

1  president of the company. That doesn't necessarily mean he was
2  the custodian. That's one of the things I was objecting to
3  before the Court laid that foundation as it did.
4      And that was really my concern, does he know what
5  these documents are, does he deal with them, I don't know.
6      MS. LIEBER:  He personally made the copies from the
7  file, so he does know.
8      THE COURT:  No, that's not the point. Now the problem
9  is whether he has firsthand knowledge about who is the lessee,
10 and what did he lease, and what did the door look like.
11     So you have to lay that foundation.
12     MS. LIEBER:  Sure. Thank you.
13     THE COURT:  Thank you.
14     MR. BALAREZO:  Before we go, I think there is an issue
15 where he may testify about Mr. Jones putting up a door that
16 cost thousands of dollars. I don't think this guy knows who
17 ordered that door put in there, how much it costs, I mean, so I
18 don't want to get into -- it's hearsay.
19     MS. LIEBER:  Since we're here -- he is going to --
20     THE COURT:  Well, it's not hearsay to say the door
21 went up.
22     MR. BALAREZO:  No, no, but --
23     THE COURT:  He saw it.
24     MR. BALAREZO:  -- but there are other things that I
25 think would be hearsay, related to the door.

77

1   MS. LIEBER:   He is going to test -- I'm going to ask
2   him --
3   THE COURT:   He can testify to what Adam -- what Jones
4   told him, not his wife though.
5   MS. LIEBER:   Right. And he's only going to -- I'm
6   sorry. He's going to testify about a conversation he had with
7   Mr. Jones about putting up the door, why Mr. Jones wanted to
8   put up the door.
9   THE COURT:   It's all staying in.
10  MS. LIEBER:   -- and the fact that the door has to stay
11  because it's permanent.
12  THE COURT:   Okay. Thank you.
13  (Open court.)
14
15  BY MS. LIEBER:
16  Q.  Mr. Schaeffer, before I get to the picture that we have
17  been talking about, in the course of your duties as the manager
18  of that property, did you have occasion to have a conversation
19  or a number of conversations with Antoine Jones?
20  A.  I had one or two.
21  Q.  Okay. And do you actually have a photograph of Antoine
22  Jones in your file?
23  A.  I have a copy of his driver's license.
24  Q.  Okay. Would you -- if you saw Mr. Jones again, would you
25  be able to recognize Mr. Jones?

78

1   A.  Maybe.
2   Q.  Okay. Would seeing that picture that you have in your file
3   refresh your memory as to what Mr. Jones looked like?
4   MR. BALAREZO:   Objection, Your Honor. He didn't
5   indicate that he couldn't.
6   THE COURT:   No, he didn't.
7   The first question is: Can you identify anybody in
8   this courtroom as Mr. Jones?
9   THE WITNESS:   Without looking at the driver's license,
10  I would say no.
11  BY MS. LIEBER:
12  Q.  Would taking a look at that driver's license picture
13  refresh your memory as to the person who calls himself
14  Mr. Jones, who rented this facility?
15  A.  It would.
16  MS. LIEBER:   I'm showing to Mr. Balarezo, Photo 60,
17  just for identification.
18  If I may approach Your Honor, may I approach?
19  THE COURT:   Yes.
20  BY MS. LIEBER:
21  Q.  Mr. Schaeffer, I'm showing you Government's Exhibit Photo
22  60. Taking a look at that photograph, does that refresh your
23  memory as to the person who identified himself as Antoine Jones
24  who rented the storage facility we're talking about?
25  A.  Yes.

79

1   Q.  Okay. Now, having taken a look at that photograph, if you
2   look around the courtroom, do you see the person who you spoke
3   with who represented himself to be Antoine Jones who rep -- who
4   rented this facility?
5   A.  I think he's sitting at that table over there.
6   Q.  Okay. Can you be -- I'm sorry. Can you be a little more
7   specific? There are several people sitting at that table.
8   You can stand up and look, if it helps.
9   A.  I would say the man in the brown suit, but I'm not sure.
10  Q.  Thank you.
11  THE COURT:   You mean that gentleman that's standing?
12  THE WITNESS:   Yes.
13  MR. BALAREZO:   For the record, Mr. Norris' client
14  stood up.
15  MR. NORRIS:   Thank you.
16  THE COURT:   All right. True, for the record.
17  All right. Go ahead.
18  BY MS. LIEBER:
19  Q.  Now, Mr. Schaeffer, I want to show you now what I've marked
20  as Government's Exhibit, again, ICE-21. It's not in evidence.
21  At the time that Mr. Jones rented the storage facility in --
22  I'll put this on the machine, which was on November 17th, 2003,
23  did the storage Unit, 400 Hampton Park Boulevard, actually have
24  that door on it?
25  A.  No.

80

1   Q.  Is that the standard door that is in front of the various
2   warehouse units at your company?
3   A.  No.
4   Q.  Okay. Did there come a point in time during the course of
5   Mr. Jones' rental of that particular space that he installed
6   this overhead door?
7   A.  He did.
8   Q.  Okay. Does this picture fairly an accurately represent the
9   storage facility unit after he had that door installed?
10  A.  It does.
11  MS. LIEBER:   Your Honor, at this time I would move
12  ICE-21 into evidence.
13  MR. BALAREZO:   Your Honor, I object, subject to the
14  objection I made at the bench.
15  THE COURT:   Who --
16  MS. LIEBER:   Your Honor, I --
17  THE COURT:   Fairly and accurately represents the
18  facility after the door was added, but the door wasn't there
19  originally; right?
20  THE WITNESS:   Correct.
21  THE COURT:   Okay. I don't understand the objection to
22  the admission of the paper.
23  MR. BALAREZO:   I'll deal with it on cross.
24  THE COURT:   All right. Then 21 is admitted.
25  (Government's Exhibit ICE-21 was received into

81

1  evidence.)
2  MR. BALAREZO:  But I still object to it, for the
3  record.
4  THE COURT:  Okay.  Overruled.
5  Go ahead.
6  BY MS. LIEBER:
7  Q.  Mr. Schaeffer, did you actually have a conversation with
8  Mr. Jones about why he wanted to install that particular
9  overhead door?
10  A.  He did ask if he could have permission to install it, and I
11  said, yes.
12  Q.  Okay.  And why -- did he tell you why he wanted to install
13  an overhead door on the front of that warehouse facility?
14  A.  He said that --
15  MR. BALAREZO:  Objection, Your Honor.
16  THE COURT:  You want to approach, on what basis?
17  MR. BALAREZO:  Let me think of one.
18  THE COURT:  Huh?
19  MR. BALAREZO:  Yes.
20  THE COURT:  Have we talked about it before?  I've
21  overruled that.
22  MR. BALAREZO:  Well --
23  THE COURT:  When you were talking with this person,
24  the person who entered into the lease, is this the same person
25  you talked to?

82

1  THE WITNESS:  Yes, Your Honor.
2  THE COURT:  Okay.  And did the person who you were
3  talking to give you a name?
4  THE WITNESS:  He did.
5  THE COURT:  What did he tell you his name was?
6  THE WITNESS:  Mr. Jones.
7  THE COURT:  Okay.  You want to approach?
8  MR. BALAREZO:  Yes.
9  THE COURT:  All right.  Sorry.
10  (Bench conference.)
11  THE COURT:  The fact that he can't make an -- can you
12  stand over there, please?  Sorry to make you do that.  Just
13  stand over there.
14  Let me -- okay.  Never mind.  Go ahead -- 21 is
15  admitted.  Go ahead.
16  MR. BALAREZO:  Where is it?
17  THE COURT:  What are you looking for?
18  MR. BALAREZO:  Well -- sorry.
19  THE COURT:  He can't make and in-court identification.
20  MR. BALAREZO:  Right.  No, I understand.
21  THE COURT:  Where is the photo I.D.?
22  MS. LIEBER:  Your Honor, if I may, I'm going to ask
23  him was that also kept in his file in the ordinary course of
24  business.  He's going to say yes, and I'm going to put it in.
25  THE COURT:  Did this come from his file?

83

1  MS. LIEBER:  It did.  I took it out of his file and
2  put a sticker on it.
3  THE COURT:  What -- what is the problem?  This is the
4  guy I talked to, this is the guy that signed the lease, this is
5  the guy --
6  MR. BALAREZO:  Well, he hasn't said that.
7  THE COURT:  He's about to.  I mean, that's the point.
8  That's where we're going.
9  And what's the answer, though?  What is the person
10  saying?
11  MS. LIEBER:  He says that he wanted more secure -- he
12  wanted to secure it with an overhead door because he ran a
13  moving and storage business.
14  THE COURT:  We're fighting over this?
15  MR. BALAREZO:  Well, Your Honor, because -- no.
16  Because the implication is --
17  THE COURT:  I'm working so hard that my brain cells
18  are gone.
19  MR. BALAREZO:  Mine are gone.
20  But the implication, I think, is that the warehouse
21  had a glass front at some point, and Mr. Jones put that in so
22  he could secure his drugs.
23  THE COURT:  The implication, but the more you bring it
24  out -- we didn't know anything about glass doors, I'll tell you
25  that.

84

1  MR. BALAREZO:  Well, I don't particularly want to get
2  into it.  The thing is, it's --
3  THE COURT:  But in any case, it's not fatal to her
4  being able to elicit this.  When a person who looks like this
5  who says, "My name's Jones and signs the lease," says the
6  following.  It's an admission of the party opponent.
7  MR. BALAREZO:  That's what I'm reading right now.  I
8  thought there was one of the subsections there that I could
9  throw at the government, but --
10  MR. GEISE:  I think it's 801(d)(2)-1.
11  MR. BALAREZO:  I have it, yeah.
12  MR. NORRIS:  While Mr. Balarezo is looking at that,
13  how do we deal with the issue of the false identification of my
14  client as Mr. Jones, with the jury?
15  THE COURT:  I think that they have to be told that he
16  has done that.  We can stipulate after he leaves.
17  MR. NORRIS:  Very well.
18  THE COURT:  I don't think we ought to clue him in, so
19  that he goes back --
20  MR. NORRIS:  No, no.  I don't want to do it in front
21  of the witness.
22  THE COURT:  But for the record, it's been done as
23  identified as your client, and we can certainly say that, you
24  know, it wasn't -- there was no suggestion that it was your
25  client that was renting this.

85

1    MR. NORRIS:   I can work on that.
2    MS. LIEBER:   Your Honor, that's why I didn't say for
3 the record he identified -- because I didn't want to tip him
4 off.
5    THE COURT:   Right. Okay. I've had enough.
6    MR. BALAREZO:   I'm sorry, Your Honor.
7    THE COURT:   Thank you.
8    MS. LIEBER:   She has enough of a recollection of the
9 rules of evidence. Thank you.
10   (Open court.)
11    THE COURT:   Thank you, sir. Would you retake the
12 stand?
13    You notice our bench conferences, ladies and
14 gentlemen, get longer as the day gets later. It's harder to
15 think fast enough.
16    Okay. Go ahead. Sorry.
17    MS. LIEBER:   Mr. Norris gets funnier.
18 BY MS. LIEBER:
19 Q.  Let me ask this, Mr. Schaeffer, the item that I identified
20 for you as Photo 60 and brought up there that you looked at --
21    THE COURT:   This is ICE-60, Gwen.
22    MS. LIEBER:   I'm sorry, it's Photo 60.
23    THE COURT:   Photo 60. Okay, Photo 60.
24 BY MS. LIEBER:
25 Q.  Is that photocopy a document that you also kept in the

86

1 ordinary course of business?
2 A.  It is.
3 Q.  Okay.
4    MS. LIEBER:   At this time, Your Honor, I would move
5 Photo 60 into evidence.
6    THE COURT:   Do you know whether that came from your
7 files, sir?
8    THE WITNESS:   It did, Your Honor.
9    THE COURT:   Any objection?
10    MR. BALAREZO:   No, Your Honor.
11    THE COURT:   That means Photo 60 is in evidence, and it
12 can be shown.
13
14 (Government's Exhibit Photo 60 was received into evidence.)
15    MR. NORRIS:   Your Honor, no objection, but just for
16 the record, can we say that that appeared to be a photocopy of
17 a driver's license that's been enlarged several times.
18    THE COURT:   Okay. I think we can agree that that's
19 probably a correct photocopy of an enlarged driver's license.
20 BY MS. LIEBER:
21 Q.  Mr. Schaeffer, I have been asking a lot of questions about
22 the person who rented the location and the person who installed
23 this overhead door.
24    The person who did all of those things, did he also give
25 you this driver's license?

87

1 A.  He did.
2 Q.  As part of his identification?
3 A.  He did.
4 Q.  Okay. Thank you.
5    THE COURT:   Is that the person you talked to?
6    THE WITNESS:   Yes, it is.
7 BY MS. LIEBER:
8 Q.  And did he say his name was Antoine Jones?
9 A.  Yes, he did.
10 Q.  Okay, thank you.
11    Back to the overhead door.
12    When you had a conversation with Mr. Jones, what did he
13 tell you about why he wanted to install this overhead door?
14 A.  He said that he was in the moving and storage business, and
15 he felt that the glass door front was not secure enough.
16 Q.  And tell the jury, what was the glass door? What did it
17 look like?
18 A.  It was a glass door front, and then it had a personnel door
19 to go in and out of.
20 Q.  When you say personnel door --
21 A.  Or a people door.
22 Q.  Like the one behind you, for instance?
23 A.  Yes. And then -- yes.
24 Q.  And for the record, I'm talking about the door to the jury
25 room.

88

1    And when you say a glass front, what kind of grass?
2 A.  It was tempered glass.
3 Q.  Okay. And when he said that he wanted to do that, did you
4 grant him permission to do that?
5 A.  I did.
6 Q.  Okay. Did you give him any sort of instructions about what
7 would have to happen to that door come time that he ended his
8 lease?
9 A.  I told him that it became affixed to the building, that
10 when he terminated his lease, that it would stay. And he
11 agreed.
12 Q.  Okay.
13    MS. LIEBER:   Court's indulgence.
14    THE COURT:   What was the day the lease was signed? D
15 you have the documents in front of you?
16 BY MS. LIEBER:
17 Q.  And this part of the --
18    THE COURT:   I just asked him the date the lease was
19 signed.
20    MS. LIEBER:   Oh, I'm sorry.
21 BY MS. LIEBER:
22 Q.  I was going to show you this anyway.
23    Looking at this, when was the lease signed, sir?
24 A.  The lease was signed November 17, 2003.
25 Q.  And was it signed by Mr. Jones, and anybody else?

89

1  A.  Mrs. Jones.
2  Q.  Did she actually come there in person, herself?
3  A.  She came at least once. I don't know if he brought it
4  signed or if she came.
5  Q.  Okay. But you actually -- she came at least one time?
6  A.  Yes.
7  Q.  Okay. And finally, sir, with respect to the overhead door,
8  how much do those cost, do you know?
9       MR. BALAREZO:  Objection.
10      THE COURT:   And how would he know?
11      MS. LIEBER:  Well --
12      THE COURT:  Do you know?
13  BY MS. LIEBER:
14  Q.  Do you have firsthand knowledge of how much an overhead
15  door like that costs?
16  A.  Approximately, yes.
17      MR. BALAREZO:  Objection.
18  BY MS. LIEBER:
19  Q.  And how do you know?
20  A.  I've had other doors like that installed.
21      THE COURT:   Did you pay for them or see the bill?
22      THE WITNESS:   I paid for them.
23      THE COURT:   Okay. Overruled.
24  BY MS. LIEBER:
25  Q.  And how much does an overhead door like that cost?

90

1  A.  Between 3,000 and $3,500.
2  Q.  Okay. Thank you very much, sir.
3       THE COURT:   Go ahead.
4       MS. LIEBER:   Oh, I'm sorry. I said "Thank you very
5  much." I meant that's all I had.
6       Thank you very much.
7       THE COURT:   That's why she sat down.
8       Okay.
9                 CROSS-EXAMINATION
10  BY MR. BALAREZO:
11  Q.  Good afternoon, Mr. Schaeffer. How are you?
12      My name is Eduardo Balarezo. I think you might recall, you
13  and I spoke a few times over the phone?
14  A.  Yes.
15  Q.  How are you?
16  A.  Fine, thank you.
17  Q.  Mr. Schaeffer, what was the date of this lease that we were
18  talking about?
19  A.  November 17, 2003.
20  Q.  So that was approximately three years ago?
21  A.  Approximately, yes.
22  Q.  Did you, yourself, accept the lease from this Mr. Jones?
23  A.  I did.
24  Q.  Okay. And you've identified an individual here that is Mr.
25  Jones; right?

91

1  A.  I did.
2  Q.  Okay. Now, you've also talked about Mrs. Jones.
3       Did you do anything to confirm that the person you are
4  calling Mrs. Jones was, in fact, Mrs. Jones?
5  A.  When they first came in, they came in together. They
6  were -- I believe there were three people. There was
7  Mr. Jones, Mrs. Jones, and Lawrence.
8       And I asked for their driver's licenses at that time. And
9  then I ran a credit check. And they came back later once the
10  process had been completed, but I'm not sure if Mrs. Jones came
11  back.
12  Q.  Right.
13      But my question -- and I'll try to make it very specific,
14  is, did you do anything to confirm that Mr. Jones and
15  Mrs. Jones were, in fact, married, besides check their
16  licenses?
17  A.  No, that's all I did, yes.
18  Q.  Okay. So --
19  A.  I mean, and I did run a credit report, but I -- I -- that's
20  all I did, yes.
21  Q.  And the -- the warehouse that you own over in Hampton Park,
22  that is a large -- well, a fairly large --
23      THE COURT:   What town is it in again?
24      THE WITNESS:   Capitol Heights.
25  BY MR. BALAREZO:

92

1  Q.  Let me show you or put up on the Elmo, ICE-19. I think
2  it's already been admitted.
3       Okay. Do you see that, sir?
4  A.  I do.
5  Q.  Exhibit 19?
6       Now, is this the -- would this diagram, would that
7  represent the entirety of the warehouse that you own in Hampton
8  Park?
9  A.  It does.
10  Q.  And the one that -- the space that we've been talking about
11  is Number 400; right?
12  A.  It is.
13  Q.  As that's -- as we can see, that's at the end of the
14  warehouse?
15  A.  It is.
16  Q.  Okay. What's -- what's on this side over here?
17  A.  There's a fence.
18  Q.  Okay.
19  A.  And then there's a parking lot. And then there's a --
20  another industrial building. I believe it's Con Paper
21  Products.
22  Q.  All right. Now, the -- the area, it's basically -- let's
23  say after hours, it's pretty desolate, is it not?
24  A.  I would say yes.
25  Q.  It's a parking lot and some other industrial complex;

93

1  right?
2  A.  Yes.
3  Q.  There's not a lot of people coming and going; correct?
4  A.  The tenant next to him sometimes stays open until 7:00 or
5  8:00, yeah, 404 and 408.
6  Q.  And that's the --
7  A.  Snack food --
8  Q.  And that's the Snack Shack; is that right?
9  A.  Yes.
10  Q.  And the Snack Shack is still there?
11  A.  It is.
12  Q.  Now, you are aware, since you're the owner and you deal
13  with these people, that the snack shack, in the past -- I'm not
14  asking about right now -- but in the past, had a lot of
15  break-ins; correct?
16  A.  I don't recall that.  I remember when there was a bicycle
17  shop in unit -- I think it was 412 or 418, they were broken
18  into.  I don't remember the snack shack being broken into, but
19  I remember at least one break in.
20  Q.  And most of these -- most, if not all of those spaces,
21  again, each of these spaces is an individual warehouse; right?
22  A.  Some of them are combined units like 404 and 408, there
23  would be no wall in-between, it would be just open space.
24  Q.  But the front of these were all the same, basically that
25  plate grass that you were talking about; right?

94.

1  A.  Right.
2  Q.  Okay.  So, for example, when the bicycle shop was broken
3  into, somebody broke the plate glass and got in; correct?
4  A.  Yes.
5  Q.  Now, you indicated that Mr. Jones told you that he was
6  going to use this as -- what was it, a furniture --
7  A.  I thought he said moving and storage.
8  Q.  A moving and storage company.
9     Did you ever go into the space at the time that Mr. Jones
10  had the lease?
11  A.  Not that I remember, no.
12  Q.  Can you tell this jury that Mr. Jones never had any
13  furniture in that -- in that particular space, Number 400?
14  A.  No, I couldn't say that.
15  Q.  Now, if Mr. Jones was conducting this business, this
16  furniture moving business, and considering that you've had
17  break-ins into your other warehouse spaces, it's not really
18  unusual for him to want to secure his space, is it?
19     MS. LIEBER:  Objection.
20     THE COURT:  Sustained.  Sustained.
21  BY MR. BALAREZO:
22  Q.  Now, you indicated that you, yourself, had some of these
23  overhead doors installed.
24     Were they installed in these other spaces?
25  A.  They were not installed in this building, no.

95

1  Q.  Why did you have those installed?
2  A.  For security.
3  Q.  To prevent break-ins; correct?
4  A.  Yes.
5  Q.  Now, you indicated that you gave the documents that Miss
6  Lieber showed you, the lease and the brochures, you gave them
7  to somebody named Katerina?
8  A.  Yes.
9  Q.  Do you recall when you gave her those documents?
10  A.  No.
11  Q.  Was it within the last month, or was it within the last
12  year, do you recall?
13  A.  It certainly wasn't within the last year.
14  Q.  Was it before last year, let's say?
15  A.  It was.
16  Q.  Okay.  And that was in response to a subpoena; is that
17  correct?
18  A.  It was.
19  Q.  All right.  And is it not true that you also agreed to
20  allow her agency, the Immigration and Customs Enforcement
21  Agency, to use another location to conduct surveillance?
22  A.  I never did that, no.
23  Q.  Are you -- you're the owner of this location; right?
24  A.  I'm the owner of this building, yes.
25     MR. BALAREZO:  If I could just have one second.

96

1  BY MR. BALAREZO:
2  Q.  Do you know who someone by the name of Larry Gasner
3  (phonetic) is?
4  A.  No.
5  Q.  Do you know what Crystal Management, LLC is?
6  A.  No.
7  Q.  How about Hampton Park Center, LLC?
8  A.  No.
9  Q.  What is the name of your particular company?
10  A.  9000 Hampton Park Limited Partnership.
11  Q.  And do you know what the building at 401 Hampton Park
12  Boulevard is -- where that is?
13     MS. LIEBER:  Objection.  Beyond the scope.
14     THE COURT:  It is.
15     If you know, you can answer this.
16     THE WITNESS:  I assume it's across the street.  You
17  know, without going out there, I don't know.  I assume 401
18  would be across from 400, I assume.
19     THE COURT:  But you don't have any interest?
20     THE WITNESS:  No.
21     THE COURT:  Okay.  Go ahead.
22  BY MR. BALAREZO:
23  Q.  No interest, just to clarify that -- because I anticipate
24  the following witness.
25     You have no interest as in you have no ownership interest?

97

1  A.  That and this is the only building I own in Hampton Park.
2  Q.  I understand.
3       MR. BALAREZO:  And, Your Honor, actually, can we
4  approach before I continue, just so -- I know it's late.
5       THE COURT:  Just finish it up please.
6       Go ahead.
7  BY MR. BALAREZO:
8  Q.  This person, Katerina, did there come a time when she --
9  when you allowed her to enter the premises at 400 Hampton Park?
10  A.  I may have.
11  Q.  As best as you can, did you, or did you not?
12  A.  I didn't have a key when the tenant was in. After the
13  tenant left, if she asked me for the key, I would have given
14  her the key.
15  Q.  Well, but my question is -- I'm not asking you to speculate
16  as to whether you did or not.
17       To the best of your recollection, did she ask you to --
18  whether --
19  A.  I do not remember.
20  Q.  All right.  Do you remember speaking to an individual by
21  the name of Mark Glick?
22  A.  Yes.
23  Q.  About a month ago?
24  A.  Yes.
25  Q.  And you're aware that Mr. Glick is my investigator?

98

1  A.  I am.
2  Q.  Okay.  And do you recall Mr. Glick asking you questions to
3  that effect, whether or not you allowed agent Katerina -- Gikas
4  is her last name -- to enter the premises?
5  A.  I do.
6  Q.  And do you remember that you told Mr. Glick that you did
7  not give Agent Gikas authority to enter the premises?
8  A.  No.  I said I did not remember.
9  Q.  Now, the -- the inside of 400, it just wasn't one big open
10  space; correct?
11       There was an office --
12  A.  There was an office in the front part, yes.
13  Q.  And that office had doors -- well, the office is what
14  fronted the glass partition at the front; correct?
15  A.  Yes.
16  Q.  All right.  Now, were you aware that Mr. Jones kept
17  furniture in the office?
18  A.  No.
19  Q.  So you had no inspections of the premises while he had the
20  lease?
21  A.  He was there a very short time.  I don't remember going out
22  while he was a tenant.
23       THE COURT:  When did he leave?  When was the tenancy
24  over?
25       THE WITNESS:  April 30th.  I think he was there for

99

1  about five months.
2       THE COURT:  April 30, '04?
3       THE WITNESS:  '04.
4  BY MR. BALAREZO:
5  Q.  And did you, yourself, enter the premises upon his
6  departure?
7  A.  I don't remember, but it's customary for me to go out and
8  inspect the premises, so he could get his security deposit
9  back.
10  Q.  And did you give Mr. Jones his --
11  A.  I did.
12  Q.  And part of the reason you gave the security deposit back
13  was because there was no damage to the property; right?
14  A.  Correct.
15  Q.  And when Mr. Jones left the property, he cleared it out; is
16  that correct?
17  A.  I don't -- I don't remember.
18  Q.  Well, if Mr. Jones had left garbage and equipment and all
19  kinds of items in the -- in the location, would you have
20  considered that basically completing his lease and given him
21  all his money back, or would you have taken money for cleanup,
22  let's say?
23  A.  Yes.  Normally, if there's a small amount of debris or
24  stuff left, I still return the security deposit.
25  Q.  Let me ask you this, do you recall whether or not once

100

1  Mr. Jones left the premises, whether there was a -- any
2  clothing, any uniforms, anything of that nature?
3  A.  I do not know.
4  Q.  Don't know or don't recall?
5  A.  I guess I would say I don't recall.  I don't remember
6  anything like that.
7  Q.  Do you remember whether or not when Mr. Jones left the
8  premises, if there were any sort of inflatable mattresses or
9  any sort of equipment like that?
10  A.  I don't recall.
11  Q.  Do you know whether or not when Mr. Jones left the
12  premises, if there were any bags, duffle bags, suitcases,
13  anything of that nature?
14  A.  No, I don't know.
15  Q.  And do you know when Mr. Jones left the premises, if there
16  were any heat-sealing equipment, any wrapping materials,
17  anything of that nature?
18  A.  I do not know.
19  Q.  And when Mr. Jones left the premises do you know if there
20  was --
21       THE COURT:  Can we ask you, do you have any idea what
22  was in it when he left?
23       THE WITNESS:  I have no idea, Your Honor.
24       MR. BALAREZO:  Well, Your Honor, I have to ask those
25  specific ones.

101

1  THE COURT:  Well, you did.  Thank you.
2  MR. BALAREZO:  Am I done?
3  THE COURT:  I hope so.
4  Anybody else?
5  MR. BALAREZO:  I may have had one more, but I'll defer
6  to the --
7  MR. NORRIS:  I'll defer to Mr. Balarezo.
8  THE COURT:  Do you want to give him your one question,
9  that will be fine.  Go ahead.
10  MR. BALAREZO:  I'll turn it into three.
11  THE COURT:  Okay, Mr. Norris.
12  MR. NORRIS:  Thank you.
13  CROSS-EXAMINATION
14  BY MR. NORRIS:
15  Q.  Good afternoon, Mr. Schaeffer.
16  A.  Good afternoon.
17  Q.  I believe you've mentioned three names in connection with
18  this lease, Mr. Antoine Jones, his wife, I believe you said was
19  Denise Jones, and someone named Lawrence; is that correct?
20  A.  Yes.
21  Q.  Okay.  And Lawrence, would that be Lawrence Maynard?
22  A.  It would be.
23  Q.  Okay.  And the name Adrian Jackson is not anything that
24  you're familiar with in connection with the rental of this
25  unit; is that correct?

102

1  A.  No.
2  Q.  And that's not one that you've met --
3  THE COURT:  Wait, no.  Is that correct meaning yes?
4  Correct, you're agreeing with him?
5  The name Adrian Jackson is meaningless to you?
6  THE WITNESS:  Yes, I have no knowledge of him.
7  BY MR. NORRIS:
8  Q.  No knowledge of Adrian Jackson?
9  A.  Correct.
10  Q.  Okay.
11  MR. NORRIS:  Nothing further.
12  MR. McDANIEL:  No thank you, Your Honor.
13  MR. ACREE:  No, Your Honor.
14  
15  REDIRECT
16  BY MS. LIEBER:
17  Q.  Mr. Schaeffer, very briefly, I'm going to show you -- I'll
18  just put them on the monitor here.
19  THE COURT:  They're not in evidence?
20  MS. LIEBER:  They're not in evidence yet.
21  BY MS. LIEBER:
22  Q.  Photo 61, do you see that?
23  A.  Yes.
24  Q.  And what is Photo 61?
25  A.  It's a driver's license of Lawrence Maynard.

103

1  Q.  Is it a photocopy of that driver's license?
2  A.  It is.
3  Q.  Okay.  Now I'm going to show you Photo 62; do you see that?
4  A.  I do.
5  Q.  And what is that?
6  A.  That's a photocopy of a driver's license of Mrs. Jones.
7  Q.  Now, Mr. Schaeffer, were these also kept in your rental
8  file in the ordinary course of business?
9  A.  It was.
10  Q.  Okay.  Were these actual photocopies that you or someone
11  like you made of the driver's licenses presented by Mrs. Jones
12  and Mr. Maynard?
13  A.  It was.
14  Q.  Okay.
15  MS. LIEBER:  Your Honor, at this time I would move
16  Photos 61 and 62 into evidence.
17  THE COURT:  Are these copies from your files?
18  THE WITNESS:  They are, Your Honor.
19  THE COURT:  Any objection?
20  MR. BALAREZO:  No.
21  THE COURT:  Photo 61 and -2 are in.
22  (Government's Exhibits Photo 61 and Photo 62 were
23  received into evidence.)
24  BY MS. LIEBER:
25  Q.  And finally, Mr. Schaeffer --

104

1  THE COURT:  Are you going to put them on the screen
2  though?
3  MS. LIEBER:  I'm sorry.
4  BY MS. LIEBER:
5  Q.  Here's Photo 62; is that right?
6  A.  Yes, it is.
7  Q.  Okay.  And that's Denise Jones?
8  A.  Yes, it is.
9  Q.  Now Photo 61?
10  A.  That's Lawrence.
11  Q.  Okay.  Thank you.
12  Did you actually see Lawrence around that property from
13  time to time?
14  A.  I did.
15  Q.  Finally, Mr. Schaeffer, when Mr. Jones was the renter of
16  that space, so we're talking now the winter of 2004, did you
17  have a key to that overhead door?
18  A.  I did not.
19  Q.  How did you get the key when he vacated the premises?
20  A.  He took the locks off the door when he left.
21  Q.  Okay.  And it was at that time that you had access to it?
22  A.  It was.
23  Q.  Okay.  Thank you.
24  MS. LIEBER:  Nothing else.
25  THE COURT:  Thank you, you may step down.

**105**

1  MR. BALAREZO:  Your Honor, administratively, can I
2  just discuss one quick issue with Mr. Schaeffer?
3  THE COURT:  You mean on the stand?
4  MR. BALAREZO:  No, no, just before he have leaves.
5  THE COURT:  I don't know.  You can walk out with him,
6  as far as I'm concerned.
7  MR. BALAREZO:  I'll let --
8  THE COURT:  In the meantime, can you get your next
9  witness?
10  Did you finish?
11  MR. BALAREZO:  Yes, thank you, Your Honor.
12  MS. LIEBER:  My next witness is coming.
13  THE COURT:  Good afternoon.  Welcome back from
14  Atlanta.  We haven't gone anywhere since you left.
15  You're still under oath.
16  MS. LIEBER:  Can I object to that, actually?
17  THE COURT:  I don't mean that we haven't progressed.
18  We're still in the same courtroom --
19  MS. LIEBER:  I think we would all object to that.
20  THE COURT:  Yeah.  Some people are wearing different
21  clothes, I hope.
22  Have a seat.  You're still under oath.  I just wanted
23  to reorient you to where you are.
24  (Special Agent Katerina Gikas, 4:10 p.m.)
25  DIRECT EXAMINATION (continued)

**106**

1  BY MS. LIEBER:
2  Q.  Good afternoon, ma'am.
3  A.  Good afternoon.
4  Q.  Welcome back.
5  A.  Thank you.
6  Q.  Now, when last we spoke a few weeks ago, you were talking
7  about an investigation that was begun by a phone call from ICE
8  agents in McAllen, Texas; is that right?
9  A.  Yes.
10  Q.  Okay.  And the first -- just want to step back for a
11  minute, but first, did you ultimately, in the course of your
12  investigation that was kicked off by that phone call, identify
13  three locations of interest in the metropolitan
14  Washington, D.C. area?
15  A.  Yes.
16  Q.  Okay.  Remind the jury, just so we know where we are,
17  remind the jury what those three locations were in, I guess I
18  should actually say suburban Maryland, outside of
19  Washington, D.C.?
20  A.  The first location was an apartment in Summit Circle in
21  Largo, Maryland.  The second location was a single-family home,
22  8550 Myrtle Avenue in Bowie, Maryland.
23  And actually, two more locations, one location -- the third
24  location was a warehouse in Capitol Heights, Maryland 400
25  Hampton Park Boulevard.

**107**

1  Q.  Okay.
2  A.  And then a club in D.C. on Montana Avenue.
3  Q.  Okay.
4  A.  Club Levels.
5  Q.  Okay.  Now, what I want to do is, first, we had some
6  discussion back when we -- before we broke the last time, about
7  what led you to focus on the residence of this apartment in
8  Summit Circle.  And what was it that, without getting, again,
9  into all the detail of your investigation, that got you there?
10  What was it about a particular apartment in Summit Circle
11  Apartments in Largo, Maryland, that peaked your interest?
12  A.  Well, we had followed one of the subjects that we were
13  following from -- that had come from Texas --
14  THE COURT:  Remind us of his name again.  You told us
15  before.
16  THE WITNESS:  Javier.
17  THE COURT:  Full name?
18  THE WITNESS:  Francisco Javier Ruan Gonzalez.
19  BY MS. LIEBER:
20  Q.  And did you call him Javier?
21  A.  I did.
22  Q.  And for purposes of this testimony, we'll call him Javier,
23  okay?
24  A.  Right.
25  Q.  Okay.  And how is it that you linked this Javier to an

**108**

1  apartment at Summit Circle?
2  A.  We followed him there, and we saw him go into an apartment
3  on the third -- on the third floor.
4  Q.  And when you say "we," it was actually you, personally, who
5  saw him go into an apartment on the third floor?
6  A.  Yes.
7  Q.  Okay.  Now, in connection with your investigation of where
8  he might be going and what he might be doing, did you obtain
9  rental documents for a particular apartment within the Summit
10  Circle apartment complex?
11  A.  Yes.
12  Q.  Okay.  And a how is it that you pinpointed a specific
13  apartment within the Summit Circle apartments?
14  A.  We looked at the list of all the renters in that apartment,
15  and one of them was the same name as the registrant of the
16  vehicle that picked up one of the --
17  MR. BALAREZO:  Objection.  Objection, Your Honor.  I
18  have to approach on this.  This is what we were talking about.
19  THE COURT:  No, no.  It's all right.  Hold on.  I know
20  what you're talking about, but we would like to know what you
21  learned on your own as opposed to being told something else.
22  But it may be that we will get to the second question next.
23  Did you actually search the titles to the cars, or did
24  somebody do that and tell you?
25  THE WITNESS:  Someone told me.

**109**

1　THE COURT:　Okay. But this is not going in for the
2　truth of the contents whatsoever.
3　MR. BALAREZO:　Yes, it is, Your Honor.
4　THE COURT:　Do you want to approach?
5　MR. BALAREZO:　Yeah.
6　(Bench conference.)
7　THE COURT:　I take it the rental car belongs to --
8　remind me. We've already probably gone over this.
9　MS. LIEBER:　We have not. Actually, something
10　developed since we were last here in terms of my ability to
11　prove certain aspects, which is why I'm eliciting this.
12　I'm not asking her now for the specific names. This
13　just goes to her state of mind, how she figured out which
14　apartment to focus on. This is -- this is what's going to
15　happy eventually.
16　At some point, Javier and his -- one of his
17　compatriots head back to Texas fairly quickly. A car comes and
18　picks up one of these people and takes them to BWI. The car
19　that picked him up was registered to Antoine Jones. I have --
20　we have the witness who was in the parking lot surveilling that
21　and seeing Mr. Jones get into -- I'm sorry, seeing the unknown
22　Hispanic male get into the black Cadillac registered to Antoine
23　Jones.
24　We have that witness who is going to be here tomorrow
25　or Monday who will testify that "I observed this particular

**110**

1　license plate."
2　THE COURT:　Do you have something that tells us that
3　the license plate belongs to him? Because that you are
4　introducing for the truth.
5　MS. LIEBER:　I have the DMV record that she obtained
6　that has that license plate tag number. Based on their
7　identification of that person, they looked at the Summit Circle
8　leases for the third floor -- I think there are four units up
9　there, 9719.
10　And when they looked at the four possible apartments,
11　one was rented by the guy who registered the car that picked up
12　the unknown Hispanic male, Jones.
13　THE COURT:　So what are you objecting to? Now, she's
14　only -- she said that to say that she identified the apartment.
15　Did she go search the apartment or something? What do
16　you care?
17　MS. LIEBER:　She looked -- in other words, the
18　question may be out there. I certainly had that question.
19　She testified there are four apartments on the third
20　floor. How did you know which one to be curious about?
21　Because all she saw -- she personally saw Javier go up to the
22　third level and didn't know which apartment.
23　THE COURT:　Right.
24　MS. LIEBER:　Well, in the days that followed, she
25　looked at the registrants of those four apartments, the leases,

**111**

1　and she realized that Antoine Jones rented Apartment 3-B, and
2　that Antoine Jones' vehicle picked up unknown Hispanic Male 2
3　and took him to BWI.
4　THE COURT:　And so are you intending to elicit the
5　latter fact from someone tomorrow?
6　MS. LIEBER:　Tomorrow or Monday, I mean, as soon as we
7　can get him here, yes. But I have his phone number now, and he
8　knows he's going to be a witness.
9　THE COURT:　Are you going to ask her?
10　MS. LIEBER:　No.
11　THE COURT:　So there's no hearsay coming out anyways.
12　MS. LIEBER:　I just want -- I just want the dots to be
13　connected that this is the process she employed, and then we
14　will connect it up.
15　THE COURT:　She can testify that the rental was to
16　Antoine Jones, we know that. Because she's -- those documents
17　are in can. She's going to say it matches the car, and they're
18　going to prove the car tomorrow.
19　MR. BALAREZO:　Well, that was --
20　THE COURT:　Okay. You're all set.
21　MR. BALAREZO:　-- my primary objection because I
22　didn't have that information before.
23　THE COURT:　Yeah.
24　MR. ACREE:　I was just going to say that Mr. Huggins
25　keeps asking me to ask you if he can go to the bathroom. I

**112**

1　think what might have happened was the last time, they didn't
2　go back. I'm not sure, but --
3　THE COURT:　I don't know. We have to let the jury go
4　back there. I can excuse him. I'm not going to stop the trial
5　at 4:15. So we'll give him a two-minute break.
6　MR. ACREE:　I apologize, but he said he really had to
7　go.
8　THE COURT:　Fine. Okay.
9　(Open court.)
10　THE COURT:　Ladies and gentlemen, I'm going to excuse
11　the jury for two minutes. Please don't go away. This is a
12　two-minute recess only. File out, and we'll bring you right
13　back. Believe me.
14　(Jury out at 4:18 p.m.)
15　THE COURT:　Okay. Go ahead.
16　When they come back in -- we don't have to be on the
17　record.
18　(Off the record, 4:19 p.m.)
19　(Back on the record, 4:20 p.m.)
20　THE COURT:　I intend to tell the jury when they come
21　back in two minutes, that Mr. Schaeffer mistakenly identified
22　Mr. Jackson in his testimony and that -- as Mr. Jones, and
23　there's no evidence that Mr. Jackson had anything to do with
24　this property.
25　MR. NORRIS:　Property or rental unit, whatever.

113

1    THE COURT: And it's agreed, it's stipulated?
2    MS. LIEBER: Yes.
3    MR. NORRIS: Thank you.
4    MR. BALAREZO: Your Honor, I know I don't have a
5    question with that, but I would object to the mistakenly part.
6    That's for the jury to make up its mind about. He identified
7    Mr. Jackson, and I would ask that the "mistakenly" be left out.
8    MR. NORRIS: I mean, it's clear from his testimony
9    that the person he was dealing with was Mr. Jones, both from
10    his testimony and from the driver's license record. So I think
11    for my client's purposes, it's important that it be pointed out
12    that the identification was a mistaken identification.
13    THE COURT: I bet maybe it's better just to say he
14    inaccurately identified Mr. Jackson as Mr. Jones. We all know
15    Mr. Jackson is not Mr. Jones, so that's not accurate.
16    MR. NORRIS: I'm fine with that.
17    THE COURT: Okay.
18    MR. NORRIS: Thank you.
19    THE COURT: All right.
20    We are going to bring back the jury in two seconds.
21    Mr. Huggins is here now, we can proceed. I just want you to
22    know, if you put in a summary chart, under the rule, once it
23    goes in, you're not required by the law to put in underlying
24    evidence, as long as they have access to it.
25    MS. LIEBER: And that's the point of it. Instead of

11[4]

1    having him come up and testify about various days --
2    THE COURT: Right. The same thing with calls and
3    everything else. The point for a summary is to avoid that.
4    MS. LIEBER: Right.
5    THE COURT: I'm just hoping that Detective Horne
6    really is not needed. I understand Hunter. Okay.
7    (Jury present at 4:24 p.m.)
8    THE COURT: Okay. Sorry for the interruption, ladies
9    and gentlemen. We apologize.
10    All right. Thank you very much.
11    We will resume.
12    BY MS. LIEBER:
13    Q. Agent Gikas, you testified -- and we're still at Summit
14    Circle Apartments -- that you identified the apartment of
15    interest by comparing two things.
16    Let me ask you, first -- and remind the jury, after you --
17    you followed Javier to 9719 Summit Circle, that garden-style
18    apartment building, did there come a time that some folks left
19    that apartment?
20    A. Yes.
21    Q. Okay. Did you personally observe where the people who were
22    in that apartment went?
23    A. When they left the first time, or when they left --
24    Q. When they left to go -- when they departed permanently?
25    A. No, I was not there. My ICE team had been relieved because

115

1    we had been there all night. And this was -- it was a Saturday
2    afternoon. It was the next day in the afternoon when -- when
3    they left.
4    Q. Okay. Did other members of ICE continue the surveillance
5    that you left off?
6    A. Yes.
7    Q. And did other members of your team see the people of
8    interest leave that apartment building?
9    A. Yes.
10    Q. And based on what they observed, did you identify a license
11    plate of interest?
12    A. Yes.
13    Q. Okay. Without getting into who that person was, whose car
14    that was, based on that information, were you able to pinpoint
15    which apartment on that third floor that you had talked about
16    was the apartment of interest?
17    A. Yes.
18    Q. Okay. And what apartment, what specific apartment was that
19    on the third floor at 9719 Summit Circle?
20    A. It was apartment 3-B.
21    Q. 3-B, as in boy?
22    A. Yes.
23    Q. And who resided in that apartment?
24    A. Antoine Jones.
25    Q. In the course of your investigation of this activity, did

11[6]

1    you actually obtain a lease application and other lease
2    documents from the rental office at the Summit Circle apartment
3    complex?
4    A. Yes, I did.
5    MS. LIEBER: Your Honor, I'm now going to show Special
6    Agent Gikas a number of documents already in evidence. ICE-2,
7    ICE-3, ICE-4, ICE-5 and ICE-6.
8    BY MS. LIEBER:
9    Q. And first, Agent Gikas, I'm going to show you ICE-2.
10    Is this the lease, a copy of the lease agreement that you
11    obtained from the Summit Properties?
12    A. It looks like it's the application for the lease.
13    Q. Okay. And who is the applicant?
14    A. Antoine Jones.
15    Q. And who does he indicate his present employer is on this
16    lease?
17    A. Thomas Brown Agency.
18    Q. And does he give a second employer?
19    A. Yes, D.C. Parks and Recreation.
20    Q. Okay. And did Mr. Jones appear to have signed that lease
21    application on November 15th of 2003?
22    A. Yes.
23    Q. Included, also, Agent Gikas -- and you may have actually
24    testified about this before, but I'll do it very quickly --
25    ICE-3, is this the actual lease agreement entered into by

117

```
1    Mr. Jones for Apartment 3-B at 9719 Summit Circle in Largo,
2    Maryland?
3    A.  Yes.
4    Q.  Does it list the date of occupancy as November --
5           MR. BALAREZO:  Objection as to form.
6           THE COURT:   The document says what it says.
7    BY MS. LIEBER:
8    Q.  Do you know the date of the lease?
9           THE COURT:   What does the document say?  It's in
10   evidence.
11   BY MS. LIEBER:
12   Q.  Now, when you obtained these rental -- related rental
13   documents, did you also obtain ICE Number 4?
14   A.  Yes, that was part of the --
15          MR. BALAREZO:   Objection.  I thought the Court ruled
16   on these particular ones.
17          THE COURT:   I thought we got them in.
18          MR. BALAREZO:   I thought these ones didn't.
19          THE COURT:   No, they were part the record that came in
20   with the custodian; right?
21          MS. LIEBER:   Yes.
22          THE COURT:   They're already in evidence; right?
23          MS. LIEBER:   Yes.
24          THE COURT:   Yeah.
25   BY MS. LIEBER:
```

118

```
1    Q.  Are these the actual documents that you obtained from that
2    rental agency?
3    A.  Yes.
4    Q.  Okay.  These statement of earnings?
5    A.  Yes.  They would have been submitted with the application.
6    Q.  Okay.  And finally, ICE-6, a statement of earnings from the
7    D.C. Government?
8    A.  Yes.
9    Q.  I said finally, but I was wrong.
10         I'm going to show you ICE-5 also.
11         Did you obtain this parking registration form?
12   A.  Yes, I did.
13   Q.  And does it indicate what type of car was registered there
14   to Mr. Jones?
15   A.  Yes, a Jeep Cherokee, champagne in color, 2001.
16   Q.  And do you recognize that license tag number, M667480?
17   A.  Yes, that is -- I observed Antoine Jones driving that car
18   on several occasions.
19   Q.  And this is back in 2004 when you made those observations?
20   A.  Yes.
21          MR. BALAREZO:   Your Honor, continuing objection to th
22   form of the question.
23          THE COURT:   Yes.  He's right about that.
24          MS. LIEBER:   Okay.
25   BY MS. LIEBER:
```

119

```
1    Q.  And Special Agent Gikas, the second page of ICE-5, what is
2    that?
3    A.  It's another parking registration form for a Summit Circle,
4    listing another vehicle to Antoine Jones.
5    Q.  And what kind of vehicle is that?
6    A.  A white Plymouth Caravan.
7    Q.  Now, in the course of your investigation -- and I think
8    this is where we left off last time -- well, I'm sorry.  Strike
9    that.
10        In terms of other vehicles of interest in your
11   investigation, did you personally observe Javier as he left BWI
12   that first time that you -- the day that you began your
13   surveillance of Javier, did you actually see him come through
14   the terminal at BWI?
15   A.  Yes.
16   Q.  And did you personally see him get into a particular
17   vehicle and depart BWI?
18   A.  Yes.
19   Q.  Do you remember, what was that car?
20   A.  It was a silver Impala, Chevy Impala.
21   Q.  Sitting here right now, do you recall the tag number on
22   that car?
23   A.  I remember it was a temporary Delaware tag.
24   Q.  Okay.  Sorry.  Would looking at your report -- a report
25   refresh your memory as to the precise digits that you
```

120

```
1    personally observed on that tag number?
2    A.  Yes, it would.
3           MS. LIEBER:   And, Your Honor, I'll mark this for
4    identification only, as ICE-38.  And I'm just going to put it
5    on the machine here.
6    BY MS. LIEBER:
7    Q.  Special Agent Gikas, I'm showing you what I've marked as
8    ICE-38 for identification.  I'll show it to Mr. Balarezo, I'm
9    sorry.
10          MS. LIEBER:   Court's indulgence.
11   BY MS. LIEBER:
12   Q.  Special Agent Gikas, I'm showing you on the projector
13   here -- take a look at that.
14        Does that refresh your memory as to the precise tag number
15   that you personally observed on that Chevy Impala on
16   February 6, 2004?
17   A.  Yes it does.  I remember it began with "XA."
18   Q.  And what is that number?
19   A.  X, as in x-ray, A, as in apple, 913316.
20   Q.  Now, you told the jury when you were here last,
21   about a second time that you began to investigate whether or
22   not Javier was back in the D.C. metropolitan area.
23        Is that right?
24   A.  Yes.
25   Q.  Okay.  And did you -- through various investigative
```

1  measures, were you able to pinpoint a house where you suspected
2  that Javier was?
3  A.  Yes.
4  Q.  Okay.  Again, just describe briefly for the jury what that
5  block looked like?
6  A.  The neighborhood block?
7  Q.  Yes, I'm sorry, the neighborhood block?
8  A.  It was near Old Town Bowie in Maryland, quiet street with
9  single-family homes.
10  Q.  And in the course of your search -- and I think we talked
11  about a red Jeep with Mexican tags; is that right?
12  A.  Yes.
13  Q.  Okay.  And, in the course of your search for that vehicle,
14  were you able to, within that block, pinpoint a couple of
15  houses where you thought Mr. Javier might be located?
16  A.  Yes, we had pretty much narrowed it down to two homes that
17  the equipment that we were using, kind of pointed to.
18  Q.  Okay.  And what -- what block was this in Bowie, Maryland?
19  A.  8550 Myrtle Avenue.
20  Q.  Okay.  Was that the actual house that you pinpointed?
21  A.  I'm sorry.  It was Myrtle Avenue, yes, but the 8550 was the
22  house that had a vehicle parked halfway in the driveway,
23  halfway in the yard that also had a temporary Delaware tag,
24  that initially, I thought was the exact same tag number, but it
25  was actually off just by a few digits.

1  Q.  Okay.  And sitting here today, do you recall the specific
2  numbers on the temporary Delaware tag that you personally
3  observed in the driveway and yard of 8550 Myrtle Avenue?
4  A.  I don't remember the entire number.  I remember it began
5  with an XA, again 99.  I think the last two digits are
6  different.  I do remember that.
7  Q.  Special Agent Gikas, I'm going to show you, again, what's
8  been marked for identification purposes only, as ICE-38, and
9  show you a page within that document, and see if that refreshes
10  your recollection of the precise tag number in that -- on that
11  van?
12  A.  Yes, it's x-ray, Alpha, 913310.  The other plate, this van
13  that was parked at that house had a regular plate in the dash
14  that had expired, and then also the -- a temporary tag which
15  was also expired, but it was also in the dash.  But it was the
16  most current of the two.
17  Q.  And sitting here today, without looking, do you know what
18  the tag number was, the permanent tag that was sitting in the
19  dashboard?
20    Do you remember the exact numbers and letters on that
21  plate?
22  A.  No.
23  Q.  Would looking at your report also refresh your memory as to
24  that?
25  A.  Yes.

1  Q.  Okay.  What was that?
2  A.  Papa, Charlie 128651.
3  Q.  Now, did you -- did there come a point in time when you
4  compared the registrant of the Impala to the registrant of the
5  but van in the driveway of 8550 Myrtle Avenue?
6  A.  Yes.
7  Q.  And without saying who that was, how did those two
8  registrants compare?
9  A.  It was the same registrant.
10  Q.  Now, Special Agent Gikas, you spoke of the employer that
11  Mr. Jones listed on his rental application and lease as the
12  Thomas Brown Agency; is that correct?
13  A.  Yes.
14  Q.  Okay.  And did you, based on your investigation, did you
15  look into the existence of a Thomas Brown Agency?
16  A.  Yes, I did.  I don't think it exists.
17      MR. BALAREZO:  Objection.  Foundation.
18      THE COURT:  Yes.  She can lay -- but before you reach
19  your conclusion, can you tell us what you did?
20      THE WITNESS:  Yes, Your Honor.
21      I went to the address listed for Thomas Brown Agency
22  601 Pennsylvania Avenue, which is a building near here.  There
23  was no Thomas Brown Agency anywhere in the building.
24      I looked for a Thomas Brown as a residence of the
25  building, couldn't find a Thomas Brown.  I searched several

1  commercial databases and corporate data bases for this company
2  and couldn't find anything.
3  BY MS. LIEBER:
4  Q.  Okay.  And why -- what was it about -- why did you look
5  into Thomas Brown Agency?
6  A.  Just to -- to-to see if Mr. Jones had a legitimate source
7  of income, had a legitimate employer or employment.
8  Q.  Did you go also to the D.C. Department of wage and
9  earnings?
10  A.  Yes, I also checked D.C. wage and earnings, Maryland wage
11  and earnings, to see -- to check for, again, legitimate
12  earnings or income reported by Mr. Jones to the tax
13  authorities.
14      The only thing I found was from the D.C --
15      MR. BALAREZO:  Objection.  I think it's still hearsay.
16  Now we're talking about public records.
17      THE COURT:  Sustained.
18  BY MS. LIEBER:
19  Q.  Now, we've been talking about this house at 8550 Myrtle
20  Avenue in Bowie, Maryland.
21      Did you personally spend some time surveilling 8550 Myrtle
22  Avenue in Bowie, Maryland?
23  A.  Yes.
24  Q.  Okay.  And over the course of how many days -- well, did
25  other ICE agents also conduct surveillance of that residence?

125

```
1    A.  Yes.
2    Q.  So -- okay.
3        And over the course of how many days in total did your team
4    of agents surveil 8550 Myrtle Avenue?
5        And now we're talking about late in February of 2004.
6    A.  Right.
7        It wasn't -- I remember it was a Sunday evening when we had
8    positively identified that house.  We had been -- the whole
9    previous week, we had been looking for the red Jeep.  And over
10   the weekend, we had, using that, the equipment, had been
11   looking in the neighborhood.  And it was Sunday evening when we
12   actually identified the house.
13       We broke off at that point, and resumed surveillance the
14   next morning, Monday morning, I believe it was February 23rd.
15   I may be off a day, but it was --
16       THE COURT:  I'm sorry '04?
17       THE WITNESS:  Yes, 2004.
18       THE COURT:  Okay.
19       THE WITNESS:  It's either the 22nd, 23rd, or 24th,
20   that Monday in February we resumed surveillance the next
21   morning, approximately 9:00 or 10:00 o'clock.
22   BY MS. LIEBER:
23   Q.  And in the course of your continued surveillance, first of
24   all, how many days did that round-the-clock surveillance of
25   8550 Myrtle Avenue, how many days did that go on?
```

126

```
1    A.  From that Monday through Friday.
2    Q.  And did you personally see anybody coming or going from
3    that -- into that house or out from that house during that
4    time?
5    A.  Yes.  One -- one coming and going, one vehicle with two
6    individuals.
7    Q.  And who -- what kind of vehicle was that?
8    A.  It was a white Isuzu box truck.
9    Q.  And this is something that you, yourself, saw; is that
10   correct?
11   A.  Yes.
12   Q.  Okay.  And did you look into who the registrant of that
13   truck was?
14   A.  Yes, I did.
15   Q.  Who was the registrant on that truck?
16       MR. BALAREZO:  Objection.
17       THE COURT:  So that's hearsay?
18       MS. LIEBER:  Your Honor, I'm about to show some
19   documents to Mr. Balarezo.
20       THE COURT:  Go ahead then.  Show it to him.  And put
21   the documents in, if you can.
22       You want to introduce them?  Are they records?
23       MS. LIEBER:  Yes.
24   BY MS. LIEBER:
25   Q.  Let me ask, Special Agent Gikas, in the course of your
```

127

```
1    investigation of vehicles in connection with this case, did you
2    obtain from the Maryland Department of Motor Vehicles, I guess
3    the Motor Vehicle Administration, certified copies of
4    registrations for various vehicles?
5    A.  Yes.
6    Q.  Okay.  Was one of those the Jeep Cherokee, license M667480?
7    A.  Yes.
8    Q.  Was one of those a 1994 Plymouth van, licensed M950354?
9    A.  Yes.
10   Q.  Was one of those an Isuzu truck, year 1999, tag 63M462?
11   A.  Yes.
12   Q.  Was one of them a 1998 Cadillac, license plate M, Mary,
13   CW738?
14   A.  Yes.
15   Q.  I want to show you now what I've marked as ICE Exhibits
16   ICE-1, ICE-7, ICE-34 and ICE-35, and see if you recognize those
17   documents.
18       THE COURT:  They are certified by the Department of
19   Motor Vehicles?
20   BY MS. LIEBER:
21   Q.  Ma'am, are those certified by the Department of Motor
22   Vehicles?
23   A.  Yes, ma'am.
24       THE COURT:  Okay.  Any objection to 1, 7, 34 and 35?
25       MR. BALAREZO:  No.
```

128

```
1        THE COURT:  All right.  They're admitted -- sorry,
2    ICE-1, -7, -34 and -35.
3        (Government's Exhibits ICE-1, ICE-7, ICE-34 and ICE-35
4        were received into evidence.)
5    BY MS. LIEBER:
6    Q.  Special Agent Gikas, what did you just ask me, just when I
7    was just up there?
8    A.  I'm sorry.  When I went to MVA, the Maryland Vehicle
9    Administration, I basically searched for all vehicles
10   registered to Antoine Jones and his wife Denise Jones.  And
11   there were a few -- there was at least one more.
12       I was just asking if you had -- if you had had -- if that
13   was in the pile.  It doesn't seem to be.
14       MR. BALAREZO:  Your Honor, I object to the witness
15   having side communications with the prosecutor.
16       THE COURT:  Okay.
17       MS. LIEBER:  That's why I asked the question.
18       THE COURT:  You can't ask questions unless you put
19   them on the record here, if you want to ask a question.
20       THE WITNESS:  I apologize.
21       THE COURT:  Okay.
22   BY MS. LIEBER:
23   Q.  And first, ICE-1, the Cadillac registration, who is that
24   registered to?
25   A.  Antoine Jones.
```

**129**

1  THE COURT:  What color is the Cadillac?
2  BY MS. LIEBER:
3  Q.  What color, do you know?
4  A.  Well, I know that it's the same vehicle that -- I'm just
5  trying to see if the color is listed.
6  MR. BALAREZO:  Objection.
7  THE COURT:  If she knows, if she has seen the vehicle,
8  she can tell it, or else it's on the thing, one or the other.
9  I'm asking her.
10  THE WITNESS:  Your Honor, I have not personally seen
11  the vehicle, but I don't know if the --
12  BY MS. LIEBER:
13  Q.  We can move on the ICE-7, the Isuzu truck, who is that
14  registered to?
15  A.  Antoine Jones.
16  Q.  And is that the same address as the registration for the
17  Cadillac?
18  A.  Yes.
19  Q.  What is that?
20  A.  12221 Brandywine Road in Brandywine, Maryland.
21  Q.  ICE-34, the Jeep Cherokee, who is that registered to?
22  A.  Denise Jones.
23  Q.  And at what address?
24  A.  12221 Brandywine Road.
25  Q.  And finally ICE-35, the '94 Plymouth van, who is that

**130**

1  registered to?
2  A.  Antoine Jones at 12221 Brandywine Road.
3  Q.  And just -- I know we're coming up with the break.  Let me
4  just ask you one question.
5  You said that you personally saw the Isuzu truck at the
6  8550 Myrtle Avenue location; is that correct?
7  A.  Yes.
8  Q.  Okay.  Who was driving that when you saw it there?
9  A.  Lawrence Maynard, I believe.
10  Q.  And when you say, Lawrence Maynard, you believe, do you
11  know who Lawrence Maynard is?
12  A.  Yes.
13  Q.  Have you seen him personally on a number of occasions?
14  Have you surveilled him?
15  A.  Yes.
16  Q.  And what was he usually driving when you saw him?
17  A.  A white Isuzu box truck.
18  Q.  And did you personally see him the day that he showed up at
19  the 8550 --
20  A.  Yes.  The only reason that I believe it was -- it was at a
21  distance.
22  MR. BALAREZO:  Objection.  The questions are assuming
23  facts not in evidence, and there is a lot of leading.  And I
24  object to that.
25  THE COURT:  All we know is she saw him at some point

**131**

1  in time at Myrtle Avenue.
2  MR. BALAREZO:  Well, no one can identify this as being
3  seen at the house yet.
4  THE COURT:  I'm sorry.  I thought identified that
5  Isuzu truck, and that from later on that day in question.
6  Is that right?
7  THE WITNESS:  Yes, Your Honor.
8  MS. LIEBER:  Yes.  And I'm asking the foundation for
9  how she would be able to identify Lawrence Maynard.
10  THE COURT:  Is that what your objection is to?
11  MR. BALAREZO:  I don't want to have the discussion in
12  open court, Your Honor.
13  THE COURT:  Did you know it was Lawrence Maynard at
14  the time you saw him in the truck?
15  THE WITNESS:  The very first time I saw him, no.
16  BY MS. LIEBER:
17  Q.  And after you saw him, did you investigate who Lawrence
18  Maynard was?
19  A.  Yes.
20  Q.  Why did you start looking around into who Lawrence Maynard
21  was?
22  A.  Because he was the lessee of that house.
23  EUFPLT:  Objection, Your Honor.  That's hearsay, I
24  believe, at this point.
25  THE COURT:  It's in evidence.  Overruled.  It's

**132**

1  pending.
2  MS. LIEBER:  Your Honor, I think the lease is actually
3  in evidence from the last time Gikas was here.
4  THE COURT:  Oh, really?  For which property?
5  MS. LIEBER:  Myrtle Avenue.
6  THE COURT:  I'm sorry.  Only Gwen can tell us.  I
7  think if it isn't, it will be.
8  Overruled.
9  BY MS. LIEBER:
10  Q.  In the course of your investigation of Lawrence Maynard,
11  did you obtain any information that contained a picture of
12  Lawrence Maynard?
13  A.  Yes.
14  Q.  What was that?
15  A.  DMV photos.
16  Q.  And how did the person that you thought was Lawrence
17  Maynard compare to the photographs that you saw from DMV?
18  A.  It seemed to be the same person.  He is a very large man.
19  Q.  Okay.  And just finally, we've been talking about the Isuzu
20  box truck.  I want to show you Photo 38, which is not in
21  evidence.
22  MS. LIEBER:  Sorry.
23  THE COURT:  Any objection to the Photo, Photo 38?
24  MS. LIEBER:  It's going to be 38, 39 and 40, Your
25  Honor.

133

1  THE COURT:  All right. 38, 39, and 40 photo, any
2  objections, gentlemen?
3  MR. BALAREZO:  No, Your Honor.
4  THE COURT:  All right. They're in.
5  (Government's Photo 38, Photo 39, and Photo 40 were
6  received into evidence.)
7  BY MS. LIEBER:
8  Q.  Agent Gikas, just very quickly, Photo 38, what is that?
9  A.  It's a white box truck.
10  Q.  And I'm going to show you a close-up of the license plate
11  on Photo 39 of that white box truck.
12  Do you see that license plate?
13  A.  Yes. That's the 63M, as in Mike, 462, the tag that comes
14  back to Antoine Jones.
15  Q.  And is that the truck that you saw Lawrence Maynard
16  driving?
17  A.  Yes.
18  Q.  And finally, Photo 40, do you recognize what that is?
19  A.  That's the building where Club Levels is located.
20  Q.  And is it at the edge of the box truck?
21  A.  Yes.
22  MS. LIEBER:  Your Honor. That's it.
23  THE COURT:  Ladies and gentlemen, I want to inform you
24  of one thing. As you are aware, Mr. Schaffer, who preceded
25  this witness, inaccurately identified Mr. Jackson, who is Mr.

134

1  Norris' client, as Mr. Jones. And it's stipulated between the
2  parties that Mr. Jackson had no connection with that property
3  at Hampton.
4  If you remember, the prior witness identified the --
5  Mr. Jackson. By that, we all agree it is an inaccurate one.
6  Okay. Thank you. You may -- anything else before the
7  jury is excused?
8  Tomorrow, if you recall, we're going to start at
9  10:00, breakfast will be here before then, it will be here
10  probably as early as 9:00. Nobody be later than 10:00. We
11  only have tomorrow for the rest of this week, okay.
12  Have a good evening. Don't talk about the case.
13  Thank you very much.
14  (Jury out at 4:51 p.m.)
15  THE COURT:  You may step down.
16  And I remind counsel, if anybody has any objection to
17  what's been referred to as the time line, they ought to put it
18  in writing by Monday morning.
19  MR. BALAREZO:  Your Honor, I'm, I guess, a little
20  confused when I heard the discussion that the Court had with
21  Miss Lieber earlier. Because I also understood that the
22  summary would come in as sort of -- instead of all the calls
23  and that sort of thing.
24  Is it coming in, in lieu of or on top of?
25  THE COURT:  Well, you can't stop them from putting in

135

1  the calls. And they have to make available, under the rules,
2  the stuff that they're summarizing, that much is clear. I
3  don't think you can stop them from playing some of it, except
4  just begging them not to.
5  And the point of summary is to avoid piling stuff into
6  the record so --
7  MS. LIEBER:  If I may --
8  THE COURT:  The problem, what they're doing here
9  though, is coordinating two types of evidence, GPS plus the
10  calls. I'm hoping when you get these in, you'll stop putting
11  in more and more call and stuff. It's not necessary.
12  MS. LIEBER:  If I may?
13  THE COURT:  Yeah.
14  MS. LIEBER:  The -- the whole point of this -- I won't
15  get into the evolution of the time line, but in lieu of playing
16  all the Kevin Holland calls or all the Mike Huggins calls, what
17  we're doing is synthesizing that and putting it into the time
18  line.
19  Now, there are certain calls to which we want the
20  jury's attention directed.
21  THE COURT:  Right. You're not going to play every one
22  of the calls --
23  MS. LIEBER:  Absolutely not, no. We're going to play
24  samplings of them for very specific reasons.
25  THE COURT:  Right. That's response to -- all right.

136

1  But if there's any other objection, what I'm suggesting to you,
2  is you will have until Monday morning to check the accuracy of
3  what she's doing. Because once that's done, you'll have
4  no real standing to object to a summary, I don't think.
5  So if you have anything, put it in writing and send it
6  to us by e-mail.
7  MS. LIEBER:  And the only reason I gave everyone the
8  cases was because before I presented it, I wanted to be
9  competent in this sort of archaic area of the law, at least
10  archaic for me. And so I found a D.C. Circuit case, talked
11  about a time line, and a second Circuit case that talks about
12  wiretaps.
13  THE COURT:  Okay. Anything else at this time?
14  Thank you. We'll resume -- if everybody will be here
15  at a quarter of 10:00.
16  Mr. Balarezo, if you're going to run late, if you're
17  going to be much later that a quarter of 10:00, please call the
18  courtroom, so we don't all just sit here.
19  MR. BALAREZO:  I thought I got a half hour, by
20  request, Your Honor.
21  THE COURT:  Well, yeah, but if it's going to run too
22  much, if you don't think you're going to get here by 10:00 --
23  well, I should tell counsel, everybody be here a five of 10:00.
24  If we don't hear from you, we'll assume you're going to be here
25  within five minutes of then.

137

```
 1        Second of all, I have looked at this -- I guess it's a
 2   Report Number 003 by this witness.  It's pretty clear to me it
 3   has nothing to do with what we're taking about here.  She's not
 4   going to go too far afield after this.
 5        MS. LIEBER:   No.  She's only testifying about the
 6   Maryland end of it.
 7        THE COURT:    All right.  I'll give that back.  Okay.
 8   There's no Jencks in there.  Thank you.  Okay.
 9        (Proceedings adjourned at 4:55 p.m.)
```

138

```
                    C O N T E N T S

WITNESS          DIRECT    CROSS    REDIRECT    RECROSS

JOHN ADAMS
    By Mr. Acree            9                      54
    By Mr. Geise                      11
    By Mr. Balarezo                               40
    By Mr. McDaniel                               53


STEPHANIE YANTA
    By Ms. Lieber    2
    By Mr. Balarezo           4

ANDREW SCHAEFFER
    By Ms. Lieber    9                41
    By Mr. Balarezo          28
    By Mr. Norris            39
KATERINA GIKAS
    By Ms. Lieber           44
```

139

```
                  EXHIBITS

                        RECEIVED

Jones Exhibit No. 24          34
Government's ICE-15           11
Government's ICE-16           11
Government's ICE-17           11
Government's ICE-18           11
Government's ICE-19           11
Government's ICE-21           19
Government's Photo 60         25
EXHIBITS    (Cont'd.)

                        RECEIVED

Government's Photo 61         42
Government's Photo 62         42
Government's ICE-1            66
Government's ICE-7            66
Government's ICE-34           66
Government's ICE-35           66
Government's Photo 38         71
Government's Photo 39         71
Government's Photo 40         71
```

140

```
        CERTIFICATE OF COURT REPORTER


    I, ANNIE R. SHAW, certify that the foregoing is a
correct transcript from the record of proceedings in
the above matter.

Date:  November 16, 2007

                           Signature of Court Reporter
```

**—**

— [380]

——————X [2]  1/2 1/8

**A**

a — [7]  7/4 22/10 22/16 50/13 67/6 92/19 100/1
abide [1]  47/17
ability [1]  109/10
able [9]  5/3 47/13 58/17 77/25 84/4 115/14 121/1 121/14 131/9
about [193]
about — [10]  6/4 16/7 22/11 26/7 29/3 37/8 47/6 58/9 75/1 124/4
above [1]  140/6
Absolutely [2]  67/1 135/23
accept [1]  90/22
access [2]  104/21 113/24
accessible [2]  34/20 34/22
accommodate [1]  5/24
according [2]  48/25 55/8
account [1]  53/6
accuracy [1]  136/2
accurate [1]  113/15
accurately [4]  73/24 74/7 80/8 80/17
acknowledged [1]  46/1
acquired [1]  23/3
ACREE [17]  2/5 3/10 8/17 12/5 12/6 12/13 13/22 14/4 15/3 17/1 22/7 22/20 23/17 56/17 57/16 62/4 138/6
across [2]  96/16 96/18
activity [1]  115/25
actual [7]  22/4 34/15 46/13 103/10 116/25 118/1 121/20
actually [16]  5/10 5/17 16/12 22/8 34/2 36/24 38/16 47/4 53/8 65/3 65/6 65/11 69/18 73/9 73/22 74/16 77/21 79/23 81/7 89/2 89/5 97/3 104/12 105/16 106/18 106/23 108/4 108/23 109/9 116/1 116/23 119/13 121/25 125/12 132/2
actually — [1]  89/5
ad [1]  41/2
ad nauseam [1]  41/2
Adam [1]  77/3
Adams [18]  7/4 9/6 11/24 18/1 18/23 21/17 40/15 41/8 41/20 43/17 48/4 53/25 54/19 63/25 65/25 66/16 66/23 138/5
Adams' [3]  5/11 64/17 65/23
add [3]  50/14 50/15 69/19
added [1]  80/18
address [3]  123/21 129/16 129/23
adjourned [1]  137/9
Administration [2]  127/3 128/9
administratively [1]  105/1
admission [4]  9/13 72/5 80/22 84/6
admits [1]  8/15
admitted [6]  34/9 72/11 80/24 82/15 92/2 128/1
admitted — [1]  128/1
ADRIAN [4]  1/6 101/23 102/5 102/8
adult [1]  64/24
affidavits [1]  47/18
affixed [1]  88/9
afield [2]  58/25 137/4
afraid [1]  6/13
after [20]  13/14 16/13 25/20 27/2 32/13 33/13 36/10 41/23 44/5 46/2 46/21 65/19 80/9 80/18 84/16 92/23 97/12 114/16 131/17 137/4
afternoon [21]  1/7 3/2 11/24 11/25 12/1 12/2 40/15 40/16 64/15 64/13 66/13 66/14 68/23

90/11 101/15 101/16 105/13 106/2 106/3 115/2 115/2
again [22]  10/6 17/14 17/24 24/3 25/7 35/3 37/24 40/1 47/16 48/16 48/20 73/15 77/24 79/20 91/23 93/21 107/8 107/14 121/4 122/5 122/7 124/11
against [3]  44/21 44/24 67/23
age [1]  64/24
agency [9]  95/20 95/21 116/17 118/2 123/12 123/15 123/21 123/23 124/5
agent [23]  3/18 42/4 9/24 9/24 63/24 64/15 65/23 66/13 98/3 98/7 105/24 114/13 116/6 116/9 116/23 119/1 120/7 120/12 122/7 123/10 126/25 128/6 133/8
agents [6]  10/3 22/9 62/18 106/8 124/25 125/4
ago [6]  37/2 56/2 90/20 97/23 106/6
agree [3]  35/12 86/18 134/5
agreed [3]  88/11 95/19 113/1
agreeing [1]  102/4
agreement [7]  38/17 39/7 40/23 41/8 74/17 116/10 116/25
ahead [16]  30/8 40/12 43/5 70/1 71/6 79/17 81/5 82/14 82/15 85/16 90/3 96/21 97/6 101/9 112/15 126/20
alerted [2]  31/21 32/16
alerting [1]  32/19
all [119]
all — [1]  21/23
allow [4]  3/7 25/12 63/24 95/20
allowed [4]  46/17 47/2 97/9 98/3
almost [1]  14/19
along [2]  11/10 51/21
Alpha [1]  122/12
already [14]  8/18 17/12 17/13 33/20 37/19 38/24 39/7 60/24 61/21 61/22 92/2 109/8 116/6 117/22
also [30]  9/15 14/20 14/20 14/22 21/5 22/6 23/16 38/6 46/10 66/24 66/24 72/17 82/23 85/25 86/24 91/2 95/19 103/7 116/23 117/13 118/10 121/23 122/14 122/15 122/23 124/8 124/10 124/25 134/21
also — [1]  66/24
although [2]  26/6 37/2
Always [1]  18/7
am [6]  4/21 6/7 6/7 50/22 98/1 101/2
AMERICA [1]  1/3
amount [4]  37/12 64/20 66/19 99/23
and — [4]  25/8 25/21 37/6 47/19
and the [1]  77/10
Andrew [3]  68/17 69/3 138/14
ANNIE [2]  2/12 140/4
another [8]  39/3 39/21 46/10 55/3 92/20 95/21 119/3 119/4
answer [7]  41/15 52/2 62/8 63/2 65/19 83/9 96/15
anticipate [1]  96/23
anticipating [1]  16/5
ANTOINE [36]
Antoine's [1]  30/23
any [38]
anybody [11]  55/8 58/16 60/8 61/8 72/2 73/10 78/7 88/25 101/4 126/2 134/16
anymore [2]  27/2 62/4
anyone [1]  55/5
anything [31]  3/8 4/13 11/10 11/12 11/13 25/10 25/22 26/12 28/9 44/23 53/21 54/15 58/4 62/8 62/9 66/6 71/22 72/2 83/24 91/3 91/14 100/2 100/6 100/13 100/17 101/23 112/23 124/2 134/6 136/5 136/13
anyway [4]  4/16 5/3 6/11 88/22

Anyway — [1]  4/16
anyways [2]  31/15 111/11
anywhere [2]  105/14 123/23
apartment [28]  106/20 107/7 107/10 108/1 108/2 108/5 108/9 108/10 108/13 108/14 109/14 110/14 110/15 110/22 111/1 114/14 114/18 114/19 114/22 115/8 115/15 115/16 115/18 115/18 115/20 115/23 116/2 117/1
apartments [6]  107/11 108/13 110/10 110/19 110/25 114/14
Apartments — [1]  114/14
apologize [3]  112/6 114/9 128/20
apparently [2]  38/25
appear [1]  116/20
APPEARANCES [2]  1/14 2/1
appeared [1]  86/16
appears [2]  62/17
apple [1]  120/19
applicant [1]  116/13
application [7]  70/20 70/20 116/1 116/12 116/21 118/5 123/11
approach [19]  16/2 16/3 20/9 20/15 20/16 25/20 26/21 31/4 44/10 56/23 70/6 74/24 78/18 78/18 81/16 82/7 97/4 108/18 109/4
approaching [1]  5/25
appropriate [1]  7/3
approximately [4]  89/16 90/20 90/21 125/21
April [2]  98/25 99/2
archaic [2]  136/9 136/10
are [99]
area [4]  92/22 106/14 120/22 136/9
areas [2]  26/22 27/3
aren't [4]  47/6 47/12 58/9 61/7
argue [1]  17/7
argument [1]  61/6
around [9]  13/15 13/18 32/5 33/4 60/24 61/25 79/2 104/12 131/20
arrest [3]  43/15 44/5 46/2
arrested [11]  33/16 41/23 48/6 48/7 54/2 54/5 54/9 54/12 64/17 64/19 64/25
as [84]
as — [1]  94/6
as November [1]  117/4
ask [47]
asked [37]
asking [21]  17/1 17/2 40/3 41/3 43/10 45/23 46/5 46/7 53/14 56/3 57/1 57/6 86/21 93/14 97/15 98/2 109/12 111/25 128/12 129/9 131/8
aspects [1]  109/11
assume [4]  96/16 96/17 96/18 136/24
assuming [1]  130/22
assure [1]  58/4
Atlanta [3]  33/11 47/8 105/14
attempted [1]  25/8
attention [1]  135/20
Attorney [1]  1/16
Attorney's [1]  41/13
attributed [1]  25/22
authorities [1]  124/13
authority [1]  1/16
available [2]  64/6 135/1
Avenue [18]  2/2 2/6 2/9 2/14 106/22 107/2 121/19 121/21 122/3 123/5 123/22 124/20 124/22 125/4 125/25 130/6 131/1 132/5
avoid [4]  26/14 63/16 114/3 135/5
aware [8]  66/15 66/19 66/23 66/24 93/12 97/25 98/16 133/24
away [4]  21/22 23/14 46/25 112/11

**B**

back [49]

**W**

was — [4] 29/21 111/19 115/1 125/15
was added [1] 80/18
Washington [9] 1/4 1/17 1/20 2/3 2/7 2/10 2/15 106/14 106/19
wasn't [9] 32/13 44/23 47/2 62/24 80/18 84/24 95/13 98/9 125/7
wasn't — [2] 84/24 125/7
way [17] 10/23 17/6 21/12 21/13 24/24 26/24 30/20 32/23 35/1 37/7 54/6 57/9 57/22 61/12 61/18 63/10 69/22
we [143]
we — [1] 107/6
we'll [13] 4/11 5/23 26/13 26/13 26/19 32/21 39/2 63/16 107/22 112/5 112/12 136/14 136/24
we'll — [2] 26/19 63/16
we're [28] 5/10 6/13 32/19 38/22 43/13 44/19 49/23 54/6 57/16 61/12 63/17 69/19 75/23 76/19 78/24 83/8 83/14 104/16 105/18 111/20 114/13 124/16 125/5 130/3 134/8 135/17 135/23 137/3
we've [10] 5/15 45/2 45/2 62/16 63/17 74/5 92/10 109/8 124/19 132/19
weapon [1] 66/16
weapons [1] 67/2
wearing [1] 105/20
Wednesday [1] 1/5
week [5] 5/12 44/5 46/2 125/9 134/11
weekend [1] 125/10
weeks [1] 106/6
Welcome [2] 105/13 106/4
well [89]
Well — [1] 81/22
well-taken [1] 75/14
went [14] 11/1 11/4 12/5 13/15 13/18 28/21 36/11 46/25 72/21 72/23 76/21 114/22 123/21 128/8
were [81]
were — [2] 43/9 91/6
weren't [2] 58/17 60/9
what [247]
what — [3] 24/1 37/24 121/18
What'd [1] 30/25
what's [26] 5/4 16/20 18/18 19/9 20/2 21/2 21/15 22/14 22/15 23/6 28/2 31/14 33/20 37/3 47/15 49/7 55/11 55/24 71/20 74/14 83/9 92/16 92/16 109/14 122/7 134/17
What's — [1] 92/16
whatever [2] 44/20 112/25
whatnot [1] 13/23
whatsoever [2] 60/12 109/2
when [91]
when — [2] 10/24 115/2
where [36]
wherever [1] 60/5
whether [36]
whether — [1] 97/18
which [29] 3/22 18/3 18/16 24/17 30/10 30/22 33/21 36/18 37/17 39/7 46/4 46/11 47/18 50/10 51/8 60/16 69/18 74/3 79/22 109/11 109/13 110/20 110/22 115/15 122/14 123/22 132/4 132/20 135/19
while [5] 69/19 73/10 84/12 98/19 98/22
white [5] 119/6 126/8 130/17 133/9 133/11
Whitehead [1] 31/8
who [75]
who — [2] 80/15 126/7
whole [15] 20/20 21/1 24/18 28/1 28/3 28/3 46/9 54/24 55/24 58/3 58/14 58/19 59/21 125/8 135/14

whom [1] 21/25
whose [2] 13/16 115/13
why [32] 5/21 5/25 6/1 6/11 7/14 7/18 17/8 31/15 34/22 35/9 46/5 46/6 55/9 60/16 61/10 64/19 64/25 65/12 71/5 77/7 81/8 81/12 81/12 85/2 87/13 90/7 95/1 109/11 124/4 124/4 128/17 131/20
why — [3] 65/12 81/12 124/4
wife [8] 11/3 11/4 12/7 34/23 64/17 77/4 101/18 128/10
will [26] 4/12 36/5 39/4 39/4 39/12 39/22 40/18 45/21 57/9 57/25 59/22 61/3 61/4 62/2 63/24 65/20 101/9 108/22 109/25 111/14 114/11 132/7 134/9 134/9 136/2 136/14
will be [1] 136/14
willing [1] 67/12
willingness [2] 65/24 66/4
winter [1] 104/16
wire [1] 6/10
wiretaps [1] 136/12
with — [1] 8/25
withdraw [1] 12/11
within [10] 44/5 46/2 95/11 95/11 95/13 108/9 108/13 121/14 122/9 136/25
without [7] 24/21 78/9 96/17 107/8 115/13 122/17 123/7
witness [34] 5/5 5/17 6/15 16/6 24/11 25/18 34/3 39/6 40/8 53/20 57/19 62/3 62/11 62/12 63/21 64/12 68/16 68/20 70/7 72/1 72/1 75/8 84/21 96/24 105/9 105/12 109/20 109/24 111/8 128/14 133/25 134/4 137/2 138/3
witnessed [1] 62/20
witnesses [1] 5/6
wives [1] 12/9
won't [4] 5/2 5/2 61/3 135/14
won't — [1] 5/2
word [4] 42/7 44/25 48/17 53/9
words [8] 4/8 11/16 15/3 15/4 23/25 59/2 59/20 110/17
work [3] 5/8 26/17 85/1
working [4] 14/10 14/12 65/13 83/17
world [1] 26/14
worms [1] 43/2
worse [1] 58/5
worth [1] 25/10
would [75]
wouldn't [1] 34/24
wrap [1] 38/3
wrapping [1] 100/16
writing [2] 134/18 136/5
wrong [4] 57/15 57/16 58/5 118/9
wrote [1] 58/22

**X**

x-ray [2] 120/19 122/12
XA [2] 120/17 122/5

**Y**

Yanta [7] 9/24 63/24 64/12 64/15 65/23 66/13 138/11
yard [2] 121/23 122/3
yeah [23] 3/16 4/13 7/10 8/8 16/23 17/15 19/1 24/7 32/4 32/12 44/23 47/4 51/19 58/13 61/4 84/11 93/5 105/20 109/5 111/23 117/24 135/13 136/21
year [4] 95/12 95/13 95/14 127/10
years [1] 90/20
yes [216]
yesterday [2] 3/17 18/3
yet [6] 26/13 27/4 69/24 75/7 102/20 131/3
you [720]
you — [9] 9/25 71/1 77/24 95/23 102/17

114/16 119/12 120/25 123/3
you know [1] 89/12
you'd [1] 75/19
you'll [4] 38/17 69/8 135/10 136/3
you're [35] 17/15 25/4 32/10 40/18 45/11 45/15 45/19 47/11 49/10 51/5 51/7 51/13 52/17 56/21 56/22 59/6 60/6 64/4 64/10 67/12 75/13 93/12 95/23 97/25 101/24 102/4 105/15 105/22 108/20 113/23 135/21 136/16 136/16 136/22 136/24
you've [10] 39/15 42/12 61/22 67/2 70/2 90/24 91/2 94/16 101/17 102/2
you've — [1] 67/2
your [208]
your — [1] 69/9
yours [1] 12/10
yourself [6] 68/25 73/9 90/22 94/22 99/5 126/9
yourselves [1] 6/6

**T**

that's [97]
that's — [2]  8/5 92/13
the — [21]  4/17 8/16 12/4 16/7 24/1 25/3
43/1 46/9 49/13 91/21 92/6 92/22 93/6 98/9
99/19 108/16 117/14 122/14 129/11 134/4
135/14
the third [1]  110/8
their [6]  4/19 59/4 67/25 91/8 91/15 110/6
them [35]  4/18 9/25 10/4 20/8 20/12 22/12
30/10 32/21 33/15 55/4 55/6 69/23 70/2 70/2
73/10 73/12 73/13 73/15 76/5 89/21 89/22
93/22 95/6 102/18 104/1 108/15 109/18
117/17 126/22 127/12 128/19 134/25 135/3
135/4 135/24
them — [1]  73/13
themselves [1]  11/8
then [38]
then — [1]  32/3
there [96]
there's [15]  4/5 27/3 30/2 47/18 61/4 75/6
92/17 92/19 92/19 93/3 99/23 111/11 112/23
136/1 137/8
these [39]
these — [1]  93/20
they [91]
they're [11]  43/3 64/2 69/23 102/19 102/20
111/17 117/22 128/1 133/4 135/2 135/8
they've [1]  69/18
thick [1]  19/22
thing [15]  3/15 9/6 24/18 29/23 37/9 42/6
60/9 61/24 62/5 84/2 114/2 124/14 129/8
133/24 134/23
things [22]  5/18 9/22 10/3 10/25 12/5 18/2
21/1 24/19 26/16 26/20 30/14 34/18 35/19
47/11 47/11 48/7 54/19 61/5 76/2 76/24
86/24 114/15
think [81]
think — [1]  63/6
thinks [2]  61/9 62/5
third [9]  106/23 108/3 108/3 108/5 110/8
110/19 110/22 115/15 115/19
third — [1]  108/3
Thirty-six [1]  15/17
this [194]
this — [2]  135/14 137/1
Thomas [8]  116/17 123/12 123/15 123/21
123/23 123/24 123/25 124/5
those [38]
those — [1]  70/25
though [8]  5/20 17/13 22/23 24/18 77/4 83/9
104/2 135/9
thought [14]  3/13 4/15 39/16 60/19 84/8
94/7 117/15 117/17 117/18 121/15 121/24
131/4 132/16 136/19
thousands [1]  76/16
three [16]  3/23 3/24 15/2 20/23 25/19 45/20
49/13 49/13 62/22 75/10 90/20 91/6 101/10
101/17 106/13 106/17
through [8]  3/21 4/24 12/5 62/22 72/5
119/13 120/25 126/1
throw [1]  84/9
ticket [39]
tickets [30]  13/23 15/4 15/4 17/1 17/3 22/7
22/8 22/9 22/22 23/15 23/15 23/15 23/16
23/19 23/20 24/8 25/13 26/4 26/18 28/1
58/18 58/18 58/19 59/21 59/21 59/23 61/1
61/7 61/7 61/25
tier [2]  42/1 42/2
time [57]
time — [1]  119/8

times [11]  10/24 14/7 14/9 14/13 14/25
28/16 41/4 50/21 60/25 86/17 90/13
timing [1]  38/3
tip [1]  85/3
titles [1]  108/23
to — [7]  18/17 37/12 46/10 77/5 97/17 124/6
135/25
to-to [1]  124/6
today [6]  4/24 18/3 70/15 73/15 122/1
122/17
together [2]  26/7 91/5
told [35]  3/25 4/18 9/25 10/3 15/6 22/9
22/12 23/19 26/4 30/14 30/25 31/11 31/20
31/21 32/2 32/2 32/15 33/2 37/8 42/10 46/3
46/16 47/7 47/14 55/4 56/1 77/4 84/15 88/9
94/5 98/6 107/14 108/21 108/25 120/20
tomorrow [8]  38/22 39/2 109/24 111/5
111/6 111/18 134/8 134/11
tons [1]  61/1
too [5]  24/23 58/25 63/13 136/21 137/4
took [2]  13/24 14/2 24/6 33/15 48/5 83/1
104/20 111/3
top [3]  42/1 42/2 134/24
total [1]  125/3
touching [1]  27/2
town [2]  91/23 121/8
tramping [1]  58/7
transaction [1]  13/21
transcribed [1]  3/6
transcript [7]  1/11 2/24 3/5 18/16 57/23
62/22 140/5
transcription [1]  2/24
transcripts [5]  12/18 12/21 12/21 12/22
35/21
transcripts — [1]  12/22
tree [1]  57/16
trial [4]  1/11 40/2 40/6 112/4
tried [1]  46/12
truck [14]  126/8 126/13 126/15 127/10
129/13 130/5 130/17 131/5 131/14 132/20
133/9 133/11 133/15 133/20
true [5]  13/12 16/17 25/2 79/16 95/19
trust [1]  12/9
trusted [1]  12/7
truth [5]  30/5 40/18 41/16 109/2 110/4
try [5]  46/10 47/24 63/19 64/3 91/13
trying [11]  20/19 24/13 45/9 45/11 45/15
51/13 56/25 56/25 57/6 59/4 129/5
trying — [1]  56/25
turn [1]  101/10
Twenty-five [2]  42/13 42/14
two [31]  3/23 5/6 15/2 20/23 35/24 35/25
48/24 49/14 50/21 50/21 51/1 51/2 51/2 51/5
51/6 51/6 53/3 64/5 75/8 77/20 106/23
112/11 112/21 113/20 114/15 121/16 122/5
122/16 123/7 126/5 135/9
two-minute [2]  112/5 112/12
two-page [1]  4/22
Ty [6]  37/15 38/9 38/10 50/2 51/7 52/17
type [2]  71/18 118/13
types [1]  135/9

**U**

U.S [2]  1/16 41/13
ultimately [1]  39/12 39/22 67/25 68/1
106/11
under [10]  15/17 15/22 35/24 35/25 64/4
64/10 105/15 105/22 113/22 135/1
underlying [1]  113/23
understand [25]  5/21 7/10 15/7 23/12 39/12
39/21 51/13 56/18 58/6 58/14 59/1 59/9
59/15 59/19 59/23 59/25 60/18 61/3 61/14

63/17 69/25 80/21 82/20 97/2 114/6
understands [2]  35/14 39/10
understood [4]  57/3 57/22 58/23 134/21
uniforms [1]  100/2
unit [11]  73/25 74/3 74/5 74/8 74/19 74/21
79/23 80/9 93/17 101/25 112/25
unit — [1]  93/17
UNITED [4]  1/1 1/3 1/12 2/13
units [3]  80/2 93/22 110/8
universe [2]  47/17 75/6
Unk [3]  33/17 33/17 33/18
unknown [3]  109/21 110/12 111/2
unless [1]  128/18
until [6]  4/14 5/3 5/12 6/21 93/4 136/2
unusual [1]  94/18
up [62]
upon [2]  39/10 99/5
upstairs [3]  30/19 48/13 48/14
us [16]  3/17 12/9 26/8 27/20 31/18 54/25
61/3 63/8 63/24 67/11 107/14 107/14 110/2
123/19 132/6 136/6
us — [1]  63/8
use [7]  16/25 17/14 23/2 23/9 23/11 94/6
95/21
used [5]  12/14 15/4 17/3 17/4 59/20
useful [1]  25/25
using [4]  21/20 75/23 121/17 125/10
usually [1]  130/16
usurping [1]  40/5

**V**

vacated [1]  104/19
van [9]  33/4 33/5 33/5 33/15 122/11 122/12
123/5 127/8 129/25
various [4]  80/1 114/1 120/25 127/4
vehicle [14]  108/16 111/2 119/4 119/5
119/17 121/13 121/22 126/5 126/7 127/3
128/8 129/4 129/7 129/11
vehicles [7]  119/10 127/1 127/2 127/4
127/19 127/22 128/9
versus [1]  47/15
very [23]  5/6 13/2 17/1 24/17 32/1 57/21
61/5 67/5 75/24 84/17 90/2 90/4 90/6 91/13
98/21 102/17 114/10 116/24 131/15 132/18
133/8 134/13 135/24
view [1]  6/9
VIP [3]  15/4 17/1 17/3
VIPs [1]  16/22
virtue [1]  9/12
voice [1]  68/25
voices [1]  18/23
volume [9]  12/19 12/20 12/21 15/11 15/11
15/18 35/22 35/24 35/25
Volume I [4]  12/19 12/21 15/11 15/18

**W**

wage [3]  124/8 124/10 124/10
wait [3]  12/23 18/25 102/3
waited [1]  6/21
walk [1]  105/5
wall [1]  93/23
want [45]
want — [2]  62/25 111/12
wanted [16]  4/25 6/22 9/6 9/22 29/25 34/2
35/6 77/7 81/8 81/12 83/11 83/12 87/13 88/3
105/22 136/8
wants [4]  5/21 44/20 60/5 60/5
warehouse [10]  73/4 80/2 81/13 83/20 91/21
92/7 92/14 93/21 94/17 106/24
warrant [1]  5/11
warrants [1]  65/6
was [310]

## S

showing [6]  31/9 70/10 78/16 78/21 120/7
120/12
shown [1]  86/12
shows [1]  32/12
side [6]  4/8 29/21 29/22 29/22 92/16 128/15
sign [2]  41/8 41/9
Signature [1]  140/10
signed [9]  41/9 83/4 88/14 88/19 88/23
88/24 88/25 89/4 116/20
signs [1]  84/5
silly [1]  24/17
silver [1]  119/20
similar [1]  11/13
similar-type [1]  35/15
since [5]  53/14 76/19 93/12 105/14 109/10
single-family [2]  106/21 121/9
sir [106]
Sir -- [1]  55/18
sit [1]  136/18
sitting [9]  13/17 30/18 64/7 79/5 79/7 119/21
122/1 122/17 122/18
situation [1]  47/23
six [1]  47/18
small [1]  99/23
smelled [1]  33/4
snack [5]  93/7 93/8 93/10 93/13 93/18
so [103]
so -- [9]  6/11 27/3 30/1 45/7 46/16 91/18
97/4 125/2 135/6
solely [1]  39/11
some [33]  12/5 15/3 18/2 20/6 26/15 26/16
29/3 29/6 29/24 30/2 30/14 30/15 31/22
32/19 33/11 37/5 47/24 48/11 52/7 61/5
63/16 83/21 92/25 93/22 94/22 105/20 107/5
109/16 114/18 124/21 126/18 130/25 135/3
somebody [18]  10/2 17/19 21/18 21/19
23/23 26/16 31/11 51/9 52/18 54/25 55/1
55/12 55/14 55/25 56/14 94/3 95/7 108/24
someone [5]  96/2 101/19 103/10 108/25
111/5
something [19]  3/14 10/21 19/21 22/17
29/18 32/3 33/4 38/1 44/17 50/5 62/20 63/2
75/1 75/10 108/21 109/7 110/2 110/15 126/9
sometimes [2]  17/13 93/4
somewhere [1]  60/11
soon [1]  111/6
sorry [48]
sort [6]  88/6 100/8 100/9 134/22 134/23
136/9
source [1]  124/6
south [1]  31/22
space [9]  74/22 80/5 92/10 93/23 94/9 94/13
94/18 98/10 104/16
spaces [4]  93/20 93/21 94/17 94/24
speak [1]  69/8
speaker [1]  19/3
speaking [2]  19/6 97/20
Special [13]  4/24 64/15 65/23 66/13 105/24
116/5 119/1 120/7 120/12 122/7 123/10
126/25 128/6
specific [12]  21/24 23/3 23/16 30/3 79/7
91/13 100/25 108/12 109/12 115/18 122/1
135/24
specifically [3]  10/17 11/16 23/10
specifics [1]  71/8
speculate [1]  97/15
spell [1]  69/1
spend [1]  124/21
spoke [5]  55/3 79/2 90/13 106/6 123/10
stand [7]  17/24 62/19 79/8 82/12 82/13

85/12 105/3
standard [1]  80/1
standing [2]  79/11 136/4
star [1]  4/16
start [7]  38/22 39/2 39/4 40/17 46/20 131/20
134/8
started [1]  47/1
starts [1]  26/22
state [1]  109/13
statement [2]  118/4 118/6
statements [1]  31/17
STATES [4]  1/1 1/3 1/12 2/13
stay [2]  77/10 88/10
staying [1]  77/9
stays [1]  93/4
step [3]  104/25 106/10 134/15
Stephanie [2]  64/12 138/11
sticker [1]  83/2
still [12]  52/8 58/9 64/4 64/10 81/2 93/10
99/24 105/15 105/18 105/22 114/13 124/15
stipulate [2]  5/19 84/16
stipulated [2]  113/1 134/1
stipulation [2]  5/8 5/17
stood [1]  79/14
stop [12]  25/9 30/25 31/18 31/19 32/18 42/9
44/9 70/23 112/4 134/25 135/3 135/10
stopped [1]  30/24
storage [13]  69/12 71/3 73/5 73/25 74/18
78/24 79/21 79/23 80/9 83/13 87/14 94/7
94/8
story [3]  21/23 22/14 23/14
street [4]  1/16 1/19 96/16 121/8
stricken [1]  65/20
strike [3]  28/10 65/17 119/8
striking [1]  26/11
stuck [1]  10/21
stuff [11]  20/20 21/14 26/16 34/22 34/24
55/25 61/21 99/24 135/2 135/5 135/11
subject [3]  6/1 64/7 80/13
subjects [1]  107/12
submitted [1]  118/5
subpoena [2]  73/13 95/16
subsections [1]  84/8
substantial [1]  94/9
suburban [1]  106/18
such [3]  45/1 61/24 62/5
suggesting [2]  59/1 136/1
suggestion [2]  59/20 84/24
suit [3]  18/6 18/7 79/9
suitcases [1]  100/12
Suite [3]  1/19 2/6 2/10
summarizing [1]  135/2
summary [5]  113/22 114/3 134/22 135/5
136/4
Summit [14]  106/20 107/8 107/10 108/1
108/9 108/13 110/7 114/13 114/17 115/19
116/2 116/11 117/1 119/3
Sunday [3]  19/8 125/7 125/11
supplier [1]  33/19
suppliers [1]  15/14
support [1]  19/22
suppose [1]  25/6
supposed [4]  6/5 31/12 37/13 37/15
supposedly [1]  48/23
sure [17]  3/16 4/11 11/10 11/10 13/19 13/20
30/4 38/15 46/18 47/4 57/20 62/24 70/2
76/12 79/9 91/10 112/2
surrounding [1]  65/15
surveil [1]  125/4
surveillance [8]  95/21 115/4 119/13 124/25
125/13 125/20 125/23 125/24
surveilled [1]  130/14

surveilling [2]  109/20 124/21
suspected [1]  121/1
sustain [2]  17/20 47/10
sustained [6]  39/19 41/18 65/18 94/20 94/20
124/17
sworn [1]  68/20
synthesizing [1]  135/17

## T

tab [6]  15/13 15/15 15/17 15/23 35/24 35/25
table [2]  79/5 79/7
tag [15]  110/6 118/16 119/21 119/23 120/1
120/14 121/23 121/24 122/2 122/10 122/14
122/18 122/18 127/10 133/13
tags [1]  121/11
take [7]  5/17 17/24 57/12 64/1 70/12 109/7
120/13
taken [2]  79/1 99/21
taken money [1]  99/21
takes [1]  109/18
taking [3]  78/12 78/22 137/3
talk [5]  12/4 33/17 48/25 59/21 134/12
talked [14]  5/15 18/12 47/7 51/18 54/19
54/23 81/20 81/25 83/4 87/5 91/2 115/15
121/10 136/10
talking [47]
talks [2]  58/18 136/11
tape [3]  45/4 45/5 59/20
tapes [6]  45/2 58/17 60/8 61/3 61/5 61/8
tax [1]  124/12
Taylor [2]  53/25 54/2
team [3]  114/25 115/7 125/3
tease [1]  71/18
tell [33]  4/17 13/24 16/15 19/15 20/21 24/1
26/8 30/17 31/18 32/21 33/6 33/8 33/10
33/13 41/16 43/1 55/14 55/15 57/2 57/22
62/25 81/12 82/5 83/24 87/13 87/16 94/12
108/24 112/20 123/19 129/8 132/6 136/23
telling [6]  30/20 31/12 40/18 53/2 59/15
67/11
tells [1]  110/2
tempered [1]  88/2
temporary [4]  119/23 121/23 122/2 122/14
ten [1]  10/12
tenancy [1]  98/23
tenant [4]  93/4 97/12 97/13 98/22
term [3]  17/1 17/3 21/20
terminal [1]  119/14
terminated [1]  88/10
termination [1]  70/20
terms [3]  5/11 109/10 119/10
test [1]  77/1
test -- [1]  77/1
testified [13]  6/11 31/8 32/23 37/2 43/17
45/25 46/2 55/22 57/17 62/16 110/19 114/13
116/24
testified -- [1]  114/13
testifies [3]  4/14 62/19 62/19
testify [8]  44/21 63/1 76/15 77/3 77/6 109/25
111/15 114/1
testifying [3]  3/19 44/20 137/5
testimony [10]  4/5 4/15 32/19 39/23 47/12
58/21 107/22 112/22 113/8 113/10
Texas [4]  4/8 106/8 107/13 109/17
than [7]  5/17 10/12 24/17 25/25 51/20 51/22
134/10
thank [43]
that [655]
that -- [21]  7/6 15/6 19/22 20/14 25/11 55/4
56/17 56/22 57/17 60/1 60/14 71/21 73/22
81/14 92/10 94/13 96/23 112/22 122/10
126/3 129/4

**R**

recognize... [4]  77/25 118/16 127/16 133/18
recognizes [1]  69/23
recollection [4]  26/5 85/8 97/17 122/10
record [19]  7/17 61/14 71/23 79/13 79/16
 81/3 84/22 85/3 86/16 87/24 110/5 112/17
 112/18 112/19 113/10 117/19 128/19 135/6
 140/5
recorded [1]  2/24
records [4]  71/1 75/24 124/16 126/22
records -- [1]  75/24
recovered [4]  9/8 9/14 64/21 64/23
Recreation [1]  116/19
recross [6]  40/24 46/19 59/5 61/21 61/25
 138/3
RECROSS-EXAMINATION [2]  53/23
 54/17
red [2]  121/11 125/9
redirect [19]  11/22 26/23 41/1 42/22 43/24
 46/18 46/22 53/22 54/7 54/15 56/19 57/3
 57/17 57/21 57/23 61/19 61/21 102/15 138/3
 33/17 46/11 56/14 56/16
reference [9]  16/25 17/10 17/11 19/19 23/4
references [1]  30/3
referred [1]  134/17
referring [3]  13/7 13/11 49/17
refers [1]  52/9
refresh [6]  78/3 78/13 78/22 119/25 120/14
 122/23
refreshes [1]  122/9
regarding [6]  30/3 40/25 42/9 48/4 53/8
 58/12
regards [1]  11/7
registered [9]  109/19 109/22 110/11 118/13
 128/10 128/24 129/14 129/21 130/1
registrant [6]  108/15 123/4 123/4 123/9
 126/12 126/15
registrants [2]  110/25 123/8
registration [4]  118/11 119/3 128/23 129/16
registrations [1]  127/4
regular [3]  71/15 71/17 122/13
rehash [2]  61/20 61/22
rehashed [1]  61/23
related [3]  3/18 76/25 117/12
release [2]  66/16 67/22
released [2]  65/10 65/11
relevant [3]  5/4 22/23 24/19
relieved [1]  114/25
remainder [1]  52/23
remember [47]
remembers [1]  32/12
remind [6]  106/16 106/17 107/14 109/8
 114/16 134/16
rental [12]  80/5 101/24 103/7 108/9 109/7
 111/15 112/25 116/2 117/12 117/12 118/2
 123/11
rental -- [1]  117/12
rented [8]  74/22 78/14 78/24 79/4 79/21
 86/22 110/11 111/1
renter [1]  104/15
renters [1]  108/14
renting [1]  84/25
reorient [1]  105/23
rep [1]  79/3
repeat [3]  25/12 29/5 44/4
rephrase [3]  24/24 25/5 46/14
report [8]  4/2 4/22 4/22 91/9 119/24
 119/24 122/23 137/2
report -- [1]  119/24
reported [1]  124/12
reporter [4]  2/16 69/2 140/2 140/10

reports [2]  3/22 62/16
represent [4]  73/25 74/8 80/8 92/7
represented [1]  79/3
represents [1]  80/17
request [1]  136/20
required [1]  113/23
resided [1]  115/23
residence [5]  64/21 64/22 107/7 123/24
 124/25
respect [1]  89/7
response [10]  28/5 28/8 28/14 30/13 58/1
 58/4 58/19 59/18 95/16 135/25
responsive [3]  23/6 60/12 65/20
rest [2]  6/19 134/11
result [1]  9/12
resume [2]  114/11 136/14
resume -- [1]  136/14
resumed [2]  125/13 125/20
retake [1]  85/11
return [1]  99/24
retyped [1]  3/4
retyped -- [1]  3/4
reviewing [1]  73/15
right [144]
Road [3]  129/20 129/24 130/2
role [1]  40/5
room [8]  2/14 29/22 30/11 30/19 48/11
 48/12 48/13 87/25
rooms [1]  48/14
round-the-clock [1]  125/24
RPR [1]  2/12
Ruan [1]  107/18
RUDOLPH [1]  2/5
rule [3]  5/3 43/14 113/22
ruled [1]  117/15
rules [2]  85/9 135/1
ruling [1]  61/14
run [3]  91/19 136/16 136/21
running [3]  19/14 19/15 61/25

**S**

S-C-H-A-E-F-F-E-R [1]  69/3
said [80]
said -- [4]  27/18 31/1 31/2 56/13
same [13]  42/4 47/23 73/15 81/24 93/24
 105/18 108/15 114/2 121/24 123/9 129/4
 129/16 132/18
samplings [1]  135/24
sat [1]  90/7
Saturday [1]  115/1
saw [20]  47/20 62/20 63/5 63/21 76/23 77/24
 108/2 108/5 110/21 110/21 126/9 130/5
 130/8 130/16 130/25 131/14 131/15 131/17
 132/17 133/15
saw -- [1]  110/21
say [68]
saying [31]  11/17 20/14 22/11 33/2 46/3
 49/10 51/5 53/2 55/6 55/10 55/21 56/4 56/18
 56/18 56/21 56/22 56/22 58/19 59/2 59/17
 59/25 60/1 60/4 60/17 60/18 60/20 61/2
 61/15 75/10 83/10 123/7
says [16]  21/17 21/17 21/25 39/9 48/24
 49/14 55/11 57/24 60/4 61/4 61/10 83/11
 84/5 84/5 117/6 117/6
scene [1]  31/3
Schaeffer [24]  68/18 69/3 69/11 70/10 72/17
 73/1 73/18 74/16 77/16 78/21 79/19 81/7
 85/19 86/21 90/11 90/17 101/15 102/17
 103/7 103/25 104/15 105/2 112/21 138/14
Schaffer [1]  133/24
scope [7]  22/5 42/22 43/23 54/6 57/21 61/12
 96/13

screen [2]  73/3 104/1
search [6]  5/11 65/6 108/23 110/15 121/10
 121/13
search -- [1]  121/10
searched [3]  33/5 123/25 128/9
seat [2]  64/4 105/22
second [10]  23/10 74/24 95/25 106/21
 108/22 116/18 119/1 120/21 136/11 137/1
secondhand [1]  62/18
seconds [1]  113/20
section [1]  44/7
secure [5]  83/11 83/12 83/22 87/15 94/18
secure -- [1]  83/11
security [4]  95/2 99/8 99/12 99/24
see [35]  11/3 14/10 14/16 14/18 18/22 20/16
 24/8 24/9 26/24 34/5 34/13 44/10 46/6 47/10
 65/19 70/13 72/20 79/2 89/21 92/3 92/13
 102/22 103/3 104/12 115/7 119/13 119/16
 122/9 124/6 124/11 126/2 127/16 129/5
 130/18 133/12
see -- [1]  124/11
seeing [6]  10/14 14/7 14/24 78/2 109/21
 109/21
seek [1]  72/4
seem [1]  128/13
seemed [2]  25/25 132/18
seems [3]  47/10 58/10 58/11
seems -- [1]  47/10
seen [12]  14/8 14/12 14/13 14/25 69/18 70/2
 70/2 70/15 129/7 129/10 130/13 131/3
SEGAL [1]  1/11
seized [1]  6/2
sell [2]  30/10 52/7
send [1]  136/5
sense [3]  51/3 58/2 58/3
sentence [2]  39/1 0 39/12
sentencing [1]  40/3
September [2]  36/5 36/17
sequentially [1]  3/22
series [1]  28/11
serve [1]  6/9
session [2]  1/7 3/2
set [4]  3/18 36/24 70/24 111/20
setting [1]  57/8
several [8]  28/14 28/15 37/2 39/14 79/7
 86/17 118/18 123/25
several -- [1]  28/15
shack [4]  93/8 93/10 93/13 93/18
share [1]  39/3
SHAW [2]  2/12 140/4
she [59]
she -- [1]  97/8
she'd [1]  62/20
she'll [2]  63/2 64/6
she's [8]  64/7 69/24 110/13 111/16 111/17
 136/3 137/3 137/5
she's -- [1]  111/1 6
shoe [1]  66/20
shoes [3]  66/17 66/17 66/21
shoes -- [1]  66/17
shop [2]  93/17 94/2
short [6]  4/22 5/6 57/12 71/25 72/1 98/21
shorter [1]  51/20 51/22
shorthand [1]  2/24
should [6]  4/17 25/15 56/21 62/23 106/18
 136/23
show [26]  20/2 3 4/2 34/12 39/6 60/10 61/11
 69/15 69/17 69/2 0 69/22 79/19 88/22 92/1
 102/17 103/3 116/5 116/9 118/10 120/8
 122/7 122/9 126/18 126/20 127/15 132/20
 133/10
showed [2]  95/6 130/18

## P

part [14] 26/11 30/10 30/18 31/5 31/9 47/6 48/23 87/2 88/17 98/12 99/12 113/5 117/14 117/19
participate [2] 64/19 65/2
particular [16] 17/20 25/1 35/19 46/8 66/8 71/2 73/25 80/5 81/8 94/13 96/9 107/10 108/9 109/25 117/16 119/16
particularly [2] 65/20 84/1
parties [3] 16/13 16/15 134/2
partition [1] 98/14
partner [3] 53/25 54/4 54/4
Partnership [1] 96/10
party [3] 33/22 34/13 84/6
past [3] 62/2 93/13 93/14
past— [1] 93/13
Paul [2] 53/25 54/2
pay [1] 89/21
peaked [1] 107/11
pencil [1] 50/11
pending [1] 132/1
Pennsylvania [1] 123/22
people [17] 5/18 15/6 25/19 27/25 29/12 52/7 59/21 59/22 79/7 87/21 91/6 93/3 93/13 105/20 109/18 114/21 115/7
people's [1] 14/5
period [1] 31/14
permanent [2] 77/11 122/18
permanently [1] 114/24
permission [2] 81/10 88/4
permitted [1] 7/6
person [30] 9/15 11/11 19/14 19/15 53/13 53/16 73/2 73/4 73/14 78/13 78/23 79/2 81/23 81/24 81/24 82/2 83/9 84/4 86/22 86/22 86/24 87/5 89/2 91/3 97/8 110/7 113/9 115/13 132/16 132/18
personally [15] 76/6 108/4 110/21 114/21 119/11 119/16 120/1 120/15 122/2 124/21 126/2 129/10 130/5 130/13 130/18
personnel [2] 87/18 87/20
pertain [1] 71/2
phone [4] 90/13 106/7 106/12 111/7
phonetic [1] 96/3
photo [35] 14/24 78/16 78/21 82/21 85/20 85/22 85/23 85/23 86/5 86/11 86/14 102/22 102/24 103/3 103/21 103/22 103/22 104/5 104/9 132/20 132/23 132/23 133/1 133/5 133/5 133/8 133/11 133/18 139/11 139/14 139/15 139/20 139/21 139/22
photo — [1] 14/24
photocopies [1] 103/10
photocopy [5] 85/25 86/16 86/19 103/1 103/6
photograph [8] 10/14 10/18 10/18 11/8 11/11 77/21 78/22 79/1
photographs [5] 10/8 10/10 11/8 11/9 132/17
photos [7] 14/4 14/5 14/7 14/14 14/24 103/16 132/15
physically [1] 5/19
pick [7] 20/24 33/11 44/16 45/11 47/8 47/9 60/10
picked [7] 7/4 14/5 36/13 108/16 109/19 110/11 111/2
picks [1] 109/18
picture [12] 10/22 70/24 73/20 73/24 74/7 75/17 75/18 77/16 78/2 78/12 80/8 132/11
pictures [1] 45/3
pile [1] 128/13
piled [1] 34/24
piling [1] 135/5

pinpoint [4] 32/14 115/14 121/1 121/14
pinpointed [2] 108/12 121/20
place [5] 13/25 14/2 24/6 42/4 48/5
plan [2] 37/22 70/21
plate [12] 93/25 94/3 110/1 110/3 110/6 115/11 122/12 122/13 122/21 127/12 133/10 133/12
play [9] 16/13 18/16 18/22 36/7 36/23 36/24 37/22 135/21 135/23
played [7] 13/5 16/18 18/20 18/24 36/8 36/25 48/20
playing [2] 135/3 135/15
plea [6] 3/5 38/17 39/7 40/23 41/8 41/10
please [13] 6/15 13/1 20/17 50/11 68/19 68/25 72/23 74/14 75/2 82/12 97/5 112/11 136/17
plus [1] 135/9
Plymouth [3] 119/6 127/8 129/25
point [39]
pointed [4] 35/6 46/20 113/11 121/17
pointing [1] 75/11
police [3] 30/25 31/3 33/13
portion [1] 36/23
portions [2] 48/20 59/13
position [1] 44/19
positive [3] 31/10 32/16 32/20
positively [1] 125/8
possession [8] 7/8 7/20 7/21 8/9 8/9 9/13 9/16 67/2
possession when [1] 8/9
possible [3] 35/15 35/16 110/10
possibly [1] 41/3
preceded [1] 133/24
precise [3] 119/25 120/14 122/10
precisely [1] 47/23
premises [12] 97/9 98/4 98/7 98/19 99/5 99/8 100/1 100/8 100/12 100/15 100/19 104/19
presence [1] 57/19
present [7] 7/3 6/16 9/23 64/8 64/22 114/7 116/15
presented [2] 103/11 136/8
president [2] 69/5 76/1
press [1] 67/23
pretty [3] 92/23 121/16 137/2
prevent [1] 95/3
previous [1] 125/9
previously [1] 9/9
price [2] 60/3 60/4
primary [1] 111/21
prior [17] 7/4 7/7 7/17 7/19 7/20 8/6 8/7 8/18 8/19 8/20 14/7 14/24 15/1 33/16 44/8 45/24 134/4
probably [6] 5/19 21/13 55/7 86/19 109/8 134/10
probably — [1] 5/19
problem [12] 9/2 20/25 24/8 25/14 44/1 45/11 60/13 61/15 63/16 76/8 83/3 135/8
problem— [1] 61/15
problems [2] 26/25 29/24
proceed [1] 113/21
proceedings [3] 2/24 137/9 140/5
process [2] 91/10 111/13
produced [1] 2/24
Products [1] 92/21
proffer [32] 19/21 21/9 21/22 22/4 22/5 23/1 23/2 23/3 23/7 23/8 24/10 24/22 25/1 25/4 27/2 42/12 42/20 43/7 43/19 44/5 44/7 44/15 44/17 44/18 46/13 46/13 46/14 46/18 46/19 46/23 47/17 59/11
proffer — [1] 42/12
proffer's [1] 24/11

proffers [1] 26/22
progressed [1] 105/17
projector [1] 120/12
promoter's [1] 18/13
promoters [1] 19/16
proper [2] 69/21 71/7
properties [2] 69/11 116/11
property [9] 69/7 77/18 99/13 99/15 104/12 112/24 112/25 132/4 134/2
prosecute [1] 68/2
prosecutor [1] 128/15
prosecutors [5] 9/24 10/4 67/20 68/6 68/9
prove [2] 109/11 111/8
provide [2] 3/24 4/10
provided [2] 3/17 4/21
province [1] 40/1
public [1] 124/16
pull [1] 38/19
purpose [2] 6/8 72/23
purposes [6] 40/2 40/6 72/18 107/22 113/11 122/8
pursue [1] 67/15
put [31] 5/18 5/21 6/1 33/3 34/1 34/5 35/18 44/18 44/19 45/19 45/20 46/23 64/5 72/17 73/2 76/17 77/8 79/22 82/24 83/2 83/21 92/1 102/18 104/1 113/22 113/23 120/4 126/20 128/18 134/17 136/5
putting [9] 17/8 21/13 46/20 64/2 76/15 77/7 134/25 135/10 135/17

## Q

quantity [1] 49/7
quarter [3] 62/2 136/15 136/17
question [39]
question — [1] 91/13
questioned [1] 63/25
questioning [2] 31/2 60/25
questions [30] 3/11 9/6 11/21 18/1 28/11 28/21 29/3 29/6 35/15 38/4 38/17 40/7 40/10 41/1 42/12 57/7 58/6 58/20 62/23 63/1 63/2 66/7 68/11 68/12 68/13 71/24 86/21 98/2 128/18 130/22
quick [2] 3/15 105/2
quickly [4] 40/12 109/17 116/24 133/8
quickly — [1] 116/24
quiet [1] 121/8

## R

RACHEL [1] 1/15
raised [2] 22/20 62/15
ran [2] 83/12 91/9
rather [1] 59/20
reach [2] 35/2 123/18
read [11] 42/20 43/7 43/15 43/19 44/5 45/24 48/1 58/21 59/18 62/16 62/17
reading [4] 17/8 24/17 62/21 84/7
ready [1] 13/2
real [7] 23/15 58/18 59/23 60/9 60/10 61/24 136/4
realized [1] 111/1
really [12] 13/20 14/1 25/9 29/23 56/24 60/9 63/7 76/4 94/17 112/6 114/6 132/4
reason [4] 32/1 99/12 130/20 136/7
reasons [1] 135/24
rebuttal [1] 37/24
recall [18] 10/14 12/13 12/15 38/17 46/18 48/5 90/12 93/16 95/9 95/12 98/2 99/25 100/4 100/5 100/10 119/21 122/1 134/8
received [11] 13/20 34/10 72/15 73/13 80/25 86/14 103/23 128/4 133/6 139/3 139/13
recess [2] 57/12 112/12
recognize [9] 18/22 20/3 70/13 71/9 73/20

**M**

Mr. Norris' [1]  58/7
Mr. Schaeffer [1]  69/11
Mr. Schaffer [1]  133/24
Mrs. [12]  65/25 66/16 73/6 89/1 91/2 91/4
  91/4 91/7 91/10 91/15 103/6 103/11
Mrs. Adams [2]  65/25 66/16
Mrs. Jones [10]  73/6 89/1 91/2 91/4 91/4
  91/7 91/10 91/15 103/6 103/11
Ms [3]  138/12 138/15 138/19
much [18]  24/17 33/6 49/2 49/4 51/16 76/17
  89/8 89/14 89/25 90/2 90/5 90/6 114/10
  121/16 134/13 135/2 136/17 136/22
MVA [1]  128/8
my [43]
my -- [1]  13/19
Myrtle [12]  106/22 121/19 121/21 122/3
  123/5 124/19 124/21 125/4 125/25 130/6
  131/1 132/5

**N**

N.W [6]  1/16 1/19 2/2 2/6 2/9 2/14
name [20]  12/13 12/14 19/17 25/19 53/25
  69/3 73/14 82/3 82/5 87/8 90/12 96/2 96/9
  97/21 98/4 101/23 102/5 107/14 107/17
  108/15
name -- [2]  12/13 98/4
name's [1]  84/5
named [2]  95/7 101/19
names [5]  29/10 49/13 69/1 101/17 109/12
narrowed [1]  121/16
nature [3]  100/2 100/13 100/17
nauseam [1]  41/2
near [3]  23/18 121/8 123/22
necessarily [2]  60/15 76/1
necessary [2]  32/1 135/11
need [6]  26/21 48/24 48/24 49/14 49/14 62/3
need -- [2]  48/24 49/14
needed [2]  35/2 114/6
neighborhood [3]  121/6 121/7 125/11
nephew [2]  30/23 30/24
never [12]  11/9 11/12 35/10 38/10 47/20
  53/18 57/25 58/13 61/3 82/14 94/12 95/22
next [14]  5/5 5/12 37/17 62/12 65/11 68/16
  71/23 93/4 105/8 105/12 108/22 115/2
  125/14 125/20
nice [3]  18/6 18/7 68/25
night [1]  115/1
no [131]
no real [1]  136/4
nobody [4]  56/21 57/25 58/18 134/10
non-hearsay [1]  63/17
none [4]  7/18 22/3 22/23 71/21
normally [2]  67/2 99/23
NORRIS [10]  2/2 25/8 43/4 45/21 47/1
  58/24 72/9 85/17 101/11 138/17
Norris' [3]  58/7 79/13 134/1
North [7]  30/15 30/20 30/24 31/18 31/19
  42/9 44/8
not [142]
not -- [1]  32/16
notes [1]  23/17
nothing [15]  3/25 4/5 4/6 27/19 27/25 44/21
  44/24 53/20 61/16 68/10 68/14 68/15 102/11
  104/24 137/3
notice [2]  36/5 85/13
noticed [1]  3/21
notion [1]  20/25
November [14]  1/5 10/4 11/13 24/2 24/2
  28/24 43/22 55/4 79/22 88/24 90/19 116/21
  117/4 140/8

November of [1]  10/4
November the [1]  43/22
now [81]
now -- [1]  93/14
number [26]  3/24 28/16 34/10 36/1 37/9
  75/6 75/8 75/10 77/19 92/11 94/13 110/6
  111/7 116/6 117/13 118/16 119/21 120/1
  120/14 120/18 121/24 122/4 122/10 122/18
  130/13 137/2
numbered [1]  3/22
numbers [3]  4/19 122/2 122/20
Numerous [1]  14/9

**O**

o'clock [1]  125/21
oath [4]  64/4 64/10 105/15 105/22
object [15]  25/16 26/21 30/2 35/13 63/10
  75/10 75/25 80/13 81/2 105/16 105/19 113/5
  128/14 130/24 136/4
objected [5]  25/15 25/20 31/9 47/2 62/22
objecting [3]  47/1 76/2 110/13
objection [45]
objections [3]  25/9 58/7 133/2
observations [1]  118/19
observe [2]  114/21 119/11
observed [6]  109/25 115/10 118/17 120/1
  120/15 122/3
obtain [2]  108/8 116/1 117/13 118/11 127/2
  132/11
obtained [4]  110/5 116/11 117/12 118/1
obviously [1]  8/25
occasion [3]  11/3 55/3 77/18
occasions [2]  118/18 130/13
occupancy [1]  117/4
October [9]  9/8 9/14 12/24 15/25 18/19
  33/16 36/22 38/6 64/17
odd [3]  17/6 59/20 61/5
of -- [1]  53/22
of the [1]  88/17
off [10]  64/1 85/4 104/20 106/12 112/18
  115/5 119/8 121/25 125/13 125/15
off for [1]  64/1
offense [2]  9/20 67/4
offenses [1]  67/3
offer [1]  41/10
offered [3]  30/4 30/6 31/14
offering [1]  31/15
offhand [1]  14/1
office [8]  1/16 41/13 98/11 98/12 98/13
  98/13 98/17 116/2
Officer [1]  31/8
officers [1]  31/17
often [3]  14/10 14/16 14/18
oh [12]  8/11 15/15 15/21 27/18 47/7 49/1
  49/8 56/12 75/19 88/20 90/4 132/4
okay [147]
old [3]  7/14 10/18 121/8
older [1]  10/22
on -- [3]  5/1 7/12 49/5
once [11]  16/19 25/9 37/23 46/20 48/16 65/6
  89/3 91/9 99/25 113/22 136/3
one [85]
One -- [1]  126/5
one-count [1]  7/11
ones [8]  5/16 15/7 49/11 72/20 72/23 100/25
  117/16 117/18
only [31]  8/8 16/21 19/25 22/10 29/23 32/6
  37/9 37/21 38/10 42/6 45/24 47/17 54/15
  55/8 55/14 57/1 57/6 61/8 73/13 77/5 97/1
  110/14 112/12 120/4 122/8 124/14 130/20
  132/6 134/11 136/7 137/5
only -- [2]  16/21 110/14

open [22]  9/4 17/23 20/21 24/3 25/10 26/1
  27/8 32/25 43/2 44/15 45/14 45/14 47/11
  48/2 58/8 77/13 85/10 93/4 93/23 98/9 112/9
  131/12
open -- [1]  26/1
opened [6]  20/10 24/18 26/2 26/3 46/7 46/19
opening [2]  26/22 58/10
openly [1]  7/24
opens [2]  26/16 59/10
opponent [1]  84/6
opportunity [2]  43/18 61/22
opposed [1]  108/21
or -- [2]  7/9 34/13
ordered [2]  38/24 76/17
ordinary [3]  82/23 86/1 103/8
originally [1]  80/19
other [33]  4/8 11/16 23/25 24/16 24/19
  26/22 27/3 29/12 29/22 30/10 30/10 31/24
  40/10 44/25 46/6 53/6 53/12 53/15 62/18
  76/24 89/20 92/25 94/17 94/24 110/17 115/4
  115/7 116/1 119/10 122/12 124/25 129/8
  136/1
other -- [1]  44/25
otherwise [4]  21/2 47/13 47/24 60/11
ought [3]  13/10 84/18 134/17
ounce [8]  37/10 49/5 49/18 49/22 49/23
  49/24 50/17 50/19
ounces [10]  37/11 50/2 50/10 50/21 51/1
  51/2 51/3 51/6 51/7 53/4
ounces -- [1]  51/6
our [5]  12/9 22/14 26/24 33/19 85/13
our -- [1]  33/19
out [41]
out -- [2]  7/15 83/24
out which [1]  109/13
outside [2]  57/19 106/18
over [16]  41/2 51/1 51/2 64/5 79/5 82/12
  82/13 83/14 90/13 91/21 92/16 98/24 109/8
  124/24 125/3 125/9
overhead [12]  80/6 81/9 81/13 83/12 86/23
  87/11 87/13 89/7 89/14 89/25 94/23 104/17
overlook [1]  67/12
overruled [11]  20/10 28/12 30/8 32/9 32/24
  35/14 81/4 81/21 89/23 131/25 132/8
own [5]  67/18 91/21 92/7 97/1 108/21
owned [1]  29/18
owner [3]  93/12 95/23 95/24
ownership [1]  96/25

**P**

P-R-O-C-E-E-D-I-N-G-S [1]  3/1
p.m [15]  1/5 3/2 6/16 57/14 62/13 64/8 64/12
  68/20 105/24 112/14 112/18 112/19 114/7
  134/14 137/9
page [23]  12/18 12/20 12/21 12/22 15/11
  15/24 35/21 35/23 36/1 36/2 36/18 36/21
  37/18 37/22 44/12 49/12 49/13 70/3 70/4
  70/18 70/18 119/1 122/9
pages [1]  46/6
paid [1]  89/22
Papa [1]  123/2
paper [3]  19/8 80/22 92/20
paragraph [10]  39/6 39/9 45/16 45/20 46/4
  46/8 46/9 46/20 46/21 47/12
paragraphs [1]  44/16
Park [17]  69/12 69/13 70/19 71/3 73/4 73/23
  74/1 74/18 79/23 91/21 92/8 96/7 96/10
  96/11 97/1 97/9 106/25
parked [2]  121/2 122/13
parking [5]  92/19 92/25 109/20 118/11
  119/3
Parks [1]  116/19

## L

Levels [5] 29/21 29/21 29/23 107/4 133/19
license [20] 75/18 77/23 78/9 78/12 86/17
86/19 86/25 102/25 103/1 103/6 110/1 110/3
110/6 113/10 115/10 118/16 127/6 127/12
133/10 133/12
licensed [1] 127/8
licenses [3] 91/8 91/16 103/11
LIEBER [8] 1/15 36/24 75/10 95/6 134/21
138/12 138/15 138/19
lieu [2] 134/24 135/15
like [30] 4/16 10/12 11/12 12/4 15/4 18/15
26/10 26/23 27/20 31/1 35/15 47/18 56/14
74/19 74/21 76/10 78/3 84/4 87/17 87/22
89/15 89/20 89/25 93/22 100/6 100/9 103/11
108/20 116/12 121/5
limit [4] 7/19 26/14 59/4 63/21
limited [5] 54/15 57/21 57/22 60/6 96/10
limits [1] 26/17
line [4] 134/17 135/15 135/18 136/11
line-by-line [3] 47/5 47/14 47/24
line-by-line and [1] 47/14
lines [2] 11/10 49/13
linked [1] 107/25
Lissen [1] 19/20
list [3] 70/3 108/14 117/4
listed [3] 123/11 123/21 129/5
listened [2] 3/5 3/8
listening [3] 58/16 59/22 60/8
listing [1] 119/4
little [19] 5/13 16/5 18/22 30/18 30/19 37/22
48/19 51/1 51/2 51/19 51/19 51/22 60/10
62/21 69/8 71/6 73/3 79/6 134/19
little -- [2] 51/19 60/10
LLC [2] 96/5 96/7
located [4] 5/19 69/12 121/15 133/19
location [9] 86/22 95/21 95/23 99/19 106/20
106/21 106/23 106/24 130/6
location -- [1] 106/23
locations [3] 106/13 106/17 106/23
locks [1] 104/20
long [2] 59/13 113/24
longer [2] 5/17 85/14
look [27] 4/12 12/18 15/10 21/7 35/21 36/18
37/17 39/9 47/23 49/12 49/13 70/12 73/3
74/8 74/19 74/21 76/10 78/12 78/22 79/1
79/2 79/8 87/17 120/13 123/15 124/4 126/12
looked [15] 4/16 10/9 10/23 14/14 31/1 78/3
85/20 108/14 110/7 110/10 110/17 110/25
121/5 123/24 137/1
looked -- [1] 110/17
looking [12] 11/9 21/2 78/9 82/17 84/12
88/23 119/24 122/17 122/23 125/9 125/11
131/20
looks [2] 84/4 116/12
loose [1] 65/25
lost [2] 5/13 5/20
lot [16] 10/9 14/15 20/20 34/24 38/17 42/12
48/7 48/14 62/17 86/21 92/19 92/25 93/3
93/14 109/20 130/23
lunch [2] 3/9 6/17
lying [1] 39/16

## M

ma'am [10] 12/20 12/25 13/4 15/19 35/25
40/4 64/11 106/2 127/21 127/23
machine [3] 2/24 79/22 120/5
made [16] 13/21 21/8 21/19 23/2 23/9 28/2
32/4 35/1 65/5 65/6 66/15 68/1 76/6 80/14
103/11 118/19
maintain [1] 71/18

make [21] 7/24 17/17 17/18 23/11 26/15
40/23 41/10 51/3 58/2 58/3 67/18 68/2 68/5
68/8 73/9 82/11 82/12 82/19 91/13 135/3
135/1
makes [1] 61/16
male [3] 109/22 110/12 111/2
man [8] 18/10 19/10 27/19 27/24 54/9 56/14
79/9 132/18
management [2] 69/7 96/5
manager [1] 77/17
manages [1] 69/12
many [14] 14/7 14/13 14/25 50/10 51/23
124/24 125/3 125/24 125/25
March [1] 81/10
mark [2] 97/21 120/3
marked [7] 19/25 20/2 69/15 79/19 120/7
122/8 127/15
married [1] 91/15
Marshal [1] 50/1
Mary [1] 127/12
Maryland [18] 8/4 8/12 69/13 106/18
106/21 106/22 106/24 107/11 117/2 121/8
121/18 124/10 124/20 124/22 127/2 128/8
129/20 137/6
matches [1] 111/17
materials [1] 100/16
math [1] 52/20
matter [3] 3/25 70/15 140/6
mattresses [1] 100/8
may [28] 11/4 24/19 24/25 26/6 32/9 34/12
45/12 50/11 51/19 51/22 67/12 70/6 75/5
76/15 78/18 78/18 82/22 97/10 101/5 104/25
108/22 110/18 116/23 125/15 134/6 134/15
135/7 135/12
may -- [2] 134/6 135/7
maybe [4] 51/17 53/4 78/1 113/13
Maybe -- [1] 51/17
Maynard [34] 14/13 30/14 30/17 31/12
31/17 31/19 31/20 31/25 32/2 32/13 32/14
33/2 42/10 44/9 45/5 46/3 47/7 47/14 47/22
48/4 101/21 102/25 103/12 130/9 130/10
130/11 131/9 131/13 131/18 131/20 132/10
132/12 132/17 133/15
McAllen [1] 106/8
McDANIEL [8] 2/9 18/2 18/3 18/9 19/21
20/5 35/3 138/9
MCI [2] 19/9 19/11
me [58]
me -- [5] 45/17 56/12 58/10 63/8 82/14
mean [37]
meaning [1] 102/3
meaningless [1] 102/5
means [7] 21/22 49/6 55/9 55/20 60/15
60/21 86/11
meant [4] 10/2 16/9 16/14 90/5
meantime [1] 105/8
measures [1] 121/1
meeting [3] 28/19 28/24 45/25
meetings [1] 9/23
member [1] 31/1
members [4] 13/24 55/3 115/4 115/7
memory [6] 78/3 78/13 78/23 119/25 120/14
122/23
mention [1] 46/19
mentioned [10] 14/4 15/6 20/5 25/19 28/14
29/17 30/14 34/17 48/20 101/17
merely [1] 61/2
mess [1] 46/21
messed [6] 8/15 10/2 23/23 55/1 55/12 55/25
messier [1] 25/25
met [8] 10/4 24/1 24/2 28/15 43/18 43/21
46/1 102/2

met -- [1] 102/2
metropolitan [4] 69/5 69/6 106/13 120/22
Mexican [1] 121/11
MICHAEL [2] 1/6 14/24
might [11] 10/13 42/16 46/10 53/4 61/11
61/24 90/12 108/8 108/8 112/1 121/15
Mike [5] 12/14 13/7 14/25 133/13 135/16
Mike's [4] 13/15 13/16 36/11 36/12
million [3] 18/10 19/10 60/25
mind [4] 6/19 82/14 109/13 113/6
Mine [1] 83/19
minor [1] 75/5
minute [6] 13/1 24/9 38/19 56/2 70/23
106/11
minutes [5] 39/3 64/2 112/11 112/21 136/25
misinterpreting [1] 58/20
misleading [2] 57/5 63/7
Miss [5] 3/4 36/24 75/10 95/5 134/21
missed [1] 62/22
missed -- [1] 62/22
misstatement [1] 45/2
mistake [3] 21/18 21/19 28/2
mistaken [2] 37/5 113/12
mistakenly [3] 112/21 113/5 113/7
moment [2] 10/9 39/25
Monday [7] 109/25 111/6 125/14 125/20
126/1 134/18 136/2
money [15] 31/21 32/18 32/23 33/5 33/6
32/10 33/10 33/14 34/18 35/2 36/13 36/14
66/19 99/21 99/21
monitor [1] 102/18
Montana [1] 107/2
month [3] 48/9 95/11 97/23
months [1] 99/1
more [27] 3/11 9/6 10/12 18/22 21/13 25/4
28/21 28/21 34/20 34/22 43/2 47/5 47/19
58/4 58/8 59/16 61/10 62/3 62/4 79/6 83/11
83/23 101/5 106/23 128/11 135/11 135/11
morning [7] 23/18 39/4 125/14 125/14
125/21 134/18 136/2
most [3] 93/20 93/20 122/16
mostly [2] 14/12 26/5
motion [1] 41/12
Motor [4] 127/2 127/3 127/19 127/21
move [11] 5/10 25/13 28/10 34/25 65/17
69/9 74/11 80/11 86/4 103/15 129/13
movement [2] 19/10 57/10
moves [1] 69/9
movie [1] 4/16
moving [6] 25/14 83/13 87/14 94/7 94/8
94/16
Mr [94]
Mr. [109]
Mr. -- [1] 60/17
Mr. Acree [15] 3/10 8/17 12/5 12/6 12/13
13/22 14/4 15/3 17/1 22/7 22/20 23/17 56/17
57/16 62/4
Mr. Adams [2] 9/6 40/15
Mr. Antoine [1] 101/18
Mr. Balarezo [1] 33/20
Mr. Geise [2] 26/22 58/20
Mr. Geise's [1] 59/18
Mr. Glick [3] 97/25 98/2 98/6
Mr. Holland [1] 19/16
Mr. Jones [60]
Mr. Jones get [1] 109/21
Mr. Jones his [1] 99/10
Mr. Jones' [2] 30/23 80/5
Mr. Maynard [4] 30/17 33/2 48/4 103/12
Mr. McDaniel [6] 18/2 18/3 18/9 19/21 20/5
35/3
Mr. Norris [5] 25/8 43/4 45/21 47/1 58/24

**I**

imagine [1] 4/23
Immigration [1] 95/20
Impala [4] 119/20 119/20 120/15 123/4
implication [3] 83/16 83/20 83/23
import [1] 59/19
important [1] 113/11
imposed [1] 39/10
in -- [2] 79/21 112/16
in as [1] 134/22
in-between [1] 93/23
in-court [1] 82/19
inaccurate [1] 134/5
inaccurately [2] 113/14 133/25
Included [1] 116/23
income [2] 124/7 124/12
incorrectly [1] 3/6
independently [1] 34/13
Indiana [1] 2/2
indicate [3] 78/5 116/15 118/13
indicated [5] 50/1 67/6 94/5 94/22 95/5
individual [3] 90/24 93/21 97/20
individuals [2] 11/14 126/6
indulgence [3] 39/25 88/13 120/10
industrial [2] 92/20 92/25
inference [3] 47/5 47/21 47/25
inflatable [1] 100/8
inform [1] 133/23
information [7] 23/3 23/6 45/8 47/19 111/22 115/14 132/11
information -- [1] 23/6
initially [2] 7/11 121/24
inquiring [1] 38/23
inquiry [1] 26/15
inside [1] 98/9
insinuate [3] 20/19 44/16 45/15
inspect [1] 99/8
inspections [1] 98/19
install [4] 81/8 81/10 81/12 87/13
installed [8] 80/5 80/9 86/22 89/20 94/23 94/24 94/25 95/1
instance [2] 62/23 87/22
instead [3] 34/25 113/25 134/22
instruct [1] 63/21
instruction [1] 26/10
instructions [1] 88/6
intend [1] 112/20
intending [1] 111/4
interception [1] 44/8
interest [13] 6/1 63/23 96/19 96/23 96/25 96/25 106/13 107/11 114/15 115/8 115/11 115/16 119/10
interpreted [1] 37/23
interpreting [1] 57/9
interrupting [1] 26/23
interruption [1] 114/8
introduce [2] 68/25 126/22
introducing [1] 110/4
investigate [2] 120/21 131/17
investigation [18] 3/18 4/8 4/9 29/14 65/12 65/14 67/7 67/12 106/7 106/12 107/9 108/7 115/25 119/7 119/11 123/14 127/1 132/10
investigation -- [1] 119/7
investigative [1] 120/25
investigator [1] 97/25
Investment [2] 69/5 69/6
involved [1] 55/12
involvement [1] 18/13
involving [1] 44/9
is [322]
is -- [9] 8/15 18/16 21/4 60/20 83/16 96/12

97/15 109/14 118/17
isn't [14] 9/9 9/20 9/24 10/3 10/10 10/12 10/15 11/14 32/15 37/24 47/13 55/22 56/8 132/7
issue [6] 23/6 38/3 46/11 76/14 84/13 105/2
Isuzu [7] 126/8 127/10 129/13 130/5 130/17 131/5 132/19
it [366]
it -- [6] 4/11 7/18 17/15 28/21 32/8 63/3
it's [112]
it's -- [1] 84/2
item [1] 85/19
items [3] 64/22 65/3 99/19
its [1] 71/6
itself [1] 71/7

**J**

JACK [2] 1/15 44/22
JACKSON [21] 1/6 2/2 2/5 20/13 25/20 25/22 26/6 27/14 59/8 59/14 101/23 102/5 102/8 112/22 112/23 113/7 113/14 113/15 133/25 134/2 134/5
Jackson -- [1] 27/14
jail [15] 8/19 20/6 20/12 22/13 22/24 23/1 24/4 27/12 41/21 41/25 42/1 45/4 46/16 57/24 59/2
jailhouse [2] 25/17 25/18
Javier [13] 107/16 107/18 107/20 107/22 107/25 109/16 110/21 114/17 119/11 119/13 120/22 121/2 121/15
Jeep [5] 118/15 121/11 125/9 127/6 129/21
Jencks [2] 4/6 137/8
jersey [8] 37/10 49/2 49/4 49/7 49/10 49/23 50/6 51/8
jerseys [6] 37/11 48/21 48/24 49/15 49/17 51/5
John [3] 64/17 65/23 138/5
JON [1] 2/2
JONES [155]
Jones -- [1] 21/6
Jones' [5] 28/8 30/23 61/2 80/5 111/2
judge [16] 1/12 20/9 20/21 22/24 24/10 25/14 26/20 39/3 39/13 39/15 39/16 39/24 40/18 40/23 41/8 59/3
July [2] 34/14 34/16
July the [1] 34/16
jurors [2] 4/15 38/21
jury [43]
jury's [2] 40/5 135/20
jury's attention [1] 135/20
just [111]
just -- [4] 17/16 40/11 45/15 130/3

**K**

Katerina [6] 73/14 95/7 97/8 98/3 105/24 138/18
Katerina -- [1] 98/3
keep [3] 21/12 21/14 59/1
keeps [1] 111/25
kept [6] 37/6 71/14 82/23 85/25 98/16 103/7
KEVIN [6] 1/7 18/12 19/20 35/3 35/6 135/16
key [5] 97/12 97/13 97/14 104/17 104/19
ki's [1] 33/11
kicked [1] 106/12
kilo [9] 28/3 52/10 52/11 52/13 52/15 55/5 55/9 56/1 60/15
kilos [3] 31/22 47/8 47/9
kind [6] 55/13 63/15 88/1 119/5 121/17 126/7
kinds [2] 47/11 99/19
knew [2] 24/16 28/18

know [114]
knowledge [9] 14/8 17/20 62/17 62/18 63/1 76/9 89/14 102/6 102/8
known [1] 21/1
knows [7] 8/18 47/18 49/21 63/11 76/16 111/8 129/7

**L**

ladies [8] 6/24 12/17 38/22 57/12 85/13 112/10 114/8 133/23
laid [2] 71/7 76/3
land [1] 58/7
large [9] 37/10 37/11 49/11 50/6 51/8 66/19 91/22 91/22 132/18
large -- [1] 91/22
Largo [3] 106/21 107/11 117/1
Larry [1] 96/2
last [18] 19/17 40/17 62/15 69/1 70/18 95/11 95/15 95/13 95/14 98/4 106/6 107/6 109/10 112/1 119/8 120/20 122/5 132/3
late [6] 18/2 38/22 63/14 97/4 125/5 136/16
later [6] 63/13 85/14 91/9 131/5 134/10 136/17
latter [1] 111/5
law [5] 9/19 24/2 55/3 113/23 136/9
lawoffice [1] 1/20
Lawrence [24] 14/13 30/14 31/19 42/10 44/9 46/3 91/7 101/19 101/21 101/21 102/25 104/10 104/12 130/9 130/10 130/11 131/9 131/13 131/17 131/20 132/10 132/12 132/16 133/15
lawyer [1] 39/3
lay [5] 63/15 69/20 69/22 76/11 123/18
lay -- [1] 123/18
laying [1] 72/7
leading [1] 130/23
learn [1] 23/7
learned [10] 20/20 21/1 22/4 23/7 31/19 32/13 32/14 44/17 45/15 108/21
lease [33] 70/19 70/25 71/2 74/14 74/17 76/10 81/24 83/4 84/5 88/8 88/10 88/14 88/18 88/23 88/24 90/17 90/22 94/10 95/6 98/20 99/20 101/18 116/1 116/1 116/10 116/10 116/12 116/16 116/20 116/25 117/8 123/11 123/2
leased [3] 73/2 73/4 74/9
leased -- [1] 73/2
leases [2] 110/8 110/25
least [11] 8/14 20/23 43/11 48/20 56/19 72/22 89/3 89/5 93/19 128/11 136/9
leave [2] 98/23 115/8
leaves [3] 3/8 84/16 105/4
led [1] 107/7
left [23] 20/25 61/18 97/13 99/15 99/18 99/24 100/1 100/7 100/11 100/15 100/19 100/22 104/20 105/14 113/7 114/18 114/23 114/23 114/24 115/3 115/5 119/8 119/11
left -- [1] 114/23
legal [1] 65/16
legitimate [5] 21/14 23/15 124/6 124/7 124/11
lessee [2] 76/9 131/22
let [25] 6/3 10/25 32/10 33/15 34/12 37/25 39/6 39/21 44/10 45/17 45/20 61/13 73/1 73/18 74/16 81/17 82/14 85/19 92/1 99/25 105/7 112/3 114/16 126/25 130/3
let's [18] 6/15 6/19 13/2 15/10 16/3 18/22 21/2 34/13 35/21 36/7 36/18 37/17 39/9 44/10 63/20 92/22 95/14 99/22
letter [1] 70/21
letters [1] 122/20
level [1] 110/22

**F**

frankly [2]  45/18 46/19
Friday [2]  34/14 126/1
from — [2]  9/19 107/13
front [21]  17/8 24/11 25/17 46/23 70/18 73/23 73/25 74/8 74/14 74/21 80/1 81/13 83/21 84/20 87/15 87/18 88/1 88/15 93/24 98/12 98/14
fronted [1]  98/14
full [2]  29/10 107/17
funnier [1]  85/17
furniture [4]  94/6 94/13 94/16 98/7
further [5]  29/14 40/7 40/13 53/23 102/11

**G**

gang [1]  31/1
garbage [1]  99/18
garble [1]  27/20
garden-style [1]  114/17
Gasner [1]  96/2
gave [15]  13/19 13/19 24/11 38/8 38/10 38/10 52/24 53/13 53/16 73/13 95/5 95/6 95/9 99/12 136/7
GEISE [9]  1/15 16/6 25/15 26/22 40/17 54/23 55/23 58/20 138/7
Geise — [1]  25/15
Geise's [1]  59/18
gentleman [2]  13/17 18/4 79/11
gentlemen [9]  6/24 12/17 38/23 57/13 85/14 112/10 114/9 133/2 133/23
get [35]  4/11 4/24 21/22 23/14 32/19 35/2 43/12 46/12 46/14 46/17 47/12 57/1 57/7 57/23 58/5 58/25 59/7 60/8 60/15 62/12 76/18 77/16 84/1 85/14 99/8 104/19 105/8 108/22 109/21 109/22 111/7 119/16 135/10 135/15 136/22
gets [4]  62/19 71/7 85/14 85/17
getting [5]  25/9 56/24 71/16 107/8 115/13
Gikas [23]  3/19 4/2 4/3 4/4 4/24 62/14 98/3 98/7 105/24 114/13 116/6 116/9 116/23 119/1 120/7 120/12 122/7 123/10 126/25 128/6 132/3 133/8 138/18
Gikas — [1]  116/23
give [18]  4/25 29/10 37/15 38/12 50/2 51/6 51/8 73/10 73/12 82/3 86/24 88/6 98/7 99/10 101/8 112/5 116/18 137/7
given [7]  3/7 39/15 39/22 51/15 51/16 97/13 99/20
giving [2]  27/5 52/17
glass [9]  83/21 83/24 87/15 87/16 87/18 88/1 88/2 94/3 98/14
Glick [4]  97/21 97/25 98/2 98/6
go [61]
go — [2]  60/5 114/24
goes [5]  21/5 22/3 84/19 109/13 113/23
going [109]
gone [6]  41/2 60/24 83/18 83/19 105/14 109/8
Gonzalez [1]  107/18
good [28]  6/17 11/24 11/25 12/1 12/2 13/2 39/19 40/15 40/16 47/22 50/14 50/24 64/3 64/15 64/16 66/13 66/14 67/5 68/23 68/24 75/24 90/11 101/15 101/16 105/13 106/2 106/3 134/12
Gordon [2]  14/18 30/23
got [24]  5/14 6/20 8/15 21/25 27/20 27/25 27/25 30/19 30/24 42/23 45/2 45/2 46/22 47/25 48/6 52/18 52/24 54/25 62/3 63/17 94/3 107/9 117/17 136/19
gotten [2]  37/14 61/11
government [25]  1/15 3/17 3/24 5/21 8/15

9/23 28/15 29/4 29/7 29/14 39/14 43/18 43/21 45/25 46/1 59/22 61/9 62/25 63/15 65/24 66/4 68/17 70/10 84/9 118/7
government's [29]  6/9 41/1 61/6 69/16 72/14 74/12 78/21 79/20 80/25 86/14 103/22 128/3 133/5 139/5 139/6 139/7 139/8 139/9 139/10 139/11 139/14 139/15 139/16 139/17 139/18 139/19 139/20 139/21 139/22
GPS [1]  135/9
grams [25]  49/8 49/10 49/18 49/19 49/21 50/2 50/2 50/17 50/19 50/21 51/1 51/2 51/2 51/23 52/4 52/7 52/7 52/13 52/15 52/21 53/1 53/6 53/12 53/15
grant [1]  88/4
grass [2]  88/1 93/25
Griffith [1]  3/4
ground [1]  61/23
group [1]  23/10
guess [10]  4/22 5/13 7/3 58/10 62/7 100/5 106/17 127/2 134/19 137/1
guess — [1]  62/7
gun [1]  8/10
guy [8]  44/20 61/4 61/9 76/16 83/4 83/4 83/5 110/11
Gwen [3]  70/3 85/21 132/6

**H**

had [88]
had — [3]  54/20 128/12 128/12
half [64]
half-price [1]  60/16
halfway [2]  121/22 121/23
Hampton [18]  69/12 69/13 70/19 71/3 73/4 73/23 73/25 74/18 79/23 91/21 92/7 96/7 96/10 96/11 97/1 97/9 106/25 134/3
happen [1]  88/7
happened [9]  19/12 22/12 32/3 33/13 48/7 52/23 53/9 53/12 112/1
happy [2]  4/9 109/15
hard [1]  83/17
harder [1]  85/14
has [40]
hashed [1]  61/21
hasn't [5]  7/14 16/18 17/16 41/3 83/6
hasn't — [1]  17/16
hate [1]  26/23
have [169]
have — [4]  4/4 4/22 45/22 109/19
haven't [4]  38/1 41/5 105/14 105/17
having [8]  18/12 29/24 31/18 34/25 56/4 79/1 114/1 128/15
he [245]
he — [2]  45/23 47/7
he's [15]  7/23 17/8 21/4 25/22 27/1 31/20 32/5 75/25 77/5 77/6 79/5 82/24 83/7 111/8 118/23
he's — [1]  32/5
head [1]  109/17
heading [1]  31/22
heads [1]  4/25
heads-up [1]  27/5
hear [6]  4/14 5/3 21/3 43/4 43/25 136/24
heard [9]  31/24 31/25 32/7 32/7 37/19 42/12 58/22 63/22 134/20
hearsay [9]  30/2 31/16 76/18 76/20 76/25 111/11 124/15 126/17 131/23
heat-sealing [1]  100/16
heavens [1]  33/19
Heights [3]  91/13 91/24 106/24
helpful [1]  3/7
helpful — [1]  3/7
helps [1]  79/8

her [37]
here [41]
here — [2]  76/19 120/13
here's [2]  25/3 104/5
herself [3]  63/5 63/21 89/2
him [113]
him — [5]  17/6 22/1 44/21 58/23 77/2
him the [1]  130/18
himself [3]  78/13 78/23 79/3
his [50]
his — [1]  109/16
Hispanic [3]  109/22 110/12 111/2
Hold [1]  108/19
hole [1]  28/1
HOLLAND [7]  1/7 2/9 19/16 35/4 35/7 35/10 135/16
Holland — [1]  35/4
home [3]  9/14 11/5 106/21
homes [2]  121/9 121/16
honest [1]  39/22
Honor [119]
Honor — [2]  45/13 47/16
HONORABLE [1]  1/11
hope [6]  6/19 42/25 101/3 105/21
hoping [2]  114/5 135/10
Horne [2]  9/24 114/5
hour [2]  38/22 136/19
hours [1]  92/23
house [23]  5/11 5/14 6/2 9/8 11/1 13/15 13/16 13/16 13/18 36/11 36/12 66/25 121/1 121/20 121/22 122/13 124/19 125/8 125/12 126/3 126/3 131/3 131/22
housed [1]  42/4
houses [1]  121/15
how [51]
huge [1]  46/21
HUGGINS [7]  1/6 13/9 14/25 14/25 111/24 113/21 135/16
Huggins' [2]  11/1 11/3
huh [3]  14/21 43/9 81/18
Huh-uh [1]  16/10
Hunter [1]  114/6
husband [1]  66/23
HUVELLE [1]  1/11

**I**

I — [10]  4/1 4/4 31/20 46/24 59/17 60/18 63/19 75/12 91/19 91/19
I'd [1]  12/4
I'll [26]  12/11 20/12 22/1 38/3 40/17 43/25 47/17 57/22 60/5 63/19 63/20 69/19 73/2 79/22 80/23 83/24 91/13 101/5 101/7 101/10 102/17 105/17 116/24 120/3 120/8 137/7
I'm [133]
I've [8]  62/17 69/15 79/19 81/20 85/5 89/20 120/7 127/15
I.D [1]  82/21
i.e [1]  59/22
ICE [8]  3/18 69/19 106/7 114/25 115/4 117/13 124/25 127/15
ID [1]  19/25
idea [4]  16/14 41/3 100/21 100/23
identification [12]  20/3 75/7 78/17 82/19 84/13 87/2 110/7 113/12 113/12 120/4 120/8 122/8
identified [18]  29/4 29/7 29/12 78/23 84/23 85/3 85/19 90/24 110/14 112/21 113/6 113/14 114/14 125/8 125/12 131/4 133/25 134/4
identified — [1]  85/3
identify [11]  11/11 19/2 72/22 75/8 75/16 75/16 78/7 106/12 115/10 131/2 131/9

**D**

documents... [15]  73/10 73/16 76/5 88/15
95/5 95/9 108/9 111/16 116/2 116/6 117/13
118/1 126/19 126/21 127/17
does [29]  6/8 12/10 13/11 51/3 51/11 54/21
55/16 56/11 60/24 73/24 74/2 74/7 74/10
74/25 76/4 76/5 76/7 78/22 80/8 80/10 89/25
92/9 116/15 116/18 117/4 117/9 118/13
120/14 120/17
doesn't [7]  4/4 24/3 49/6 58/2 58/3 76/1
128/13
dog [10]  31/3 31/9 31/21 32/10 32/15 32/16
32/19 33/3 33/3 33/4
doing [13]  17/15 17/18 17/19 29/15 45/18
46/5 60/11 60/19 69/24 108/8 135/8 135/17
136/3
dollars [2]  49/6 76/16
don't [106]
don't – [2]  26/1 99/17
done [8]  20/23 26/24 61/22 61/25 84/16
84/22 101/2 136/3
door [3]
doors [8]  29/24 34/23 45/14 45/14 83/24
89/20 94/23 98/13
doors – [1]  98/13
dots [1]  111/12
doubt [1]  24/17
doughnut [1]  6/20
down [6]  49/13 58/22 90/7 104/25 121/16
134/15
driver's [13]  75/18 77/23 78/9 78/12 86/17
86/19 86/25 91/8 102/25 103/1 103/6 103/11
113/10
driveway [3]  121/22 122/3 123/5
driving [4]  118/17 130/8 130/16 133/16
drug [5]  13/21 32/18 48/24 53/11 53/14
drugs [15]  13/20 13/20 17/5 31/10 35/7
35/10 37/5 38/9 38/10 38/11 38/12 49/4
66/24 67/2 83/22
duffle [1]  100/12
during [4]  26/18 27/10 80/4 126/3
duties [1]  77/17

**E**

e-mail [1]  136/6
each [6]  49/2 49/4 49/10 49/17 49/23 93/21
earlier [3]  18/3 43/17 134/21
early [1]  134/10
earnings [6]  118/4 118/6 124/9 124/10
124/11 124/12
easy [1]  35/1
edge [1]  133/20
EDUARDO [2]  1/18 90/12
effect [1]  98/3
eighth [19]  37/6 37/7 37/8 51/18 51/20 51/21
51/22 51/23 51/25 51/25 52/3 52/3 52/4 52/8
52/9 52/9 52/10 52/15 53/1
either [2]  9/23 125/19
elegantly [1]  21/13
elicit [3]  63/1 84/4 111/4
eliciting [1]  109/11
ELLEN [1]  1/11
Elmo [3]  72/17 73/2 92/1
else [28]  3/8 25/2 26/16 31/11 38/16 51/9
52/18 53/20 53/21 54/15 55/14 61/16 62/8
62/9 66/6 68/10 68/14 71/22 72/2 75/2 88/25
101/4 104/24 108/21 114/3 129/8 134/6
136/13
employed [4]  14/20 14/22 69/4 111/13
employer [4]  116/15 116/18 123/10 124/7
employment [1]  124/7

end [4]  4/7 23/18 92/13 137/6
ended [1]  88/7
enforcement [4]  9/19 24/2 55/4 95/20
enlarged [2]  86/17 86/19
enough [6]  11/12 16/17 85/5 85/8 85/15
87/15
enter [4]  97/9 98/4 98/7 99/5
entered [4]  33/21 74/17 81/24 116/25
entire [2]  59/11 122/4
entirety [1]  92/7
equals [1]  49/21
equipment [5]  99/18 100/9 100/16 121/17
125/10
ESQUIRE [6]  1/15 1/15 1/18 2/2 2/5 2/9
essentially [2]  7/5 9/25
establish [1]  75/20
even [5]  5/25 17/13 24/21 28/2 48/11
evening [3]  125/7 125/11 134/12
event [5]  19/10 19/11 19/12 19/14 19/15
events [2]  30/15 30/17
eventually [3]  29/25 30/9 109/15
ever [5]  11/3 12/14 17/2 17/4 94/9
every [5]  14/12 14/12 14/17 14/19 135/21
everybody [16]  5/24 6/17 7/12 12/23 13/1
15/22 20/19 25/2 34/5 56/24 57/1 60/25 64/9
70/2 136/14 136/23
Everybody was [1]  20/19
Everybody's [1]  24/13
everyone [2]  38/16 136/7
everything [4]  28/18 31/2 34/25 114/3
evidence [39]
evolution [1]  135/15
exact [6]  29/1 41/24 42/11 48/8 121/24
122/20
exactly [1]  13/25 41/25 60/22
EXAMINATION [4]  11/22 64/13 68/21
105/25
example [3]  10/17 60/2 94/2
except [3]  21/2 25/10 135/3
excuse [9]  45/1 50/2 51/6 52/1 52/1 56/12
57/9 112/4 112/10
excused [2]  62/11 134/7
exhibit [10]  20/17 33/21 34/10 70/19 78/21
79/20 80/25 86/14 92/5 139/4
exhibits [9]  42/15 69/16 70/10 72/14 103/22
127/15 128/3 139/1 139/12
exhibits – [1]  42/15
exist [1]  60/17
existence [2]  61/12 123/15
exists [1]  123/16
experienced [2]  53/11 53/14
expired [2]  122/14 122/15
explain [3]  29/20 30/6 59/17
explain his [1]  30/6
explaining [1]  57/23
explains [1]  46/4
expressed [1]  66/3
extent [1]  60/7
extra [3]  37/11 50/5 51/8

**F**

face-to-face [3]  14/8 14/14 14/25
facility [10]  69/12 71/3 73/5 78/14 78/24
79/4 79/21 80/9 80/18 81/13
fact [12]  7/4 10/21 46/12 54/20 54/23 56/5
70/15 77/10 82/11 91/4 91/15 111/5
fact that [1]  82/11
fact-finder [1]  40/6
factor [1]  65/24
facts [3]  47/6 47/23 130/23
factual [1]  46/14
fair [14]  6/3 7/6 7/7 8/14 9/7 9/12 9/25 10/9

10/12 10/12 10/19 10/24 11/8 11/14
fairly [7]  8/15 73/24 74/7 80/8 80/17 91/22
109/17
fall [1]  34/24
false [1]  84/13
familiar [1]  101/24
far [6]  21/25 50/24 58/10 58/25 105/6 137/4
fast [1]  85/15
fatal [1]  84/3
Fats [1]  30/1
February [4]  120/16 125/5 125/14 125/20
feel [1]  24/18
felon [5]  7/8 7/20 7/21 8/9 8/9
felony [8]  7/4 7/7 7/19 8/7 8/7 8/21 9/9 9/15
felt [1]  87/15
fence [1]  92/17
few [8]  9/6 11/21 64/2 66/9 90/13 106/6
121/25 128/11
few – [1]  128/11
Fifth [1]  1/19
fighting [1]  83/14
figure [4]  3/6 57/25 58/17 61/8
figured [1]  109/13
file [10]  41/12 75/17 76/7 77/22 78/2 82/23
82/25 83/1 103/8 112/12
files [4]  71/11 71/12 86/7 103/17
finally [10]  65/23 73/18 89/7 103/25 104/15
118/6 118/9 129/25 132/19 133/18
find [6]  13/1 16/1 26/13 32/22 123/25 124/2
fine [9]  8/24 27/7 47/16 59/13 63/20 90/16
101/9 112/8 113/16
finish [3]  44/22 97/5 105/10
finished [2]  3/13 18/25
firearm [6]  7/5 7/7 7/9 9/8 9/13 9/16
firearms [1]  64/20
first [37]
first – [3]  70/24 106/10 114/16
firsthand [3]  17/19 76/9 89/14
five [6]  3/23 41/4 47/18 99/1 136/23 136/25
flip-flop [1]  32/6
flip-flopping [1]  32/5
flip-floppy [1]  32/13
floor [7]  2/3 108/3 108/5 110/8 110/20
115/15 115/19
floor – [1]  110/8
flop [1]  19/13
flyer [1]  33/21
flyers [1]  61/1
focus [6]  65/12 65/18 67/6 67/11 107/7
109/14
focused [1]  65/14
folks [3]  24/1 24/2 114/18
follow-up [1]  60/2
followed [4]  107/12 108/2 110/24 114/17
following [3]  84/6 96/24 107/13
food [1]  93/7
food – [1]  93/7
fooled [1]  61/9
foregoing [1]  140/4
form [4]  117/5 118/11 118/22 119/3
formally [2]  65/3 65/9
forth [1]  34/25
found [12]  3/5 8/10 13/2 15/22 31/21 32/18
33/13 66/16 66/20 66/24 124/14 136/10
foundation [6]  63/16 69/21 71/7 72/7 76/3
76/11 123/17 131/8
four [7]  3/22 3/23 71/23 110/8 110/10
110/19 110/25
Fourteen [2]  49/19 50/17
Fourteen grams [2]  49/19 50/17
Fourth [1]  1/16
Francisco [1]  107/18

## C

comes [4]  61/4 63/13 109/17 133/13
coming [11]  31/9 60/25 61/1 62/14 93/3
105/12 111/11 126/2 126/5 130/3 134/24
comment [1]  58/12
commercial [2]  69/7 124/1
committed [1]  67/13
committee [1]  41/12
communications [1]  128/15
company [11]  69/5 69/6 69/7 69/11 71/18
74/18 76/1 80/2 94/8 96/9 124/1
company's [1]  71/12
compare [3]  47/14 123/8 132/17
compared [1]  123/4
comparing [1]  114/15
compatriots [1]  109/17
competed [1]  65/7
competent [1]  136/9
completed [2]  3/10 91/10
completely [1]  22/24
completing [1]  99/20
complex [3]  92/25 108/10 116/3
computer-aided [1]  2/24
Con [1]  92/20
Con't [1]  2/1
concern [1]  76/4
concerned [3]  58/24 62/21 105/6
concerning [1]  46/15
concludes [1]  40/8
conclusion [2]  65/16 123/19
conduct [2]  95/21 124/25
conducting [1]  94/15
conference [8]  7/1 16/4 20/18 31/7 44/11
75/4 82/10 109/6
conferences [1]  85/13
confirm [2]  91/3 91/14
confused [4]  48/19 56/24 57/1 134/20
connect [1]  111/14
connected [1]  111/13
Connecticut [2]  2/6 2/9
connection [6]  65/3 101/17 101/24 108/7
127/1 134/2
considered [1]  99/20
considering [1]  94/16
conspiracies [1]  65/15
conspiracy [1]  7/11
Constitution [1]  2/14
Cont'd [1]  139/12
contained [1]  132/11
containing [1]  66/20
contents [1]  109/2
context [3]  5/18 17/4 22/21
context of [1]  17/4
continue [2]  97/4 115/4
continued [2]  105/25 125/23
continuing [1]  118/21
conversation [42]
conversation — [1]  60/7
conversations [6]  12/15 15/7 21/11 55/13
67/20 77/19
convicted [1]  9/9
conviction [2]  8/18 8/19
convince [1]  30/9
cooperate [2]  65/24 66/4
coordinating [1]  135/9
copies [4]  73/9 76/6 103/17 127/3
copy [6]  3/24 4/9 19/24 71/11 77/23 116/10
corporate [1]  124/1
corporation [1]  39/16
correct [40]
corroborates [1]  6/10

cost [3]  76/16 89/8 89/25
costs [2]  76/17 89/15
could [33]  5/16 6/22 7/8 7/25 8/11 8/25 9/14
9/16 10/5 10/5 10/7 11/15 23/14 24/21 24/24
28/25 29/12 35/6 35/18 38/15 38/15 43/11
45/22 58/2 59/3 62/25 64/5 72/22 81/10
83/22 84/8 95/25 99/8
couldn't [10]  5/8 8/2 21/1 24/16 25/20 35/16
78/5 94/14 123/25 124/2
counsel [2]  134/16 136/23
counsels' [1]  28/14
couple [8]  3/11 9/22 18/1 24/19 37/25 38/4
41/23 121/14
couple — [1]  37/25
course [18]  7/25 71/15 71/17 77/17 80/4
82/23 86/1 103/8 106/11 115/25 119/7
121/10 121/13 124/24 125/3 125/23 126/25
132/10
court [27]  1/1 2/12 2/13 4/10 4/12 9/4 17/23
26/11 27/8 32/25 39/2 39/11 46/20 48/2
59/25 60/18 63/24 69/1 76/3 77/13 85/10
112/9 117/15 131/12 134/20 140/2 140/10
court — [1]  39/2
Court's [5]  39/25 61/14 61/15 88/13 120/10
courtroom [5]  39/14 78/8 79/2 105/18
136/18
cousins [1]  29/10
cover [2]  21/23 23/14
covered [2]  38/2 61/23
crack [2]  37/8 37/13
crazy [1]  45/21
create [2]  47/21 47/25
creates [1]  46/21
credit [3]  70/19 91/9 91/19
crime [1]  67/12
cross [7]  3/10 4/24 26/23 59/4 72/3 80/23
138/3
cross — [1]  26/23
cross-examination [11]  3/7 17/11 28/15 30/7
30/13 40/13 43/17 46/12 66/11 90/9 101/13
crosses [1]  26/24
Crystal [1]  96/5
cumulative [1]  6/14
curious [1]  110/20
current [1]  122/16
custodian [3]  75/24 76/2 117/20
custody [1]  65/10
customary [1]  99/7
customer [2]  37/14 52/24
customers [3]  29/4 29/7 37/4
Customs [1]  95/20
cut [1]  65/25

## D

D.C [19]  1/4 1/17 1/20 2/3 2/7 2/10 2/15
27/12 42/1 106/14 106/19 107/2 116/19
118/7 120/22 124/8 124/10 124/14 136/10
D.C — [1]  124/14
damage [1]  99/13
dash [2]  122/13 122/15
dashboard [1]  122/19
data [1]  124/1
databases [1]  124/1
date [10]  18/18 29/1 36/16 48/8 74/14 88/18
90/17 117/4 117/8 140/8
dated [1]  36/5
dates [2]  35/19 75/16
day [25]  1/6 13/19 13/21 14/12 14/12 14/17
14/19 34/13 34/15 36/21 38/8 38/12 38/14
41/24 42/11 48/9 65/11 68/24 85/14 88/14
115/2 119/12 125/15 130/18 131/5
days [10]  37/2 39/14 41/23 64/5 110/24

114/1 124/24 125/3 125/24 125/25
days — [2]  114/1 124/24
deal [5]  59/14 76/5 80/23 84/13 93/12
dealer [2]  53/11 53/14
dealing [1]  113/9
debris [1]  99/23
decide [1]  40/2
decided [2]  25/8 67/15
decision [13]  65/2 65/5 65/8 65/9 65/25
66/15 67/18 67/24 67/25 68/1 68/2 68/5 68/8
defendant's [1]  2 8/5
Defendant [6]  1/18 2/2 2/5 2/9 13/23 28/8
defendants [1]  1/8
Defendants [1]  1/8
defense [1]  69/18
defer [2]  101/5 101/7
Delaware [3]  119/23 121/23 122/2
delivered [2]  35/7 35/10
Denise [5]  73/7 101/19 104/7 128/10 129/22
depart [1]  119/17
departed [1]  114/24
Department [4]  124/8 127/2 127/18 127/21
departure [1]  99/6
depending [1]  49/5
deposit [3]  99/8 99/12 99/24
Derrick [14]  14/1 8 30/20 30/22 30/23 31/1
31/24 37/15 38/9 38/10 38/12 51/7 51/10
52/19 52/20
Derrick — [1]  51/7
describe [2]  31/20 121/4
described [1]  36/14
desolate [1]  92/23
detail [1]  107/9
details [3]  31/25 32/1 44/8
details — [1]  31/25
detection [1]  19/22
Detective [2]  64/10 114/5
determine [3]  39/22 40/18 41/15
determined [2]  39/11 72/1
developed [1]  109/10
diagram [1]  92/6
did [163]
Did — [1]  67/15
didn't [35]  10/2 20/21 23/7 24/14 25/10
25/16 26/12 26/15 28/9 32/22 40/23 48/11
53/19 55/19 56/3 56/18 58/4 58/13 59/1
59/19 67/18 72/21 75/12 75/21 75/25 78/4
78/6 83/24 85/2 85/3 97/12 110/22 111/22
112/1 117/18
didn't — [1]  24/14
difference [1]  32/7
different [3]  22/24 105/20 122/6
digits [1]  119/25 121/25 122/5
direct [10]  5/3 5/4 25/24 62/18 63/1 64/13
68/21 71/21 105/25 138/3
directed [2]  67/22 135/20
discuss [1]  67/12
discussed [5]  18/2 20/5 22/24 23/13 25/6
discussing [4]  20/13 21/7 21/8 27/19
discussion [18]  13/25 18/9 20/8 20/12 21/5
22/8 23/2 23/16 23/19 24/4 26/11 26/13
26/18 27/10 30/7 107/6 131/11 134/20
discussions [5]  20/22 22/4 25/17 25/18 59/8
distance [1]  130/21
district [7]  1/1 1/1 1/12 2/13 2/13 7/25 8/3
divided [1]  29/23
DMV [3]  110/5 132/15 132/17
do [127]
Docket [1]  1/3
document [10]  17/9 19/22 45/24 46/4 46/6
47/25 85/25 117/6 117/9 122/9
documents [27]  3/18 24/17 45/3 70/12 70/13
70/15 70/17 70/25 70/25 70/25 71/14 71/18

**B**

bad [1] 37/5
bag [2] 36/13 36/14
bags [2] 100/12 100/12
BALAREZO [18] 1/18 29/3 29/6 29/17
 33/20 34/17 35/18 38/16 78/16 84/12 90/12
 101/7 120/8 126/19 136/16 138/8 138/13
 138/16
Balarezo's [1] 30/13
balarezo.net [1] 1/20
barely [1] 4/14
barking [1] 57/16
based [9] 36/16 38/8 39/14 62/16 64/20
 110/6 115/10 115/14 123/14
bases [1] 124/1
basically [12] 10/1 21/13 22/14 23/21 53/5
 53/6 60/1 67/22 92/22 93/24 99/20 128/9
basically — [2] 21/13 92/22
basis [3] 45/18 47/22 81/16
bathroom [1] 111/25
be [84]
be — [2] 24/9 79/6
became [1] 88/9
because [45]
because — [1] 83/15
been [53]
been — [1] 125/8
before [44]
before — [1] 6/23
began [4] 119/12 120/17 120/21 122/4
begging [1] 135/4
begin [1] 12/6
beginning [1] 44/13
begun [1] 106/7
behalf [1] 53/22
behind [1] 87/22
being [12] 4/21 9/13 30/4 30/6 31/14 60/2
 64/7 74/9 84/4 93/18 108/21 131/2
believe [23] 11/4 13/11 18/19 21/4 22/20
 46/21 50/1 65/11 66/7 66/9 66/10 67/4 73/14
 91/6 92/20 101/17 101/18 112/13 125/14
 130/9 130/10 130/20 131/24
believed [1] 39/15
belongs [2] 109/7 110/3
bench [11] 7/1 16/4 20/18 25/21 31/7 44/11
 75/4 80/14 82/10 85/13 109/6
Bermea [1] 16/7
besides [1] 91/15
best [6] 14/7 16/14 26/5 29/12 97/11 97/17
bet [1] 113/13
better [2] 75/19 113/13
between [4] 26/5 51/24 90/1 134/1
Between — [1] 51/24
beyond [6] 22/4 42/22 43/23 54/6 61/12
 96/13
bicycle [2] 93/16 94/2
big [2] 32/7 98/9
bill [1] 89/21
birthday [2] 33/21 34/15
bit [6] 16/5 18/22 22/19 37/22 69/9 71/6
black [1] 109/22
block [5] 121/5 121/6 121/7 121/14 121/18-
Boom [4] 29/22 29/22 30/10 30/11
both [3] 9/23 55/12 113/9
bottom [2] 16/22 49/14
bought [1] 37/4
Boulevard [7] 69/13 70/19 71/3 73/23 79/23
 96/12 106/25
Bowie [5] 106/22 121/8 121/18 124/20
 124/22
box [8] 66/17 66/20 126/8 130/17 132/20

133/9 133/11 133/20
boy [1] 115/21
brain [1] 83/17
Brandywine [4] 129/20 129/20 129/24
 130/2
break [4] 12/6 93/19 112/5 130/3
break-ins [3] 93/15 94/17 95/3
breakfast [3] 38/23 39/4 134/9
BRIAN [7] 2/9 37/16 38/9 38/10 50/3 51/7
 52/17
briefly [3] 10/8 102/17 121/4
bring [7] 4/17 6/15 23/24 63/20 83/23
 112/12 113/20
brochure [1] 70/21
brochures [1] 95/6
broke [4] 34/23 94/3 107/6 125/13
broken [3] 93/17 93/18 94/2
brought [9] 22/10 22/17 31/3 31/17 33/3
 37/5 53/3 85/20 89/3
brown [5] 79/9 116/17 123/12 123/15
 123/21 123/23 123/24 123/25 124/5
building [15] 19/9 70/21 70/22 88/9 92/20
 94/25 95/24 96/11 97/1 114/18 115/8 123/22
 123/23 123/25 133/19
buildings [1] 69/7
bunch [2] 21/1 27/20
business [10] 70/20 71/15 71/18 82/24 83/13
 86/1 87/14 94/15 94/16 103/8
but — [3] 5/22 31/13 76/22
buy [2] 29/25 31/22
BWI [5] 109/18 111/3 119/11 119/14 119/17

**C**

Cadillac [5] 109/22 127/12 128/23 129/1
 129/17
call [22] 12/18 12/21 15/10 15/25 16/13
 16/15 18/16 30/18 35/21 36/7 36/16 36/18
 36/21 38/6 48/19 68/16 106/7 106/12 107/20
 107/22 135/11 136/17
call — [1] 30/18
called [1] 44/7
caller [1] 19/2
calling [1] 91/4
calls [12] 38/8 65/16 68/17 78/13 114/2
 134/22 135/1 135/10 135/16 135/16 135/19
 135/22
calls — [1] 135/22
came [14] 6/21 7/12 25/17 29/21 51/15 86/6
 89/3 89/4 89/5 91/5 91/5 91/9 91/10 117/19
can [94]
can — [2] 21/21 70/1
can't [27] 3/7 4/13 4/23 5/20 11/16 14/1 16/8
 16/15 16/20 16/23 20/24 38/13 44/16 44/18
 45/11 46/14 53/6 55/14 60/16 61/20 63/10
 66/7 75/15 82/11 82/19 128/18 134/25
can't — [2] 16/20 16/23
cans [1] 43/2
Capitol [3] 69/13 91/24 106/24
car [11] 109/7 109/17 109/18 110/1 111/17
 111/18 115/13 118/13 118/17 119/19 119/22
Caravan [1] 119/6
care [2] 53/15 110/16
cares [1] 5/13
Carlos [5] 29/18 29/25 29/25 30/7 30/9
Carolina [7] 30/15 30/21 30/24 31/18 31/19
 42/9 44/9
Carolina — [1] 30/21
cars [1] 108/23
case [10] 4/6 4/9 32/18 53/1 64/6 84/3 127/1
 134/12 136/10 136/11
cases [2] 67/3 136/8
catch [1] 61/3

CD [5] 13/5 18/20 18/24 36/8 36/25
cells [1] 83/17
Center [2] 19/11 96/7
certain [5] 14/5 67/3 67/3 109/11 135/19
certain — [1] 67/3
certainly [3] 84/23 95/13 110/18
CERTIFICATE [1] 140/2
certified [3] 127/3 127/18 127/21
certify [1] 140/4
champagne [1] 118/15
chance [2] 42/20 43/7
charge [3] 8/8 65/3 65/9
charged [9] 7/8 7/11 7/25 8/2 8/11 8/25 9/15
 9/16 9/20
charges [3] 7/5 67/15 67/23
Charlie [1] 123/2
chart [1] 113/22
check [6] 4/19 23/17 91/9 91/15 124/11
 136/2
checked [1] 124/10
Cherokee [3] 118/15 127/6 129/21
Chevy [2] 119/20 120/15
chimed [1] 26/6
choose [3] 20/24 44/16 45/12
chose [1] 46/17
Circle [13] 106/20 107/8 107/10 108/1
 108/10 108/13 110/7 114/14 114/17 115/19
 116/2 117/1 119/3
Circuit [2] 136/10 136/11
circumstances [1] 22/25
claim [2] 10/25 41/20
claimed [1] 54/20
claiming [2] 21/12 21/14
claims [1] 45/24
clarify [2] 59/3 96/23
cleanup [1] 99/21
clear [7] 11/7 11/12 46/5 68/25 113/8 135/2
 137/2
cleared [1] 99/15
clearly [1] 25/19
clerk [1] 68/20
client [15] 20/22 25/1 25/10 25/19 26/11
 26/13 39/9 75/7 75/9 75/11 79/13 84/14
 84/23 84/25 134/1
client's [1] 113/11
climb [1] 34/25
close-up [1] 133/10
closer [1] 69/9
closet [4] 34/18 34/23 66/16 66/20
clothes [1] 105/21
clothing [1] 100/2
club [11] 14/10 14/16 14/19 14/20 14/22
 29/18 29/23 48/11 107/2 107/4 133/19
clubs [2] 29/23 29/24
clubs — [1] 29/23
clue [1] 84/18
clued [1] 60/8
cocaine [7] 28/4 32/20 32/21 33/12 33/19
 49/24 64/20
cocaine — [1] 32/20
coconspirators [1] 31/16
cocounsel [1] 59/4
codefendants [1] 20/6
coke [1] 51/15
collaborative [1] 67/24
color [4] 118/15 129/1 129/3 129/5
COLUMBIA [2] 1/1 2/13
combined [1] 93/22
come [22] 5/12 7/15 22/2 26/17 26/25 42/18
 51/11 51/12 71/1 80/4 82/25 88/7 89/2 97/8
 107/13 112/16 112/20 114/1 114/18 119/13
 123/3 134/22

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

Case 1:07-cv-01193-RJL    Document 1-3    Filed 06/29/2007    Page 1 of 2

F
07 1193
RJL

## I (a) PLAINTIFFS

LAWRENCE MAYNARD

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

PRO SE PR

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

#307 469

## DEFENDANTS

STEPHANIE E XANTA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:07-cv-01193
Assigned To : Leon, Richard J.
Assign. Date : 6/29/2007
Description: Pro Se Gen. Civil

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZ

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ■ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☒ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Selzure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

**No Summons Issued**

| ☐ **G. Habeas Corpus/ 2255** | ☐ **H. Employment Discrimination** | ☐ **I. FOIA/PRIVACY ACT** | ☐ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |
| ☐ **K. Labor/ERISA (non-employment)** | ☐ **L. Other Civil Rights (non-employment)** | ☐ **M. Contract** | ☐ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

● 1 Original
Proceeding
☐ 2 Removed
from State
Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated
or Reopened
☐ 5 Transferred from
another district
(specify)
☐ Multi district
Litigation
☐ 7 Appeal to
District Judge
from Mag.
Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*42 USC 1983*

**VII. REQUESTED IN
COMPLAINT**
CHECK IF THIS IS A CLASS ☐
ACTION UNDER F.R.C.P. 23
**DEMAND $**
Check YES only if demanded in complaint
**JURY DEMAND:** ☐ YES ● NO

**VIII. RELATED CASE(S)
IF ANY**
(See instruction)
☐ YES ● NO
If yes, please complete related case form.

DATE *6.29.07*   SIGNATURE OF ATTORNEY OF RECORD   *NCD*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

